**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

GLOBAL PLASMA SOLUTIONS, INC.,
*Plaintiff*,
v.                                              CIVIL ACTION NO.21-cv-00884-D
D ZINE PARTNERS, LLC and                        JURY TRIAL DEMANDED
MARWA ZAATARI
*Defendants*.

## DEFENDANTS' VERIFIED APPLICATION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF

COMES NOW, D ZINE PARTNERS, LLC ("D Zine") and MARWA ZAATARI ("Dr. Zaatari") collectively referred to as "Defendants" herein, and files this their Defendants' Verified Application for Temporary Restraining Order ("TRO") and Injunctive Relief Pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, which is made subject to and without waiver of Defendants' previously filed Motion to Dismiss Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure as to Plaintiff Global Plasma Solutions, Inc. ("GPS"), Original Complaint, which is currently before this court or of any waiver to later allege a cause of action under the Texas Citizens Participation Act should the Fifth Circuit decide that the 2019 amendment to the act made same statutory rather than procedural and thus allowable in Federal practice. In support thereof, Defendants would respectfully show unto the Court as follows:

## I.     INTRODUCTION

1.     Plaintiff GPS begins their flagrant slap suit with a colorful narrative depicting GPS as a victim and the collective Defendants as a money hungry aggressor spreading a reckless campaign starting in January 2021. Plaintiff's narrative cannot be further from the truth.

2.     Plaintiff's suit is a further attempt to attack Dr. Zaatari, smear her name and discredit her respectable work as a member of the American Society of Heating, Refrigerating and Air-Conditioning Engineers' ("ASHRAE") Standing Standard Project Committee 62.1.

3.      From 2016 and continuing even after filing their slap suit, GPS has engaged in a slew of personal and professional attacks on Dr. Zaatari in an attempt to buy her off, shut her up and discredit her career to prevent ASHRAE from improving their indoor air quality standards and making the requirements more stringent.

4.      While the science is still up for debate, GPS has marketed their products beyond what science will allow and as a result they are attempting to suppress scientists like Dr. Zaatari, that interpret the science, who have differing views.[1]

5.      Defendants believe that after this court understands the full facts that this court will not only see GPS as the aggressor but will also issue a TRO to stop the improper conduct of GPS and to prevent Defendants from suffering immediate and irreparable injury.

## II.      BACKGROUND FACTS

6.      Dr. Marwa Zaatari is Chief Science Officer at D Zine Partners, LLC. *See* Appendix A at 1. She leads the research development of "Air as a Service" around heat exchanger coils, ventilation, filters, and IAQ measurements to design and operate buildings for optimal energy and people efficiency. *See* Appendix A at 1. Dr. Zaatari has extensive experience in identifying and quantifying the sources, fate, and transport of indoor air pollutants, building energy and environmental management, assessing performance-based procedures of HVAC ventilation and air cleaning, and developing and applying models for energy efficiency, indoor air quality, exposure assessment, and economic impacts of indoor air pollution. *See* Appendix A at 1, 2.

7.      Dr. Zaatari earned a PhD in Civil Engineering from the Department of Civil, Architectural, and Environmental Engineering from the University of Texas at Austin with a focus on energy efficiency and indoor air quality in the built environment and a master's degree

---

[1] https://www.bloomberglaw.com/public/desktop/document/vGarneretalDocketNo121cv00665DDelMay072021CourtDocket?1620880435

in engineering management from The American University of Beirut, Lebanon with a focus on energy management. *See* Appendix A at 1. Dr. Zaatari is an ASHRAE Distinguished Lecturer and a member of several ASHRAE Committees, a member of the ASHRAE Epidemic task force, Voting Member of Standard 62.1, Chair for TRG4 Indoor Air Quality Procedure, Vice Chair of MTG.HWBE Health and Wellness in the built environment, Vice Chair of TC2.3 gaseous removal contaminants, Voting Member Standard 145.2 laboratory test method for gasphase air cleaning systems, IAQ2020 Conference organizer, LEED Committee member, and ex-Chair of LEED IAQP Working Group. *See* Appendix A at 2.

8.      D Zine is a Nationwide Boutique Design Firm Dedicated to Delivering Performance-Based Solutions that Achieves Your Indoor Air Quality and Energy Efficiency Goals. *See* Appendix B at 5.



9.      D Zine does not use a limited number of products or services but uses those that are right for its customers. *See.* Appendix B at 7. D Zine simply states that "Our mission is to advance the built environment through expertise in design, implementation and verification. *Id.* We don't

believe in one size fits all approach. *Id.* We lead by design to implement the best solutions within your budget." *Id*.



10.     Although D Zine was founded in November 2, 2020, Zaatari had been on the receiving end of GPS' ire long before. *See* Appendix A at 2, 3.

11.     In 2016, American Society of Heating and Air-Conditioning Engineers ("ASHRAE") assembled knowledgeable members of ASHRAE to assemble a Standing Standard Project Committee to conduct its regular update on internal standards. *See* Appendix A at 2. Once such committee was led by Committee Chair Don Brundage relating to update of standards for Acceptable Indoor Air Quality Ventilation ("62.1 Committee"). *See* Appendix G at 74, 75. Dr. Zaatari was asked to work in this committee as a committee member because of her vast experience and depth of knowledge on the topic. *See* Appendix A at 1, 2.

12.     The 62.1 Committee conducted an in-depth investigation into the current and emerging technologies in the industry coupled with relevant concerns to increase quality standards and therefore resolved to strengthen the standards regulating the indoor air quality standards for

ASHRAE. *Id.* These initial 62.1 Committee's efforts were submitted as proposals for a series of reviews by other ASHRAE members. *See* Appendix A at 1,2, C at 12-16, D at 17-24, E at 25-33, and F at 34-61.

13.     GPS fervently objected the 62.1 Committee's proposals during subcommittee and asked the committee to either reject the proposals or delay voting on the resolutions. *See* Appendix G at 62-76.

14.     During a series of four public review sessions GPS was an outspoken critic of the increase of quality standards largely because GPS sells an emerging technology that would fail the new quality standards if adopted. *See* Appendix G at 62 -64, 70-73, 74-76. GPS clogged up the review process by submitting duplicate comments whose substance had previously been answered in the initial review. *See* Appendix C at 12-16, D at 17-24, E at 25-33 and F at 34-61. GPS further used the comment process to make personal attacks on Dr. Zaatari. *See* Appendix A at 1-3 and E at 33, G at 62, 64, 70-73, and 75. GPS questioned Dr. Zaatari's ethics and claimed that she had "extreme bias". *Id.*

15.     On May 14, 2019, Charles Waddell, Founder & CTO at Global Plasma Solutions, further engaged in a campaign of baseless personal attacks against Dr. Zaatari demonstrating a clear intent to damage her professional reputation, including accusing her of "hijacking" the 62.1 Committee and engaging in "unethical" and "deceptive" conduct in written correspondence directed to more than 150 members of the ASHRAE community. *See* Appendix G at 63-69.

16.     In July of 2019, Dr. Zattari was forced to send GPS an immediate cease and desist letter for the continual defamatory statements made about Defendant Zaatari. *See* Appendix H at 77-78.

17.     GPS continued their aggressive suppression campaign against those that disagree with GPS by emailing ASHAE members and guest speakers asking them to stop sharing unfavorable articles and suing speakers if they do not comply. *See* Appendix G at 74-76.

18.     Despite previously attacking Dr. Zaatari's for questionable ethics and professional bias, GPS praised Dr. Zaatari and then attempted to hire her as a consultant on March 20, 2021. See Appendix J at 80-81. Glenn Brinckman, Chief Executive Officer at Global Plasma Solutions said "I would love to bring you [Dr. Zaatari] into our research efforts and support our science advisory board" in an attempt to buy her off. *Id.* This email further stated that she would "not be disappointed", that GPS "would even compensate you [Dr. Zaatari] for a trip to Charlotte and your time for consultation" and that "I believe this would be so much more productive than the constant webinar wars and social media post attacks". *Id.*

19.     On April 12, 2021, a collaboration of experts, including Dr. Zaatari, drafted an open letter to address the use of electronic air cleaning equipment in buildings. *See* Appendix K at 82-93.

20.     In an effort to suppress Defendants' opinions and analysis of data, Plaintiff called and emailed Defendants' speaking engagements in an effort to interfere with them going forward. *See* Appendix A at 2-3, Appendix A at 2-3 and *See* Appendix M at 155-157. GPS promoted a "Use Letter" campaign accusing Dr. Zaatari of engaging in "reckless campaign by competitors of GPS" and spreading "false and misleading statements to advance the false narrative". *See* Appendix L at 96-154 and Appendix M at 155-157. On April 21,2021, GPS wrote a scathing email to the board of governors of ASHRAE writing them in an effort to cancel Dr. Zaatari's April speaking engagement and attacked Dr. Zaatari's work as "spreading unlawful, false and defamatory statements regarding ionization technology" and she was getting a "wrongful competitive advantage" and that she was engaged in an "unlawful smear campaign" *See* M at 155-258. In this letter to ASHRAE, GPS proffered this lawsuit with all exhibits as definitive

proof of their allegations. *Id.*  GPS' intentional acts have resulted in Dr. Zaatari losing her scheduled ASHRAE presentation for the months of April and May. *See* Appendix A at 2, 3, Appendix M at 155-157, and Appendix N at 259-263.

21.     In addition to interfering with Defendants' business relationships, GPS filed this lawsuit, participated in an active add campaign advertising the lawsuit, sent a response letter further attacking Dr. Zaatari's professional integrity while alleging competitive motives and finally calling and threatening organizations if speaking events are not canceled.  *See* Appendix A at 2,3, Appendix L at 96-154, and Appendix M at 155-258. By attaching this lawsuit to these letters attacking Defendants, GPS is making affirmations of truth when the truth of those statements have not been determined by this court. *See* Appendix M at 155-258.

22.     Defendants' current attorneys also sent out a second cease and decease to GPS due to their failure to stop their aggressive behavior. *See* Appendix A at 3, and Appendix O at 264, 265.

23.     As a direct result of Plaintiff's actions to interfere with Dr. Zaatari's personal and professional relationships Dr. Zaatari has suffered and will continue to suffer harm and irreparable damage to her business and reputation. *See* Appendix A at 2-3

### III.   <u>INJUNCTIVE RELIEF</u>

24.     Subject to and without waiving the Defendants' previously filed Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(6) as to Plaintiff Global Plasma Solutions, Inc. ("GPS"), Original Complaint or any waiver to later allege a cause of action under the Texas Citizens Participation Act Defendants request injunctive relief, Paragraphs 1 through 23 are incorporated herein for all purposes.

25.     In light of the above-described facts, Defendants seeks injunctive relief from Plaintiff. The nature of the lawsuit is one of defamation, business disparagement, and tortious interference with prospective business.

26.     Trial court may grant preliminary injunction if the party seeking it shows (1) substantial likelihood of prevailing on merits, (2) irreparable harm in absence of injunction, (3) proof that threatened harm outweighs any damage injunction may cause to party opposing it, and (4) that injunction, if issued, will not be adverse to public interest; where movant establishes second, third and fourth factors, then first factor is relaxed to require only that movant raise questions so serious, substantial, difficult, and doubtful as to make them fair ground for litigation and thus far more deliberate inquiry. *See Haynes v. Office of the AG*, 298 F. Supp. 2d 1154, 2003 U.S. Dist. LEXIS 23573 (D. Kan. 2003).

27.     Defendants are likely to succeed on the merits of this lawsuit because the claims Plaintiff brought against Defendants were brought to stifle Defendants' rights: (1) to free speech; (2) to petition; and/or (3) of association. Plaintiff had sought to attack Defendants and dismantle their credibility.

28.     Preliminary injunction is warranted where public interest lies with protection of First Amendment rights, and issuance of preliminary injunction will serve that end while at the same time will not cause substantial harm to others. *Combs v. United States*, 490 F. Supp. 19, 45 (E.D. Ky. 1978).

29.     Unless this Court immediately restrains Plaintiff, Defendants will suffer immediate and irreparable injury, for which there is not adequate remedy at law to give Defendants complete, final and equitable relief.  Defendants has already lost three speaking presentations, but if injunctive relief is not granted there will be more speaking presentations canceled and loss of credibility in Dr. Zaatari's profession and future consulting relationships. The purpose of an injunction is to prevent future violations, *Swift & Co. v. United States*, 276 U.S. 311, 326 (1928), and, of course, it can be utilized even without a showing of past wrongs. But the moving party must satisfy the court that relief is needed. The necessary determination is that there exists some

cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive. *See United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953).

30.    If an injunctive relief is issued by this court, it will not be adverse to public interests and that threatened harm outweighs any damage injunction may cause to the party opposing it.

31.    Defendants have no choice but to seek to enjoin GPS from contacting individuals or organization where Defendants have speaking engagements, publicizing this lawsuit, or disparaging Defendants and Defendants respectfully request injunctive relief from this Court.

### IV.    CAUSES OF ACTIONS

#### A.    Defamation

32.    Paragraphs 1 through 31 are incorporated herein for all purposes.

33.    Plaintiff has engaged in systemic personal and professional attacks that surpasses permissible in public debate.

34.    To state a defamation claim, a Defendant must show (1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the Defendant, (3) with the requisite degree of fault, at least amounting to negligence, and (4) damages, in some cases. *Innovative Block of S. Tex., Ltd.*, 603 S.W.3d 409, 417 (Tex., 2020). A defamatory statement is one that "tends [ ] to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement (Second) of Torts § 559 (Am. L. Inst. 1977); *see also Hancock v. Variyam*, 400 S.W.3d 59, 63 (Tex. 2013) (defining defamation "as the invasion of a person's interest in her reputation and good name"). For a statement to be actionable, a reasonable fact-finder must be able to conclude that the statement implies an assertion of fact. *Milkovich*, 497 U.S. at 20–21; *see Bentley*, 94 S.W.3d at 579; *Gaylord Broad. Co. v. Francis*, 7 S.W.3d 279, 284 (Tex.App.—Dallas 1999), *pet. denied*, 35 S.W.3d 599 (Tex.2000). To make this determination, the court must look at the entire

context in which the statement was made. *See Scripps NP Oper., LLC v. Carter*, 573 S.W.3d 781, 795 (Tex.2019); *Bentley*, 94 S.W.3d at 581.

35.    GPS published a false statement of fact to the public comment section of ASHRAE (Appendix E), over 150 members of ASHRAE (Appendix G, Appendix L, and Appendix M), countless third-party individuals and businesses to whom GPS sent out the Use Letter (*Id.*) and the Board of Governors of ASHRAE (*Id.*). In the 3rd public review, GPS questioned Dr. Zaatari's ethics and claimed that she had "extreme bias". *See* Appendix A and E. GPS attempted to publicly shamed Dr. Zaatari by stating she was "hijacking" the 62.1 Committee and engaging in "unethical" and "deceptive" conduct in written correspondence directed to more than 150 members of the ASHRAE community. *See* Appendix A and Appendix G. In the letter titled "The Use of GPS Needlepoint Bipolar Ionization Equipment in Buildings", GPS specifically intended to address the Open Letter distributed by Dr. Zaatari and Dr. Marcel Harmon among others and attacks Dr. Zaatari's professional competency, competitive motives and questionable integrity of testing methods. *See* Appendix L.  All such statements were not true. *Id.* Further, GPS continued the same defamatory comments in the letter to the board of governors. Appendix M.

36.    GPS either new or should have known that the comments, published to prevent Defendants' speaking engagements, to peers, customers and colleagues would cause harm to Defendants. This fault amounts to negligence at the very least. *See* Appendix A, Appendix E, Appendix G, Appendix L, and Appendix M.

37.    As a direct result of GPS contacting the board of governors Dr. Zaatari lost her scheduled ASHRAE presentation for the months of April and May. *See* Appendix A. Since filing this suit, GPS has caused Defendants' loss of at least three speaking engagements that were previously scheduled all of which have been a direct result of GPS exercising improper pressure. See Appendix A and Appendix N. By GPS publishing this lawsuit and derogatory false statements to

Defendant's speaking engagements, peers, customers and colleagues would cause harm to the reputation of Defendants and has hindered the prospects for future business and speaking engagements. *See* Appendix A and Appendix L, and Appendix M.

### B. Business Disparagement

38. Paragraphs 1 through 37 are incorporated herein for all purposes.

39. Defendants further allege that Plaintiff has engaged in actionable business disparagement. The tort of business disparagement encompasses falsehoods concerning the condition or quality of a business's products or services that are intended to, and do in fact, cause financial harm. *See* RESTATEMENT (SECOND) OF TORTS § 629. Its elements are more stringent than those of defamation because business disparagement protects against pecuniary loss. *See Hurlbut v. Gulf Atl. Life Ins*., 749 S.W.2d 762, 766 (Tex. 1987). The focus of the cause of action lies on recompensing pecuniary loss. *See Innovative Block of S. Tex., Ltd*., 603 S.W.3d 409, 417 (Tex., 2020). The elements of the claim are 1) the existence of a false statement, 2) published with malice, 3) with the intent that it causes pecuniary loss or the reasonable recognition that it will cause such loss, and 4) actual pecuniary loss, or special damages, resulting from it. *Id.*

40. Malice is established when the perpetrator knew of the falsity or acted with reckless disregard concerning it, or if he acted with ill will or intended to interfere in the economic interest of the other party in an unprivileged fashion. *See* RESTATEMENT (SECOND) OF TORTS § 623A, cmt.g (1977)); *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003).

41. GPS published a false statement of fact to the public comment section of ASHRAE (see Appendices A-N), over 150 members of ASHRAE, countless third-party individuals and businesses to whom GPS sent out the Use Letter, (see Appendix L), and the Board of Governors of ASHRAE letter. *See* Appendix M. In the 3rd public review, GPS questioned Dr. Zaatari's

ethics and claimed that she had "extreme bias". *See* Appendix E. GPS attempted to publicly shame Dr. Zaatari by stating she was "hijacking" the 62.1 Committee and engaging in "unethical" and "deceptive" conduct in written correspondence directed to more than 150 members of the ASHRAE community. *See* Appendix G. In the letter titled "The Use of GPS Needlepoint Bipolar Ionization Equipment in Buildings," GPS specifically intended to address the Open Letter distributed by Dr. Zaatari and Dr. Marcel Harmon among others and attacked Dr. Zaatari's professional competency, competitive motives and questionable integrity of testing methods. *See* Appendix LBy claiming that Dr. Zaatari and D Zine were "spreading unlawful, false and defamatory statement", to obtain a "wrongful competitive advantage", and by using the legal petition to perpetuate a false narrative to the Board of Governors of ASHRAE GPS published a false statement of fact. *See* Appendix M. All such statements were not true. See Appendix A.

42.    Plaintiff published its statements with malice. Plaintiff deliberately sought out forums to discredit Dr. Zaatari and D Zine. See Appendix L and Appendix M. In the 62.1 Committee public comment section of ASHRAE GPS addressed Dr. Zaatari by name and made accusations that there was "extreme bias" and "perceived ethical conflicts of interest". *See* Appendix E.  GPS knew or acted with reckless disregard in making these statements and make those comments with ill will and deliberately intended to interfere in the economic interest of Defendants in an unprivileged fashion. GPS attempted to publicly shame Dr. Zaatari by stating she was "hijacking" the 62.1 Committee and engaging in "unethical" and "deceptive" conduct in written correspondence directed to more than 150 members of the ASHRAE community. *See* Appendix G. By sending out said email to so many parties GPS knew or acted with reckless disregard in making the harmful statements and made those comments with ill will and deliberately intended to interfere in the economic interest of Defendants in an unprivileged fashion. GPS sought a

greater visibility with their Use Letter when they questioned the professional competency, competitive motives and questionable integrity of testing methods of Dr. Zaatari. *See* Appendix L. By publicly shaming Defendants in GPS' Use Letter GPS knew or acted with reckless disregard in making the harmful statements and made those comments with ill will and deliberately intended to interfere in the economic interest of Defendants in an unprivileged fashion. *See* Appendix L. By claiming that Dr. Zaatari and D Zine were "spreading unlawful, false and defamatory statement, to obtain a "wrongful competitive advantage", and by using the legal petition to perpetuate a false narrative to the Board of Governors of ASHRAE GPS published a false statement of fact. *See* Appendix M.

43.     The attacks on the Defendants were made by GPS with deliberate intent or reasonable recognition that their conduct would cause pecuniary loss to Defendants.  Dr. Zattari had built her career on integrity and competency in her field. *See* Exhibit A. As a consultant her clients trust her reputation and her skill to give them good advice. *See* Exhibit A. By GPS actively attacking Dr. Zaatari's ethical integrity and professional competency GPS has jeopardized the economic livelihood of Dr. Zaatari and D Zine *See* Appendix A, Appendix E, Appendix G, Appendix L and Appendix M. GPS demonstrated its intent and reasonable recognition by targeting Defendants' current and potential clients. *Id.* If GPS scares off Dr. Zaatari's speaking engagements, peers, customers and colleagues and convinces them into not working with her and D Zine or if the reckless claims made by GPS are believed then Defendants have and will suffer irreparable harm and pecuniary loss.

44.     The consequences of the aggressive smear campaign have already produced poisonous fruit resulting in pecuniary loss and special damages. GPS pressured the board of governors to first cancel the scheduled presentation for April then cancel the one scheduled for May. Appendix A and Appendix N. The longer GPS is allowed to continue smearing Defendants

without consequence the more irreparable harm Defendants will suffer. The full extent of the harm is unknown, but the Defendants are aware of the special damages of at least three speaking engagements that were previously scheduled but did not or will not occur as direct result of GPS exercising improper pressure. *See* Appendix A, Appendix L, Appendix M and Appendix N.

### C.   Tortious Interference with Existing and/or Prospective Business (Texas Law)

45.    Paragraphs 1 through 44 are incorporated herein for all purposes.

46.    Plaintiff has engaged in Tortious Interference with existing and/or future business relationships. To prove an action for tortious interference with an existing contract, the plaintiff must show it had a valid contract. *Juliette Fowler Homes, Inc. v. Welch Assocs.*, 793 S.W.2d 660, 664 (Tex.1990); the plaintiff must establish the defendant committed a willful and intentional act of interference; *Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 926–27 (Tex.1993); the plaintiff must establish the defendant either (A) had actual knowledge of the contract and of the plaintiff's interest in it or (B) had knowledge of facts and circumstances that would lead a reasonable person to believe there was a contract in which the plaintiff had an interest; *Crossroads Hospice, Inc. v. FC Compassus, LLC*, S.W.3d __ , 2020 WL 1264188 (Tex.App.—Houston [1st Dist.] 2020, no pet.) (No. 01-19-00008-CV; 3-17-20); the plaintiff must show the defendant interfered with the plaintiff's contract. *Fluor Enters. v. Conex Int'l*, 273 S.W.3d 426, 442 (Tex.App.—Beaumont 2008, pet. denied); and the plaintiff must establish the defendant's interference proximately caused the plaintiff's injury. *Immobiliere Jeuness Establissement v. Amegy Bank*, 525 S.W.3d 875, 880 (Tex.App.—Houston [14th Dist.] 2017, no pet.); and the plaintiff must establish the interference caused actual damage or loss. *See, Turner v. KTRK TV, Inc.*, 38 S.W.3d 103 (Tex.2000).

47.    The elements of the claim of Tortious Interference with Prospective Business (Texas Law) are: 1) a reasonable probability that the plaintiff would have entered into a business

relationship with a third party; 2) the [respondent] either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; 3) the [respondent]'s conduct was independently tortious or unlawful; 4) the interference proximately caused the plaintiff injury; and 5) the [movant] suffered actual damage or loss as a result. *See Coinmach Corp. v. Aspenwood Apt. Corp*., 417 S.W.3d 909, 923 (Tex. 2013); *Batra v. Covenant Health System*, 562 S.W.3d 696, 712 (Tex.Civ.-Amarillo 2018, pet. denied).

48.      Dr. Zaatari has long standing relationships with her clients with both completed binding agreements and the reasonable probability of continued business relationships with such clients and others. ASHRAE is one such business relationship in which Defendants have maintained a business relationship and had scheduled speaking engagements. *See* Appendix A and Appendix N. Defendants had existing business relationship with ASHRAE and were likely to continue this business relationship into the foreseeable future.

49.      Plaintiff either acted with a conscious desire to prevent the relationship with ASHRAE from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct. GPS engaged in a sophisticated smear campaign in which blackballed Dr. Zaatari and others who disagreed with the efficacy of GPS' products.  *See* Appendix A, Appendix E, Appendix G, Appendix I, Appendix L and Appendix M. GPS made false statements about Defendants in a comment section of ASHRAE (Appendix E), it emailed over 150 members of ASHRAE and attacked Defendants (Appendix G), it further emailed countless third-party individuals and businesses within Defendants' circle of clients and colleagues (Appendix I and L.) and used this lawsuit to convince ASHRAE Board of Governors to cancel speaking engagements (Appendix "M"). By GPS targeting Defendants' speaking engagements, peers, customers and colleagues it either acted with conscious desire to prevent relationships from

occurring or knew the interference was substantially certain to occur as a result of their conduct. *See* Appendix A, Appendix L, Appendix M, and Appendix N.

50.     Plaintiff's conduct of attacking Defendants and interfering with Defendants' speaking engagements was independently tortious or unlawful conduct. *Id.* Plaintiff's defamatory remarks are independently tortious and support a claim of tortious interference with prospective business relationships.

51.     Plaintiff's interference with D Zine and Dr. Zaatari's customer relationships are the approximate cause of Defendants' injury. *See* Appendix "A".

52.     This interference has caused Defendants actual damages in excess of the minimal jurisdictional levels of this Court. *Id.*

### D.     Irreparable Injury

53.     Paragraphs 1 through 52 are incorporated herein for all purposes.

54.     Defendants' conduct is jeopardizing Defendants' reputation and good name, and if allowed to proceed, will continue to jeopardize D Zine business and Dr. Zaatari's career.  Such acts have caused and are threatening to cause irreparable harm to D Zine and Dr. Zaatari. Dr. Zaatari has contacted Plaintiff and has requested that they immediately cease and desist making false and defamatory statements regarding. GPS continues to harass and defame D Zine and Dr. Zaatari, especially Dr. Zaatari's work as a member of the ASHRAE Standing Standard Project Committee 62.1.  Specifically referencing public statements accusing Dr. Zaatari of engaging in unethical and anti-competitive conduct as a 62.1 Committee member have no basis in law or fact and have caused Dr. Zaatari significant harm, including damage to her professional reputation. *See* Appendix A, Appendix G, Appendix L, Appendix M and Appendix N.

55.     Unless the acts of GPS of which Defendants complain above are restrained and enjoined by this Court, GPS will continue and will cause further irreparable injury to D Zine and Dr.

16

Zaatari for which there is no adequate remedy at law. The full extent of the current harm to Defendants is unknown, but the harm to Defendants will only be multiplied by the continued attacks by GPS. *Id.*

56.     Therefore, action by this Court is necessary to prevent the breach of the valid contracts which is presently occurring or is about to occur and to protect prospective business relationships.

## V.     REQUEST FOR TEMPORARY INJUNCTION

57.     Paragraphs 1 through 56 are incorporated herein for all purposes.

58.     In order to preserve the status quo during the pendency of this action, Defendants request that Plaintiff, their officers, agents, servants, employees, attorneys, successors, assigns, related companies, heirs, and all those acting in concert with them, any of them and/or all of them, be temporarily restrained, from either directly or indirectly, be temporarily enjoined from 1) contacting individuals or organization where Defendants have speaking engagements; 2) Publicizing this lawsuit; 3) Making defamatory or disparaging remarks; 4) or otherwise causing financial hardship to Defendants until further litigation has been completed.

59.     Defendants ask the Court to set its verified application for temporary restraining order for a hearing and, after the hearing, issue a temporary restraining order against Plaintiff.

## VI.     BOND

60.     Defendants are willing to post a reasonable temporary restraining bond and requests that the court to set such bond.  However, Defendants urge the Court that an extremely inexpensive bond is all that the circumstances of this case require as the only remedy being sought is to maintain the status quo and to prevent additional harm.

61.     Defendants request a bond of $100.00 or less as determined by the Court.

## VII.     REQUEST FOR PRELIMINARY INJUNCTION

62.    Paragraphs 1 through 61 are incorporated herein for all purposes.

63.    Defendants asks the Court to set its application for Preliminary injunction for a hearing and, after the hearing, issue a preliminary injunction against Plaintiff.

### VIII.    REQUEST FOR PERMINANT INJUNCTION

64.    Paragraphs 1 through 63 are incorporated herein for all purposes.

65.    Defendants asks the Court to set its request for a permanent injunction for a full trial on the merits and, after the trial, issue a permanent injunction against Plaintiff.

### IX.    CONCLUSION

66.    Plaintiff has caused and likely will continue to cause substantial injury to Defendants' business and personal reputation. Thus, for the above reasons, the Defendants respectfully requests that this Court issue the attached proposed TRO to protect Defendants, Dr. Marwa Zaatari and D Zine Partners, LLC from further injury and help ensure effective relief by this court.

### X.    PRAYER

67.    WHEREFORE PREMISES CONSIDERED, Defendants, D ZINE PARTNERS, LLC and DR. MARWA ZAATARI, respectfully requests the following:

    a.  Temporary restraining order;

        i. That Plaintiff, their officers, agents, servants, employees, attorneys, successors, assigns, related companies, heirs, and all those acting in concert with them, any of them and/or all of them, be temporarily restrained, from either directly or indirectly, contacting individuals or organization where Defendants have speaking engagements.

ii.  That Plaintiff, their officers, agents, servants, employees, attorneys, successors, assigns, related companies, heirs, and all those acting in concert with them, any of them and/or all of them, be temporarily restrained, from either directly or indirectly, publicizing this lawsuit or sending it to or contacting individuals or organizations in the relevant scientific community.

iii.  That Plaintiff, their officers, agents, servants, employees, attorneys, successors, assigns, related companies, heirs, and all those acting in concert with them, any of them and/or all of them, be temporarily restrained, from either directly or indirectly disparaging Defendants.

iv.  otherwise causing financial hardship to Defendants

b.  Any further appropriate declarations that the Court declares necessary, including the Temporary Restraining order,

c.  That the Court grant Defendants a Temporary injunction;

d.  That the Court grant Defendants a Permanent injunction;

e.  That the Court grant Defendants actual damages and additional damages in an amount in excess of the minimal jurisdictional level of this Court;

f.  That the Court grant Defendants prejudgment and post judgment interest;

g.  That the Court grant Defendants exemplary damages as may be allowed by law;

h.  That the Court grant Defendants costs incurred in this action, and all other relief as this Court may deem appropriate.

Respectfully submitted,

THE LAW OFFICE OF
PAUL M. SULLIVAN, PLLC

19

Paul M. Sullivan
Texas Bar No. 24102546
paul.sullivan@psullivanlawfirm.com
5111 Center Street
Houston, Texas 77007
*Tel.* (713) 869-1155
*Fax. (281) 783-2220*

THE ESSMYER LAW FIRM

*/s/ Michael M. Essmyer, Sr.*
MICHAEL M. ESSMYER, Sr.
State Bar No. 06672400
messmyer@essmyerlaw.com
5111 Center Street
Houston, Texas 77007
(713) 869-1155 Telephone
(713) 869-8659 Facsimile

**ATTORNEYS FOR DEFENDANTS**

**<u>CERTIFICATE OF CONFERENCE</u>**

On Friday the 13th day of May, a cease-and-desist letter was sent by Defendants' counsel Michael M. Essmyer, Sr. to all counsel for GPS allowing that if GPS did not agree to stop making disparaging, tortious remarks about Defendants and stop trying to block Defendants' speaking engagements that otherwise an injunctive action would be filed against GPS. On Tuesday, May 18, 2021 I, Michael M. Essmyer, Sr. called GPS counsel Justin Optiz at McGuire Woods and discussed the Defendants' proposed Temporary Restraining Order. Further, on Tuesday, May 18, 2021 I also sent a draft TRO to counsel for GPS Justin Optiz and discussions with him and other counsel for GPS in an attempt to reach some stipulated agreement. No agreement could be reached between the parties, and, as of May 25, 2021. GPS opposes this Motion for Temporary Restraining Order.

*/s/ Michael M. Essmyer, Sr.*
Michael M. Essmyer, Sr.

20

## VERIFICATION

Before me, the undersigned notary, on this day personally appeared Marwa Zaatari, the affiant, a person whose identity is known to me. After I administered an oath, affiant testified as follows:

"My name is Marwa Zaatari. I have read the Request for Temporary restraining Order. The facts stated in it in paragraphs six (6) through twenty-three (23) are within my personal knowledge and are true and correct."

_____
Marwa Zaatari

SWORN TO and SUBSCRIBED before me by Marwa Zaatari on May 20, 2021.

JACKIE L. MOORE
Notary Public, State of Texas
Comm. Expires 03-23-2025
Notary ID 125055438

Notary Public in and for
the State of Texas

21

## CERTIFICATE OF SERVICE

COMES NOW, Counsel for Defendants D ZINE PARTNERS and Dr. MARWA ZAATARI and I certify compliance with the Court's procedures. On Wednesday, May 26, 2021, I served copies of the DEFENDANTS' VERIFIED APPLICATION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF on all other parties.

**McGuireWoods LLP**
Justin Opitz
Texas State Bar No. 24051140
Matthew W. Cornelia
Texas State Bar No. 24097534
2000 McKinney Avenue, Suite 1400
Dallas, TX 75201
Tel: (214) 932-6400
Fax: (214) 932-6499
jopitz@mcguirewoods.com
mcornelia@mcguirewoods.com

Robert A. Muckenfuss
North Carolina State Bar No. 28218
Kelly A. Warlich
North Carolina State Bar No. 51053
201 North Tryon Street, Suite 3000
Charlotte, NC 28202
Tel: (704) 343-2000
Fax: (704) 343-2300
rmuckenfuss@mcguirewoods.com
kwarlich@mcguirewoods.com

Lucy Jewett Wheatley
Virginia State Bar No. 77459
800 East Canal Street
Richmond, VA 23219
Tel: (804) 775-4320
Fax: (804) 698-2017
lwheatley@mcguirewoods.com
*Counsel for Plaintiff*
*Global Plasma Solutions, Inc*.

*/s/ Michael M. Essmyer, Sr.*
Michael M. Essmyer, Sr.