## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

GLOBAL PLASMA SOLUTIONS, INC.,
*Plaintiff*,
v.                                                  CIVIL ACTION NO. 3:21-cv-00884-D
D ZINE PARTNERS, LLC and                            JURY TRIAL DEMANDED
MARWA ZAATARI
*Defendants*.

## DEFENDANTS' THIRD MOTION TO DISMISS PURSUANT TO THE PREP ACT AND FEDERAL RULES OF CIVIL PROCEDURE 12(b)(6)

1.      Defendants D Zine Partners, LLC ("D Zine") and Marwa Zaatari ("Zaatari") (collectively, "Defendants") by and through their undersigned attorneys, without waiver of their right to later allege a cause of action under the Texas Citizens Participation Act should the Fifth Circuit decide that the 2019 amendments to the act made same statutory rather than procedural and thus allowable in Federal practice, file this the Defendants' Third Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(6) as to Plaintiff Global Plasma Solutions, Inc.'s ("GPS"), Second  Amended Complaint, and state as follows:

## I.      PROCEDURAL HISTORY

2.      On April 19, 2021, GPS filed its Original Complaint. Dkt. No.1. After service, Defendants timely filed on April 30, 2021, their Rule 12(b)(6) Motion to Dismiss, Dkt. No.14, to the defective GPS Original Complaint. Rather than respond to Defendants' Rule 12(b)(6), on May 21, 2021, GPS filed its First Amended

Complaint. Dkt. No. 21.[1] On May 26, 2021, Defendants filed their Verified Application for Temporary Restraining Order, Dkt. No. 22, and accompanying Appendix, Dkt. No.23. The Court filed the Court's Order requiring that GPS to file a Response to the Verified Application for Temporary Restraining Order by Friday, June 4, 2021, Dkt. No.24. Defendants then filed their Second Rule 12(b)(6) Motion to Dismiss as to GPS' First Amended Complaint. Dkt. No.26. GPS then filed its Reply to Defendants' requested TRO. Dkt. Nos.26 & 27. The Court entered an order denying the requested TRO, Dkt. No.29, and GPS filed GPS' Response to Defendants' Second 12(b)(6). Dkt. No.32. Defendants filed their Reply to the GPS Response to Defendants' Second 12(b)(6), Dkt. No.34; whereupon, GPS filed its Second Amended Complaint and added enVerid Systems Inc., ("enVerid"), as an additional Defendant. Dkt. No.36.[2] EnVerid has not answered as of this date.

## II.   INTRODUCTION

3.     This case under the GPS' Original Complaint, the GPS' First Amended Complaint, and GPS' Second Amended Complaint is nothing more than a thinly

---

[1] While there were approximately 834 changes in the First Amended Complaint as to the GPS Original Complaint according to computer analysis, the main thrust of the First Amended Complaint was to attempt to strengthen the unsupported allegation that Defendants Marwa Zaatari and D Zine Partners, LLC are business competitors to GPS, which, by GPS' own pleading, they are not.

[2] There are 466 total changes in the Second Amended Complaint as to the GPS First Amended Original Complaint according to computer analysis; of which there were 39 deletions. The main thrust of the Second Amended Complaint was to assert that it is really enVerid who is the evil business competitor since Defendants keep pointing out factually that Defendant D Zine is yet to even have customers, much less be a competitor.

vailed slap suit aimed at Defendant Dr. Marwa Zaatari, and it was filed in Federal Court in order to escape the provisions of the Texas Citizens Participation Act, ("TCPA"), also known as the Texas's Anti-SLAPP statute. Tex. Civ. Prac. & Rem. Code § 27.001-.011.[3] The main thrust of the First Amended Complaint was to attempt to strengthen the unsupported allegation that Defendants Marwa Zaatari and D Zine Partners, LLC are business competitors to GPS, which, by GPS' own pleading, they are not. The main thrust of the Second Amended Complaint was to assert that it is really enVerid who is the evil business competitor since Defendants keep pointing out factually that Defendant D Zine is yet to even have customers, much less be a competitor. Here the claims Plaintiff brought especially against Defendant Dr. Marwa Zaatari were brought to stifle her right: (1) to free speech; (2) to petition; and/or (3) of association.[4] While the TCPA may not be applicable, Federal Rules 12 and 56 are as applicable to the Second Amended Complaint, as to the First Amended Complaint, and as to the Original Complaint.

4.      Under 12(b)(6) Plaintiff's Second Amended Complaint, like the First Amended Complaint, and like the Original Complaint, must now "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.*

---

[3] *Klocke v. Watson*, 936 F.3d 240 (5th Cir. 2019).
[4] In actuality, the other Defendants are mere window dressing to stifle Dr. Zaatari's outspoken position on ionization as a COVID-19 deterrent.

*Twombly*, 550 U.S. 544, 570 (2007)); accord *Little v. KPMG LLP*, 575 F.3d 533, 541 (5th Cir. 2009). Thus, to survive a Rule 12(b)(6) motion, the Plaintiff must state a claim that is "plausible on its face." This Plaintiff has not done so. The facts in the Plaintiff's Second Amended Complaint do not "raise a right to relief above the speculative level," and into the 'realm of plausible liability.'" *See Twombly*, 550 U.S. at 555. In other words, the Plaintiff's Second Amended Complaint does not allege enough facts to move past possibility and on to plausibility of "entitlement to relief." *Id.* at 558. Further, Defendants urge that GPS' Complaint(s) is legally barred by the mandates of the Public Readiness and Emergency Preparedness Act (PREP Act).

### III.   SUMMARY OF ARGUMENT

5.     Defendants urge that through Dr. Marwa Zaatari that the PREP Act applies to this case and these Defendants. The PREP Act authorizes the Secretary of the Department of Health and Human Services (Secretary) (HHS) to issue a PREP Act Declaration ("Declaration") that provides immunity from liability for any loss caused, arising out of, relating to, or resulting from administration or use of countermeasures to diseases, threats and conditions determined in the Declaration to constitute a present or credible risk of a future public health emergency. This the Secretary has done, and Defendants urge that this immunity applies in this case and applies as to all asserted causes of action.

6.     Plaintiff also again alleges Federal False Advertising and Unfair Competition (15 U.S.C. § 1125(a)) against Defendants. In so doing, the Plaintiff again fails to assert a cause of action for which relief could be granted. Rule 12(b)(6). Specifically, Plaintiff's Second Amended Complaint does not assert sufficient factual allegations to support Plaintiff's claims against Defendants under the Federal False Advertising and Unfair Competition Act. Plaintiff does not allege, among other deficiencies, that the statements have a "tendency to deceive a substantial segment of its audience," that there is any specific evidence of harm; that the statements are verifiable and "capable of being prove[n] false" by scientific methods,[5] that Defendants are competitors as to a specific product when they are not,[6] or what statutory grounds Plaintiff alleges for attorney fees or exemplary damages. These pleading deficiencies are fatal to Plaintiffs' allegations against Defendants under the Federal False Advertising and Unfair Competition Act.

7.     Plaintiff alleges Defamation under Texas law. In so doing, the Plaintiff fails to assert a cause of action for which relief could be granted. Federal Rules of Civil Procedure 12(b)(6). Specifically, Plaintiff's Second Amended Complaint does not assert sufficient factual allegations to support Plaintiff's Texas Defamation claims of damages caused by the alleged Defamation by Defendants. Plaintiff's

---

[5] Literal falsity requires Plaintiff to allege that "all reasonable experts in the field agree that the representations are false." *Brown v. GNC*, 789 F.3d 505 (4th Cir. 2015).

[6] These Defendants do not design, manufacture or sell ionizers.

Second Amended Complaint actually cites multiple experts in the field that agree with Dr. Zaatari. Plaintiff's Second Amended Complaint does not in the defamation section give the time, date, audience, or exact words of the alleged defamation; it does not separate libel from slander and does not quantify which alleged statements are libel per se.

8.     For a statement to be actionable in defamation, it must expressly or impliedly assert facts that are objectively verifiable. *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 18, 19 (1990); *Bentley v. Bunton*, 94 S.W.3d 561, 580 (Tex.2002); *see Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 639 (Tex.2018). Plaintiff does not categorize which statements can be categorized as fact or non-fact. Plaintiff's Second Amended Complaint does not sufficiently set forth the factual setting in which the statement was made (e.g., political, social, or philosophical debate), the format in which the statement appears (e.g., in a review, editorial, or cartoon), the general tenor of the entire work, and, most particularly, the reasonable expectations of the audience in that particular situation. These pleading deficiencies are fatal to Plaintiffs' Defamation allegations against Defendants.

9.     Plaintiff alleges Business Disparagement under Texas law. In so doing, again the Plaintiff fails to assert a cause of action for which relief could be granted. Rule12(b)(6). Specifically, Plaintiff's Second Amended Complaint does not assert sufficient factual allegations to support Plaintiff's Texas Business Disparagement

6

claims against Defendants. Plaintiff's Second Amended Complaint does not in its pleadings identify the specific words or statements it contends were made by the defendants that causes harm to Plaintiff's economic interests and what that specific harm is. Plaintiff further has not established that the specific published words were false. In a business-disparagement action the Plaintiff must plead and prove that the specific statement was false. *Hurlbut v. Gulf Atl. Life Ins.*, 749 S.W.2d 762, 766 (Tex.1987). Further, proof of special damages is an essential element in a business-disparagement claim—without proof of special damages, there is no claim. *Waste Mgmt. v. Texas Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 155 (Tex.2014). Special damages, (e.g., loss of specific sales), have not been specifically pled.

10.     As to Plaintiff's Exhibit HH, the article attached does not support the theory that Defendant caused the Newark School District to quit using the GPS product, but, as the article relates, it was a class action lawsuit's allegations that caused the concern. Dr. Zataari is mentioned solely as to a previous article that she contributed to in the Kaiser Health News, and it appears GPS, the only responding party, may have introduced that topic. Interestingly, this Newark, is in California and not New Jersey as GPS argued in their first amended complaint at page 21, paragraph 80. Even though, GPS corrected this in the second amended complaint, there is no showing that GPS has any damages from lost profit or revenue at this time, only that the product had been removed from service. It is hard to take their

7

claim seriously when they can't even place the district on a map, and they need our helping hand.

11.     These pleading deficiencies are fatal to Plaintiff's Texas Business Disparagement allegations against Defendants.

12.     Plaintiff alleges Tortious Interference with Prospective Business (Texas Law). In so doing, the Plaintiff fails to assert a cause of action for which relief could be granted. Rule 12(b)(6). Specifically, Plaintiff's Second Amended Complaint does not assert sufficient factual allegations to support Plaintiff's Tortious Interference with Prospective Business claim. For instance, Plaintiff's Second Amended Complaint does not expressly mention with whom the implicated tortious interference of prospective business relationships claim is made. Plaintiff's Second Amended Complaint does not state how the alleged statements, which are not even listed, are not authorized under the commercial speech exemption. Furthermore, conclusory or speculative testimony of lost profits will not support a complaint or judgment. Plaintiff does not allege any specific "independently tortious or unlawful" conduct to support the required elements of the cause of action. These pleading deficiencies are fatal to Plaintiff's Tortious Interference with Prospective Business (Texas Law) allegations against Defendants.

13.     Plaintiff alleges Common Law Unfair Competition. Once again, the Plaintiff fails to assert a cause of action for which relief could be granted. 12(b)(6).

8

Specifically, Plaintiff's Second Amended Complaint does not assert sufficient factual allegations to support Plaintiff's Common Law Unfair Competition claims against Defendants. Plaintiff's Second Amended Complaint does not in its pleadings establish what regulation or statute this particular claim is based upon. The Second Amended Complaint also does not allege "actual malice" as to this allegation as is required. The Second Amended Complaint further alleges no specific damages or actual evil acts of unfair competition. The section does not even establish how they are competitors. These pleading deficiencies are fatal to Plaintiffs' Common Law Unfair Competition allegations against Defendants.

14.     Defendants further contend that Plaintiff's allegations regarding the Plaintiff's alleged right to attorneys' fees and exemplary damages lacks citations to any statute or regulation to support said allegation. Plaintiff further states no specific losses as is required for special damages; and indeed, the Plaintiff states no actual damage or damage amount other than to plead it is over $75,000.00 for jurisdictional purposes.

## IV.    RULE 12(b)(6)

15.     Rule 12(b)(6) allows for dismissal of an action when the claimant has failed to state a claim upon which relief can be granted. The factual allegations supporting the claim "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This "requires more

than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* The Court should not strain to find favorable inferences for the plaintiff or accept "conclusory allegations, unwarranted deductions, or legal conclusions." *R2 Investments LDC v. Phillips*, 401 F.3d 648, 652 (5th Cir. 2005).

16.    If a complaint omits facts concerning pivotal elements of a plaintiff's claim, a court is justified in assuming the non-existence of those facts. *See, e.g., Reneker v. Offill*, No. Civ. A. 3:08-CV-1394-D, 2009 WL 3365616, at *5 (N.D. Tex. October 20, 2009). The sufficiency of Plaintiff's Second Amended Complaint must also be determined by the federal pleading standard, not the Texas state pleading standard. And, in ruling on a Rule 12(b)(6) motion, when there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (pleadings that are "no more than conclusions . . . are not entitled to the assumption of truth").

17.    Plaintiffs' Second Amended Complaint wholly fails to plead sufficient facts to support any of the alleged Plaintiff causes of action. While Plaintiff contends that Defendants contacted GPS's existing and potential customers; Plaintiff fails to list the name of any customer, the date or where the contact occurred – much less what defamatory statement was said. Likewise, Plaintiff pleads that Defendants disparaged Plaintiff at presentations; but again, Plaintiff fails to list the date or where

the exact contact occurred – much less what defamatory statement was said in the presentation.  The causes of action asserted in Plaintiffs' Second Amended Complaint are wholly conclusory. *Twombly*, 550 U.S. at 555.

18.  Furthermore, Dr. Zaatari has no interest in contacting customers looking to purchase ionization technologies. It is her scientific opinion, which is in agreement with national and international regulatory/Standard bodies and prominent indoor air quality academics, that this technology at best does not work and at worse causes harm. Dr. Zaatari does consulting and volunteering work to provide recommendations on proven solutions that will reduce the risk of transmission of COVID. Dr. Zaatari follows the CDC and ASHRAE's recommendation that ionizers are unproven technologies. Thus, she does not recommend ionizers.

## V.  PUBLIC READINESS AND EMERGENCY PREPAREDNESS ACT (PREP ACT) IMMUNITY

19.  The Public Readiness and Emergency Preparedness Act (PREP Act) adds new legal authorities to the Public Health Service (PHS) Act, provides liability immunity related to the manufacture, testing, development, distribution, administration and use of medical countermeasures against chemical, biological, radiological and nuclear agents of terrorism, epidemics, and pandemics, and adds authority to establish a program to compensate eligible individuals who suffer injuries from administration or use of products covered by the PREP Act's immunity provisions.

11

20.     In a declaration effective February 4, 2020 (the HHS Declaration), the Secretary of HHS (the Secretary) invoked the PREP Act and declared Coronavirus Disease 2019 (COVID-19) to be a public health emergency warranting liability protections for covered countermeasures. Under the HHS Declaration and its amendments, covered persons are generally immune from legal liability (Le., they cannot be sued for money damages in court) for losses relating to the administration or use of covered countermeasures against COVID-19.

21.     The PREP Act may thus provide liability immunity for covered persons. Covered persons may include:

> Manufacturers of countermeasures;
> Distributors of countermeasures;
> Program planners, i.e., individuals and entities involved in planning, administering, or supervising programs for distribution of a countermeasure (e.g., State or local governments, Indian tribes, or private sector employers or community groups that establish requirements or provide guidance, technical or scientific advice or assistance, or provide a facility); Qualified persons, i.e., persons who prescribe, administer, or dispense countermeasures such as healthcare and other providers or other categories of persons named in a Declaration, e.g., volunteers; Officials, agents, and employees of any of these entities or persons; and The United States.

22.     Immunity, according to the act, means that courts must dismiss claims brought against any entity or individual covered by the PREP Act. Claims that courts must dismiss include claims for any loss that is related to any stage of design, development, testing, manufacture, labeling, distribution, formulation, labeling, packaging, marketing, promotion, sale, purchase, donation, dispensing, prescribing,

administration, licensing or use of a countermeasure recommended in the act. This includes, but is not limited to, claims for death, physical, mental, or emotional injury, illness, disability, or condition or fear of any such injury, illness, disability, or condition; any need for medical monitoring; or property damage or loss, including business interruption loss.[7]

23.     Dr. Marwa Zaatari is a qualified person, and therefore a covered person, because she is holds a Phd from University of Texas at Austin majoring in Environmental and Water Resources Engineering, she is a member of the ASHRAE Epidemic response team (established to help nationally and internationally deploy technical resources to address the challenges of the current pandemic and future epidemics as it relates to the effects of heating, ventilation, and air-conditioning systems on disease transmission in healthcare facilities, the workplace, home, public and recreational environments) , a member of the Environmental Health Committee, and other several committee related to indoor air quality and tets methods to assess performance of air cleaners. GPS's loss, especially in terms of business interruption fits under the broad definition of "any type of loss" that the PREP Act specifies. Furthermore, the loss GPS speculates has a causal relationship with the "clinical testing/investigation of the covered countermeasure". Therefore, since Marwa

---

[7]The "sole exception" to immunity is when a covered person proximately causes death or serious physical injury to another person through willful misconduct.

Zaatari's open letter and scientific position is a form of such investigation/clinical testing, the Ms. Zaatari, and thus D Zine have immunity under the PREP Act.

24.     The GPS alleged loss has a relationship with the investigation in Marwa Zaatari's covered open letter and statements as a science consultant. The impetus of writing the open letter is to provide guidance to the school administrators on proper and proven solutions that is recommended by the scientific body. After many pleas from the community, teachers, parents, and school administrators, that have been bombarded with "snake-oil" marketing campaigns in an attempt to grab relief aid funds, the scientists in the open letter have a mission to dessiminate where the science stands on proper mitigation measures to reduce the risk of transmission of COVID.  In short, this open letter which was co-authored and co-signed with 12 other prominent academics/scientists is intended to save lives at its core, and encourage schools to use the relief aid funds in proven technologies. The covered countermeasures in question are the "properly sized and maintained ventilation, mechanical filtration, and germicidal ultraviolet light systems that Marwa Zaatari recommended as proven measures for schools and other buildings. These countermeasures fall under the realm of "a qualified pandemic/epidemic product" because they were "developed to diagnose, mitigate, prevent, treat, or cure a pandemic or epidemic" and were "used to limit the harm such pandemic or epidemic might otherwise cause." Furthermore, Marwa Zaatari's open letter and consulting

14

advice serves as a countermeasure because it saves lives and saves critical COVID relief aid dollars that can be used to fund other countermeasures to the pandemic. The same countermeasures mentioned in the open letter can help the larger society such as Hospitals, Offices, Industrial facilities, and their occupants from bad results.. For example, CDC published a study showing that the use of HEPA air cleaners and masks reduced the exposure to SARS-COV-2 by 90%, therefore reducing the likelihood of the uninfected individuals to get sick with COVID. https://www.cdc.gov/mmwr/volumes/70/wr/mm7027e1.htm

  25.  Thus, Marwa Zaatari meets all four checkpoints necessary to receive her immunity under the PREP Act, and thus immunity likewise for D Zine. She is a covered person because her membership in the ASHRAE Epidemic taskforce response team and as a Chair for the Indoor Air Quality Procedure, which further establish her as a "qualified person." The loss of business claimed by GPS (qualified under "any type of loss") has a causal relationship with the clinical testing/investigation of a covered countermeasure. And the countermeasures investigated and tested (ventilation, mechanical filtration, and UV light systems) by Dr. Zaatari and Dr. Zaatari's reallocation of COVID relief funds are covered because they were created and are used to mitigate and prevent the pandemic spread and limit the harms the COVID-19 pandemic has brought about. Dr Marwa Zaatari, and thus D Zine have immunity under the PREP Act.

15

26.     Counsel for Defendants urge that Federal laws such as the PREP Act preempt state tort laws-as well as other state and federal laws in certain contexts. Preemptive federal legislation displaces state law to alter the usual liability rules or immunize certain individuals from liability. In the PREP Act, Congress made the judgment that, in the context of a public health emergency, immunizing certain persons and entities from liability was necessary to ensure that potentially life-saving countermeasures will be efficiently developed, deployed, and administered. Therefore Counsel urges that this immunity includes all causes of action and loss alleged by GPS.

## VI.   FEDERAL FALSE ADVERTISING AND UNFAIR COMPETITION (15 U.S.C. § 1125(A))

27.     Under the Federal False Advertising and Unfair Competition Act a "commercial advertisement" consists of a representation that is 1) commercial speech, 2) made by the defendant who commercially competes with the plaintiff, 3) for the purpose of influencing consumers "'to buy the defendant's goods or services,'" and 4) is disseminated to the relevant purchasing public to constitute advertising or promotion within that industry. *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379 (5th Cir. 1996).

28.     In its Second Amended Complaint GPS makes generalized, conclusory statements like that found at Paragraph 1 of the Second Amended Complaint that this case, "involves a reckless campaign by industry competitors of GPS," without

16

stating how they are competitors. See likewise paragraph 12. While the Second Amended Complaint at Paragraph 5 states that:

> "enVerid and Zaatari used D Zine to engage customers of GPS and steer them toward enVerid and its products. enVerid and Zaatari targeted (and continue to target) GPS's school district customers and perpetuate the false narrative that GPS's products are somehow unsafe."

29.    Such statement still is no explanation of the exact manner in which they are competitors, or that D Zine is other than a consulting company that does not favor GPS. In fact at paragraph 13 GPS admits that "D Zine a firm that offers indoor air filtration consulting and design services and a competitor to GPS. Zaatari uses D Zine to engage GPS's customers and steer them to enVerid" but that is the job of a consultant, not necessarily a competitor. Defendants urge that being a consultant that is not directing potential customers to GPS but to the best system for that customer, is not being a competitor, but a consultant. Furthermore, the claim is baseless and the plaintiff doesn't provide evidence of steering customers to enVerid.

30.    Here there is no evidence indicating that Defendants uttered misrepresentations to The American Society of Heating, Refrigerating, and Air-Conditioning Engineers (ASHRAE), the U.S. Green Building Council, the academic community, other industry organizations or other industry-sponsored webinars, and online events while attempting to sell Defendants' products. Utterances were purportedly made. Missing though is evidence that any of these entities were consumers of Defendant's products or that Defendants sought to influence them or

17

any consumers to buy its products when the utterances were made. *Seven-Up Co.*, 86 F.3d at 1384 (assessing whether a misrepresentation was uttered in an advertisement or promotion and observing that one issue before it was "whether Coca-Cola's presentation was made 'for the purpose of influencing consumers to buy defendant's goods'").

31.    At most, Defendants allegedly were attempting to dissuade those entities from dealing with Plaintiff, rather than attempting to induce them to buy Defendants' goods. To compound the point, Defendants' do not currently sell any goods or products and have not made any money since its creation. Thus, Plaintiff failed to present a prima facie case on the element of "commercial advertisement".

32.    Furthermore, Plaintiff fails to show how Plaintiff and Defendants are competitors. Plaintiff admits at paragraph eight (8) of the Second Amended Complaint that, "GPS is an innovative company focused on providing consumers with safe and effective air purification products." And admits at paragraph thirteen (13) that, "Zaatari is a partner and, on information and belief, an owner of D Zine, a firm that offers indoor air filtration consulting and design services, and a competitor to GPS." But Plaintiff does not relate how air filtration consulting and design services are competitive to GPS. But being a consultant does not make Defendant Zaatari a "competitor." GPS' own complaint acknowledged Defendant Zaatari as a consultant. Defendant Zaatari, as a consultant, would be able to promote GPS'

products if she believed the scientific evidence supported its safety and effectiveness. She does not have such belief.

33.   Plaintiff, Global Plasma Solutions, Inc., ("GPS"), is a Defendant in a class action case in Delaware: *Garner v. Global Plasma Solutions, Inc.*, Cause Number 21-665-CFC, in the United States District Court for the District of Delaware. There it has filed its own 12(b)(6), a copy of the GPS' 12(b)(6) Initial Brief for informational purposes is attached hereto as Exhibit A. From Exhibit A there seems to be three legal points on which the parties agree:

> 1. Plaintiff GPS cites to numerous sources in GPS' Complaint, including GPS's website. Thus, Defendants can rely on these sources, including anything on a website, in Defendants' motion to dismiss. *See Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993).
>
> 2. If there are competing studies, citing to one or the other is not deceptive.
>
> 3. A court is permitted to find, as a matter of law, that no reasonable consumer could be misled by the challenged advertising." *Pernod Ricard USA LLC v. Bacardi U.S.A., Inc.*, 702 F. Supp. 2d 238, 251 n.19 (D. Del. 2010).

34.   Plaintiff GPS ignores the fact that the law is clear that the publication attacked must contain a false statement of fact to be actionable (under defamation, but without deception Plaintiff has no case under any of its causes of action). *See e.g.*, *Neely v. Wilson*, 418 S.W.3d 52, 62 (Tex. 2014) ("[S]tatements that are not verifiable as false cannot form the basis of a defamation claim."). Thus, a statement that cannot be proved either true or false cannot form the basis of a defamation claim.

19

*See, e.g., Harvest House Publ'rs v. Local Church*, 190 S.W.3d 204, 211-12 (Tex. App.—Houston [1st Dist.] 2006, *pet. denied*).

35.    In the present case GPS has attached cites to verifiable studies that further disagree with the GPS position. These include:

Evaluating a commercially available in-duct bipolar ionization device for pollutant removal and potential byproduct formation." Yicheng Zeng[a] Prashik Manwatkar[a] Aurélie Laguerre[b] Marina Bekea Insung Kang[a] Akram S.Ali[a] Delphine K.Farmer[c] Elliott T.Gall[b] Mohammad Heidarinejad[a] BrentStephens[a].
https://www.sciencedirect.com/science/article/pii/S036013232100158X#!

*Open Letter to Address the Use of Electronic Air Cleaning Equipment in Buildings* (the "Open Letter") on or about April 12, 2021

The May 14, 2021, NBC News article is entitled *Federal Officials Seek Better Rules About Schools' Indoor Air Quality*
*https://www.nbcnews.com/business/business-news/federal-officials-seek-better-rules-about-schools-indoor-air-quality-n1267313*

"How to prevent "Snake Oil" Sales from the IAQ Industry" Webinar on April 15 at 1:00 pm ET with Professor Glenn Morrison, PhD (University of North Carolina at Chapel Hill, Gillings School of Public Health), Mr. Bud Offerman, MSME, PE, CIH (IAQ researcher, sick building investigator, mitigation planner, healthy building design consultant, expert witness), and Mr. Thomas Licker, CEICR, CBRM (division manager of Infection control technologies).
https://vimeo.com/537459733
https://healthyindoors.com/2021/04/how-to-prevent-snake-oil-sales-in-the-iaq-industry/

Zeng Y, Manwatkar P, Laguerre A, et al. Evaluating a commercially available in-duct bipolar ionization device for pollutant removal and potential by product formation. Build Environ 2021; 195: 107750.

Trane Technologies. A Taxonomy of Air-Cleaning Technologies Featuring Bipolar Ionization,

https://www.jp.trane.com/content/dam/Trane/Commercial/global/about-us/wellsphere/Technology
Whitepaper — Bipolar Ionization.pdf (2021, accessed 31 March 2021).

Sleiman M, Fisk WJ. Evaluation of Pollutant Emissions from Portable Air Cleaners. Final Report: Contract №10–320. Berkeley, CA,https://ww2.arb.ca.gov/sites/default/files/classic//research/apr/past/10-320.pdf (2014, accessed 5 April 2021).

Crawford T, Fritz P, Wainman T. Changes in IAQ Caused By Corona Discharge Air Cleaner. ASHRAE J 2018; 64–67.
https://www.nafahq.org/wp-content/uploads/Crawford-Todd.pdf

Gressel MG, Wilder LC. Evaluation of mitigation strategies for reducing formaldehyde concentrations in unoccupied Federal Emergency Management Agency-owned travel trailers. Atlanta, GA,
https://stacks.cdc.gov/view/cdc/26758 (2009).

U.S. Environmental Protection Agency (EPA). Residential Air Cleaners: A Technical Summary, 3rd Edition, Portable Air Cleaners, Furnace and HVAC Filters, www.epa.gov/iaq (2018, accessed 6 April 2021).

Liu W, Huang J, Lin Y, et al. Negative ions offset cardiorespiratory benefits of PM2.5 reduction from residential use of negative ion air purifiers. Indoor Air 2021; 31: 220–228.

Dong W, Liu S, Chu M, et al. Different cardiorespiratory effects of indoor air pollution intervention with ionization air purifier: Findings from a randomized, double-blind crossover study among school children in Beijing. Environ Pollut 2019; 254: 113054.

EMG (Environmental and Modelling Group). EMG: Potential application of air cleaning devices and personal decontamination to manage transmission of COVID-19, 4 November 2020.

U.S. Environmental Protection Agency (EPA). Indoor Air Pollution: An Introduction for Health Professionals | Indoor Air Quality (IAQ) | US EPA, https://www.epa.gov/indoor-air-quality-iaq/indoor-air-pollutionintroduction-health-professionals (accessed 31 March 2021).

U.S. Environmental Protection Agency (EPA). Air Quality Criteria For Ozone and Related Photochemical Oxidants (Final Report, 2006). Washington, DC, https://cfpub.epa.gov/ncea/risk/recordisplay.cfm?deid=149923 (2006, accessed 31 March 2021).

Phaniendra A, Jestadi DB, Periyasamy L. Free Radicals: Properties, Sources, Targets, and Their Implication in Various Diseases. Indian J Clin Biochem 2015; 30: 11–26.

Vallyathan V, Shi X. The role of oxygen free radicals in occupational and environmental lung diseases. Environ Health Perspect 1997; 105: 165–177.

Corsi RL. Assessment of Maximum Ozone Emissions in Residential, Office and School Buildings. Austin, TX, https://corsiairquality.files.wordpress.com/2021/03/assessment-ofmaximum-ozone-emissions-in-residential-office-and-school-buildings-.pdf (2006, accessed 5 April 2021).

ASHRAE. ANSI/ASHRAE Standard 62.1–2019 — Ventilation for Acceptable Indoor Air Quality. Atlanta, GA, https://ashrae.iwrapper.com/ASHRAE_PREVIEW_ONLY_STANDARDS/ST D_62.1_2019 (accessed 5 April 2021).

Wells JR, Schoemaecker C, Carslaw N, et al. Reactive indoor air chemistry and health — A workshop summary. In: International Journal of Hygiene and Environmental Health. Elsevier GmbH, 2017, pp. 1222–1229

Price DJ, Day DA, Pagonis D, et al. Budgets of Organic Carbon Composition and Oxidation in Indoor Air. Environ Sci Technol. Epub ahead of print 2019. DOI: 10.1021/acs.est.9b04689.

Isaacman-VanWertz G, Massoli P, O'Brien R, et al. Chemical evolution of atmospheric organic carbon over multiple generations of oxidation. NatChem 2018; 10: 462–468.

Peng Z, Jimenez JL. Radical chemistry in oxidation flow reactors for atmospheric chemistry research. Chem Soc Rev 2020; 49: 2570–2616.

Daniels SL. Applications of Air Ionization for Control of VOCs and PM X, Paper #918, www.globalplasmasolutions.com (2019, accessed 31 March 2021).

Jiang S-Y, Ma A, Ramachandran S. Negative Air Ions and Their Effects on Human Health and Air Quality Improvement. International Journal of Molecular Sciences ; 19. Epub ahead of print 2018. DOI: 10.3390/ijms19102966.

CDC via ASHRAE. CDC Position on Bipolar Ionization, https://www.ashrae.org/technical-resources/filtrationdisinfection# cdcposition (2020, accessed 31 March 2021).

Alcamí A, del Val M, Hernán M, et al. Scientific report on the modes of transmission of COVID-19, https://www.ciencia.gob.es/portal/site/MICINN/menuitem.edc7f2029a2b e27d7010721001432ea0/?
vgnextoid=673bb7e72dba5710VgnVCM1000001d04140aRCRD (2020, accessed 8 April 2021).

36.     Plaintiff's Second Amended Complaint thus proves that there is an ongoing scientific debate and thus there is no defamatory statement. There is just GPS attempting to squelch the other side of the debate. In any debate over science, one side inherently contends the other's position is false.   And the scientific community needs to have that type of debate to advance our knowledge and understanding of the world around us.   If one scientist can sue another over a disagreement, these debates won't happen. Because of this admitted on-going scientific debate, there can be no deception. Without deception, GPS' house of cards tumbles: there is no Lanham Act advertising violation, no defamation, no business

disparagement, no tortious interference with prospective business, and no common law unfair competition violation.

## VII.   DEFAMATION UNDER TEXAS LAW

37.    Defendants address the Plaintiff's claim of defamation under Texas law. Second Amended Complaint pages 34-36 at Paragraphs 136-144. In this, what boils down to a libel-by-implication case, the Court must determine whether the defamatory meanings that GPS alleges are capable of arising from the words that Defendants wrote or spoke. Defendants urge that the Defendants' speech is a scientific opinion and is fully protected under the 1st Amendment to the united States Constitution. Further, the publication must contain a false statement of fact. *See e.g.*, *Neely v. Wilson*, 418 S.W.3d 52, 62(Tex 2014) ("[S]tatements that are not verifiable as false cannot form the basis of a defamation claim."). Plaintiff argues that defendant' statements are understood as referring to GPS, while their own exhibits are evidence that contradict it. It shows the Defendant appealing to and educating her readers to stop using unproven technologies not limited to needle point bipolar ionization as evidenced below:

> Exhibit J:  "Stay away of fancy technology marketing: Plasma wave, Fragrance Sponge, UV Light Sanitizer Eliminates, NCCO technology, Active oxygen generator, ionic purifier + composite catalyst, cold catalyst layer, negative ion generator, Bi-polar, PECO, PCO, Plasma, Cold Plasma"

Exhibit R: "No to Ozone generation, No to Bipolar ionization, No to PC oxidation, No to Radicals formation, No to Magic disinfection, Chemical vaporization…"

Exhibit T: "The widely used removal mechanisms occur by electrically charging particles using corona wires, pins or needles, with plasma (positive and/or negative ions formed by charging major components of air as well as pollutant molecules), or by photocatalytic oxidation. The design of the system may create one or more reactive oxygen species (ROS), ozone, hydroxyl radicals, superoxide anions, gaseous hydrogen peroxide, and others."

The Defendant's tweets are meant to educate the readers on unproven technologies. Plaintiff is pigeonholing the Defendant's scientific outreach and portraying as personal attack on GPS. This is obviously untrue as evidenced by many of the Plaintiff's own exhibits and claims.

38.     A statement that cannot be proved either true or false cannot form the basis of a defamation claim. *See, e.g., Harvest House Publ'rs v. Local Church*, 190 S.W.3d 204, 211-12 (Tex. App.—Houston [1st Dist.] 2006, *pet. denied*) (whether labeling a church as a "cult" is defamatory depends on religious beliefs).

39.     To state a defamation claim, a plaintiff must show (1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, at least amounting to negligence, and (4) damages, in some cases. *Innovative Block of S. Tex., Ltd*., 603 S.W.3d 409, 417 (Tex., 2020). A defamatory statement is one that "tends [ ] to harm the reputation of another as to lower him in the estimation of the community or to deter third persons

from associating or dealing with him." Restatement (Second) of Torts § 559 (Am. L. Inst. 1977); *see also Hancock v. Variyam*, 400 S.W.3d 59, 63 (Tex. 2013) (defining defamation "as the invasion of a person's interest in her reputation and good name").

40.    The first element of a defamation claim is that the "defendant" published a false statement. *Bedford v. Spassoff*, 520 S.W.3d 901, 904 (Tex. 2017) (*per curiam*). Defendants urge that the questioned statements are true, and Plaintiff has not given clear and specific evidence establishing a *prima facie* case for each element of defamation by Defendants. For instance, Plaintiff's Second Amended Complaint at page 35, paragraph 140, alleges libel *per se* as defined by Section 73.001 of the Texas Civil Practice and Remedies Code but Plaintiff has not given a specific example of complicit *per se* violation. Are Defendants supposed to guess what the libel *per se* words were, to whom they were spoken, when the words were spoken, and where these words were spoken? Perhaps, Plaintiff believes it is the poem, Exhibit R, page 22. That would just be a guess by Defendants. Regarding a Complaint, in which Plaintiff is making a claim against a Defendant, the Defendant should not have to guess. Under Texas defamation law, the Plaintiff must be particularly specific as to the specific defamatory words.

41.    In any event there was no actual evidence of harm to Plaintiff's reputation listed in Plaintiff's Second Amended Complaint. Plaintiff boasts at page

8, paragraph 36 that "…GPS has earned a reputation as a leader in the air quality/purification industry." At pages 8-9 , paragraph 43 Plaintiff expounds that,

> "GPS's reputation for excellence and dedication to offering safe, high-quality products is embodied within its GLOBAL PLASMA SOLUTIONS logo, the GPS name, and its NPBI™ brand, all of which are readily associated with GPS and its products when encountered by the public and entities or individuals within the industry."

And while on page 12, paragraph 59, Plaintiff speculates that, "Defendants have embarked on a meritless campaign to damage GPS's reputation and goodwill…," and even states at page 32, paragraph 124 that "Defendants' false, misleading, disparaging, and defamatory statements have caused substantial damage to GPS and irreparable harm to GPS's reputation," such is a conclusory statement and insufficient to sustain a *prima facie* case. In Texas, special damages must be "specifically stated," and defamation *per quod* claims are not actionable unless plaintiffs plead and prove special damages. Tex. R. Civ. P. 56. *Kelly v. Diocese of Corpus Christi*, 832 S.W.2d 88, 94 (Tex. App. Corpus Christi 1992) ("Slander per se" is actionable as defamation on its face, while "slander *per quod*" is actionable only upon pleading and proof of special damages).

42.     Defamation is broken down into two categories: (1) defamation *per se*; and (2) defamation *per quod*. *Hancock,* 400 S.W.3d at 63. "Historically, defamation *per se* has involved statements that are so obviously hurtful to a plaintiff's reputation that the jury may presume general damages, including for loss of reputation and

mental anguish." *See Bentley v. Bunton,* 94 S.W.3d 561, 604 (Tex. 2002). For instance, a statement is typically defamatory *per se* when it injures a person in their office, profession or occupation by "accus[ing] a professional of lacking a peculiar or unique skill that is necessary for the proper conduct of [their] profession." *Hancock,* 400 S.W.3d at 67. In contrast, defamation *per quod* is understood as defamation that is not actionable *per se. Hancock,* 400 S.W.3d at 64. Whether a defamatory statement constitutes defamation *per se* or defamation *per quod* also has an impact on the type of damages available to a plaintiff. Defendants urge that special damages must be pled by GPS but have not been pled.

43.     So, what is actionable defamation? In *Bentley*, the Texas Supreme Court adopted the test used by the U.S. Supreme Court in *Milkovich* for determining whether a statement is actionable in defamation. *Bentley v. Bunton*, 94 S.W.3d 561, 579 (Tex.2002). For a statement to be actionable in defamation, it must expressly or impliedly assert facts that are objectively verifiable. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990); *Bentley*, 94 S.W.3d at 580; *see Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 639 (Tex.2018).

44.     For a statement to be actionable, a reasonable fact-finder must be able to conclude that the statement implies an assertion of fact. *Milkovich*, 497 U.S. at 20–21; *see Bentley*, 94 S.W.3d at 579; *Gaylord Broad. Co. v. Francis*, 7 S.W.3d 279, 284 (Tex.App.—Dallas 1999), *pet. denied*, 35 S.W.3d 599 (Tex.2000). To make this

determination, the court must look at the entire context in which the statement was made. *See Scripps NP Oper., LLC v. Carter*, 573 S.W.3d 781, 795 (Tex.2019); *Bentley*, 94 S.W.3d at 581.

45.     Texas cases recognize a distinction between a statement that is defamatory by its text alone and a statement that is defamatory only by reason of "extrinsic evidence" and "explanatory circumstances." *Moore v. Waldrop*, 166 S.W.3d 380, 385 (Tex. App.—Waco 2005, no pet.); *see also Gartman v. Hedgpeth*, 157 S.W.2d 139, 141–43 (Tex.1941) (discussing the distinction). The common law employed the term "defamation *per se*" to refer to the first type of statement—one defamatory by its text alone. *See Defamation Per Se*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining as defamatory "per se" a "statement that is defamatory in and of itself"). Similarly, at common law, "defamation *per quod*" referred to a statement whose defamatory meaning required reference to extrinsic facts. *See Defamation Per Quod*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining as defamatory "*per quod*" a statement whose defamatory meaning is "not apparent but [must be] proved by extrinsic evidence showing its defamatory meaning"). The difference is important and ignored by Plaintiff. *See Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 629 (Tex. 2018).

46.     The court considers the factual setting in which the statement was made (*e.g.*, political, social, or philosophical debate), the format in which the statement

appears (*e.g.*, in a review, editorial, or cartoon), the general tenor of the entire work, and the reasonable expectations of the audience in that particular situation. *See Milkovich*, 497 U.S. at 24 (Brennan & Marshall, JJ., dissenting); *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 54 (1988) (statements made in political cartoons, satires, and parodies are often exaggerated, exploitative, and one-sided); *Letter Carriers v. Austin*, 418 U.S. 264, 286 (1974) (statements made during labor disputes often contain exaggerated rhetoric); *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 13 (1970) (statements made during heated public debate often contain exaggerated rhetoric); *Bentley*, 94 S.W.3d at 585 (statement on public-access television projects less credibility than statement on network news).

47.     In applying these factors, the court determines whether a reasonable reader, listener, or viewer could conclude that the statements were conveying facts about the plaintiff. *See, e.g., Hustler Mag.*, 485 U.S. at 57 (no reasonable reader could have concluded statements in ad parody were describing actual facts about P); *Letter Carriers,* 418 U.S. at 285–86 (no reasonable reader would have understood the term "scab" to suggest Ps were being charged with a crime); *Greenbelt Coop.*, 398 U.S. at 14 (no reasonable reader would have perceived the use of the word "blackmail" as charging P with a crime); *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 161 (Tex.2004) (no reasonable reader would conclude that article stated actual facts because of newspaper's irreverent tone and its semi-regular publication of

satire); *Bentley*, 94 S.W.3d at 581 (reasonable viewer of public-access television show would have understood term "corrupt" to have its ordinary meaning).

48.     In the present case, there is a legitimate public debate about the use and benefit of ionizers and in a COVID-19 world such is an issue of public concern. *Innovative Block of S. Tex., Ltd. v. Valley Builders Supply, Inc.*, 603 S.W.3d 409, 418 (Tex. 2020) teaches that whether a communication is defamatory is "in the first instance a legal question." The Second Amended Complaint requires competent evidence to support an award of actual or compensatory damages when the speech is public, or the level of fault is less than actual malice.... Thus, the Constitution only allows juries to presume the existence of general damages even in defamation per se cases where: (1) the speech is not public, or (2) the plaintiff proves actual malice."). *Hancock v. Variyam*, 400 S.W.3d 59, 65–66 (Tex. 2013), Defendants urge that the alleged statements are not defamatory as a matter of law and that Plaintiff has failed to allege specific damage to Plaintiff.

## VIII.  BUSINESS DISPARAGEMENT

49.     Next, Defendants address the Plaintiff's claim of business disparagement and whether the statements outside the realm of commercial speech can serve as its foundation. Second Amended Complaint pages 36-37 Paragraphs 145-153. The focus of the cause of action lies on recompensing pecuniary loss. *Innovative Block of S. Tex., Ltd*., 603 S.W.3d 409, 417 (Tex., 2020). The elements

of the claim are 1) the existence of a false statement, 2) published with malice, 3) with the intent that it causes pecuniary loss or the reasonable recognition that it will cause such loss, and 4) actual pecuniary loss, or special damages, resulting from it. *Id.* Thus, an essential part of a plaintiff's claim is proof of special damages. *Hurlbut*, 749 S.W.2d at 767. Special damages can include loss of a specific sale, loss of credit, and loss of business, such as its complete destruction. *Id.* (loss of sale and loss of business); *FDIC v. Perry Bros.,* 854 F.Supp 1248, 1275-76 (E.D.Tex. 1994)(loss of credit). GPS must plead and show "direct, pecuniary loss necessary to satisfy the special damage element of a claim for business disparagement." *Hurlbut* at 767.

50.     Plaintiff further has not established that the specific published words which Plaintiff alleges were false or not otherwise protected speech under the 1st Amendment. In a business-disparagement action the Plaintiff must plead and prove the specific statement which was false. *Hurlbut v. Gulf Atl. Life Ins*., 749 S.W.2d 762, 766 (Tex.1987). Truth is an absolute defense; and a statement that cannot be proved either true or false cannot form the basis of a defamation or business disparagement claim. *See, generally Harvest House Publ'rs v. Local Church*, 190 S.W.3d 204, 211-12 (Tex. App.—Houston [1st Dist.] 2006, *pet. denied*) (whether labeling a church as a "cult" is defamatory depends on religious beliefs).

51.     The torts of defamation and business disparagement are alike in that both involve harm from the publication of false information, but there are important

differences between the two, largely explained by the interests the respective torts seek to protect; defamation serves to protect one's interest in character and reputation, whereas business disparagement protects economic interests by providing a remedy for pecuniary losses from slurs affecting the marketability of goods and services. *Id.* at 417. Because business disparagement, unlike defamation, is solely concerned with economic harm, proof of special damages is a "fundamental element of the tort. *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 155 (Tex. 2014). Additionally, essential to a claim of business disparagement is proof of malice and lack of privilege. There is no clear and specific evidence cited in Plaintiff's Second Amended Complaint that Defendants acted with malice in submitting any statement alleged. Again, because the Plaintiff did not establish by clear and specific evidence a prima facie case for business disparagement, the trial court should correctly dismiss that claim. *See generally Batra v. Covenant Health Sys.*, 562 S.W.3d 696, 711 (Tex. App.-Amarillo 2018). Plaintiff has pled no specific special damage or proof of malice or lack of privilege as is required for a *prima facie* case.

### IX.   TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS (TEXAS LAW)

52.    The elements of the claim of Tortious Interference with Prospective Business (Texas Law) (Pages 37-38, Paragraphs 154-158), are: 1) a reasonable probability that the plaintiff would have entered into a business relationship with a

third party; 2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; 3) the defendant's conduct was independently tortious or unlawful; 4) the interference proximately caused the plaintiff injury; and 5) the plaintiff suffered actual damage or loss as a result. *Coinmach Corp. v. Aspenwood Apt. Corp.*, 417 S.W.3d 909, 923 (Tex. 2013); *Batra v. Covenant Health System*, 562 S.W.3d 696, 712 (Tex.Civ.-Amarillo 2018, *pet. denied*).

53.     The evidence presented in Plaintiff's Second Amended Complaint does not clearly and specifically establish which referrals or customers Plaintiff lost, if any, due to the adverse statements that Plaintiff might allege but does not. To speculate that Plaintiff "would have been" chosen for a business relationship is insufficient to meet Plaintiff's pleading burden of proof. Plaintiff does not establish which business relationships Plaintiff would have entered into but for the alleged defamation by Defendants. Furthermore, Plaintiff did not plead that Defendants committed an independently tortious act. Plaintiff's Second Amended Complaint makes conclusory statements that Plaintiff's reputation might be harmed and at page 38, paragraph 158 that Plaintiff alleges that Plaintiff sustained a loss of prospective contracts and other business. Again, plaintiff speculates as to intentional interference with prospective customer at page 38, paragraph 157, without pointing to a single

specific instance of a lost customer or prospective customer. Plaintiff also failed to produce clear and specific evidence of the required element that Defendants acted with a conscious desire to prevent a business relationship from occurring or that Defendants knew that any interference with a business relationship was certain to occur from any to be alleged adverse statement. Worst of all, Plaintiff at page 38, paragraph 158 in a conclusionary manner states that Defendants committed "independently tortious and unlawful" acts without stating what those alleged independently tortious and unlawful acts are; and this is a *prima facie* requirement to this alleged tort. As such, Plaintiff failed to establish a *prima facie* case for tortious interference with prospective business relations and the Trial Court should correctly dismiss this claim.

## X.   COMMON LAW UNFAIR COMPETITION

54.   The Second Amended Complaint again alleges Common Law Unfair Competition at pages 38, paragraphs 159-162. The contours of Texas unfair competition law are not entirely clear.[8]  Texas generally recognizes the following types of business torts under the umbrella of unfair competition: passing off,

---

[8]Actually, no specific Texas law defines common law unfair competition. When applied by Texas courts, "unfair competition" is more of a catch-all term for various kinds of business-related torts. None of which business-related tort is listed by Plaintiff in this section of the Second Amended Complaint.

misappropriation of trade secrets,[9] and common law misappropriation. None of these are applicable to this case. The Restatement of the Law (Third), Unfair Competition states:

Chapter One- The Freedom to Compete

§ 1 GENERAL PRINCIPLES

One who causes harm to the commercial relations of another by engaging in a business or trade is not subject to liability to the other for such harm unless:

(a) the harm results from acts or practices of the actor actionable by the other under the rules of this Restatement relating to:
   (1) deceptive marketing, as specified in Chapter Two;
   (2) infringement of trademarks and other indicia of identification, as specified in Chapter Three;
   (3) appropriation of intangible trade values including trade secrets and the right of publicity, as specified in Chapter Four; or from other acts or practices of the actor determined to be actionable as an unfair method of competition, taking into account the nature of the conduct and its likely effect on both the person seeking relief and the public; or

(b) the acts or practices of the actor are actionable by the other under federal or state statutes, international agreements, or general principles of common law apart from those considered in this Restatement.

55.     The Plaintiff's Second Amended Complaint does not cite a statute or regulation on which it alleges are actionable under federal or state statutes, international agreements, or general principles of common law. Plaintiff does not

---

[9] The Fifth Circuit Court of Appeals recently ruled that the federal copyright and patent laws preempt the Texas common law claim of unfair competition by misappropriation. *Motion Med. Techs., L.L.C. v. Thermotek, Inc.*, 875 F.3d 765 (5th Cir. 2017),

allege misrepresentations to consumers, and again does not state the actual statements or the context in which those statements were made. Further as this is not a passing off, misappropriation of trade secrets, or common law misappropriation, same is mis-pled and should be dismissed.

## XI.   LACK OF SPECIFIC DAMAGES AND SUPPORT FOR OTHER CLAIMS

56.     Conclusory testimony is not evidence. *In re L.C.L.*, 599 S.W.3d 79, 85 (Tex. App.—Houston [14th Dist.] 2020, pet. filed); *See In re A.H.*, 414 S.W.3d 802, 807 (Tex. App.—San Antonio 2013, *no pet.*). The same is true when attempting to establish lost profits; conclusory testimony will not support recovery even if coming from the business owner. *Nat. Gas Pipeline Co. v. Justiss*, 397 S.W.3d 150, 157 (Tex. 2012) (stating that a "business owner's conclusory or speculative testimony of lost profits will not support a judgment"). Required is reasonably certain evidence of lost profits based on objective facts, figures, or data. *Id.* (quoting *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992)). Missing from Plaintiff's Second Amended Complaint are the objective facts, figures or data mandated by the alleged causes of action. So, Plaintiff failed to present clear and specific evidence in Plaintiff's Second Amended Complaint establishing a *prima facie* case at least as to one element of each of its claims involving the statements of Defendants.

57.     Furthermore, in Plaintiff's prayer, Plaintiff at page 39 requests attorney fees and exemplary damages; yet Plaintiff fails to plead for same in the body of the

Second Amended Complaint and does not cite the statutory or Common Law source for such allowance. The Plaintiff's Second Amended Complaint should be dismissed under Rule 12(b)(6).

## XII.   CONCLUSION[10]

58.     First, Defendants urge that the PREP Act applies to this case and these Defendants. The PREP Act authorizes the Secretary of the Department of Health and Human Services (Secretary) (HHS) to issue a PREP Act Declaration ("Declaration") that provides immunity from liability for any loss caused, arising out of, relating to, or resulting from administration or use of countermeasures to diseases, threats and conditions determined in the Declaration to constitute a present or credible risk of a future public health emergency. The Secretary has issued such Declaration and it provides complete immunity in this case.

59.     Secondly, under two Supreme Court decisions, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) the dismissal rules as to 12(b)(6) changed. No longer must a defendant prove "beyond any doubt that the plaintiff can prove no set of facts in support of his or her claim which would entitle him or her to relief." Now, a plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

---

[10] Drawn from Fundamentals of Rule 12, FBA NO Chapter -- Federal Practice Series, Thursday, March 26, 2015; The Honorable Carl Barbier, United States District Judge.

on its face.'" *Iqbal,* 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570) (emphasis added); *accord Little v. KPMG LLP*, 575 F.3d 533, 541 (5th Cir. 2009). To survive a Rule 12(b)(6) motion, the plaintiff must state a claim that is "plausible on its face." *Iqbal*, 556 U.S. at 678-79.[11]

60.     The GPS Second Amended Complaint must contain "allegations plausibly suggesting (not merely consistent with)" an entitlement to relief. *Twombly*, 550 U.S. at 557. The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). The facts in the Complaint must "raise a right to relief above the speculative level," and into the "realm of plausible liability." *See Twombly*, 550 U.S. at 555. In other words, the complaint must allege enough facts to move past possibility and on to plausibility of "entitlement to relief." *Id.* at 558.

61.     Determining whether a complaint states a plausible claim for relief [is]…a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief." *Iqbal*, 556

---

[11] Defendants urge that the Second Amended Complaint must at the very least meet the standards or elements of a prima facie case of a set cause of action.

U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)); *see also Gonzales v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (same).

62.    Defendants argue that the claims in Plaintiff's Second Amended Complaint fail to meet the pleading requirements set forth in Fed.R.Civ.P. 8(a). Under Rule 8, Plaintiff is required to provide Defendants with notice of Plaintiff's claims and the grounds upon which those claims rest. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993). Plaintiff's drafting is less than model, and it is insufficient to meet the requirements set forth in Rule 8(a) for the various allegations do not state facts plausible to support the elements of any given alleged cause of action.

63.    Rule 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). To satisfy Rule 8(a), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, (2007)). A pleaded claim is plausible if the allegations in the complaint "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id. Matter of Life Partners Holdings, Inc.*, 926 F.3d 103, 116 (5th Cir. 2019).

64.     Under Rule 8, although facts properly alleged must be construed in favor of the plaintiff, a court need "not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusion." *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010); *see also Iqbal*, 556 U.S. at 678 (court is not required to accept mere legal conclusions as true). Thus, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993); *see also Jebaco, Inc. v. Harrah's Operating Co., Inc.*, 587 F.3d 314, 318 (5th Cir. 2009) (allegations amounting to mere labels and conclusions or containing a formulaic recitation of the elements of the cause of action will not suffice). Courts are not required to accept as true allegations contradicted by documents attached to in the complaint. *Simmons v. Peavy-Welsh Lumber Co*., 113 F.2d 812 (5th Cir. 1940

65.     In this case, the Court should find Plaintiff has failed to sufficiently plead actual or likely injury as to all Plaintiff's claims even under the standards of Rule 8(a)(2). *See NATIONAL TRAVEL SYSTEMS, L.P. v. SHORTS TRAVEL MANAGEMENT, INC.*, 2010 WL 11601990 (W.D. Texas, Austin Division 2010). In *National* the District Court found plaintiff had not sufficiently pleaded actual or likely injury from defendant's alleged misrepresentations, and the Court dismissed plaintiff's Lanham Act claim without prejudice to refiling. The court also dismissed the plaintiff's claims of prospective interference for failure to allege "independently

tortious or unlawful" conduct, which is also true in the present case, and the Complaint was dismissed without prejudice. The Second Amended Complaint should be dismissed under Federal Rule 12(b)(6) and the PREP Act.

## XIII. PRAYER

66.    Defendants pray that this Court grant Defendants' Motion to Dismiss with prejudice under the PREP Act, and without prejudice to attempted refiling pursuant to Rule 12(b)(6), and dismiss Plaintiff's claims asserted against Defendants, and for any and all other relief to which Defendants have shown themselves justly entitled.

Respectfully Submitted,

THE ESSMYER LAW FIRM

*/s/ Michael M. Essmyer, Sr.*
MICHAEL M. ESSMYER, Sr.
State Bar No. 06672400
messmyer@essmyerlaw.com
5111 Center Street
Houston, Texas 77007
(713) 898-1320 Cell
(713) 869-1155 Telephone
(713) 869-8659 Facsimile

The Law Office of Paul M. Sullivan, PLLC

*/s/ Paul M. Sullivan*
Paul Sullivan
State Bar No. 24102546
paul.sullivan@psullivanlawfirm.com
5111 Center St.

Houston, Texas 77007
(713) 869-1155 Telephone
(281) 783-2220 Fax
*Pro hac vice* application pending

STALCUP LAW

*/s/ Brett B. Stalcup*
Brett B. Stalcup
Texas Bar No. 19011800
Email: bstalcup@stalcuplaw.com
Michael Theo Smith
Oregon Bar No. 032128
Texas Bar No. 24117985
Email: smith@stalcuplaw.com
3811 Turtle Creek Blvd.,
Suite 175
Dallas, Texas 75219
Tel. (214) 219-1000
Fax. (214) 219-1003

Attorneys for D Zine Partners, LLC and
Marwa Zaatari

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has

been forwarded to all known counsel of record in accordance with the applicable

Federal Rules of Civil Procedure on this 17th day of August 2021.

McGuireWoods LLP
Justin Opitz
Matthew W. Cornelia
2000 McKinney Avenue, Suite 1400
Dallas, Texas 75201
Tel. 214-932-6400
Fax: 214-932-6499
jopitz@mcguirewoods.com

mcornelia@mcguirewoods.com

Robert A. Muckenfuss (pro hac vice)
Kelly A. Warlich (pro hac vice)
201 North Tryon Street, Suite 3000
Charlotte, NC 28202
Tel: 704-343-2000
Fax: 704-343-2300
rmuckenfuss@mcguirewoods.com
kwarlich@mcguirewoods.com

Lucy Jewett Wheatley (pro hac vice)
800 East Canal Street
Richmond, VA 23219
Tel: 804-775-4320
Fax: 804-698-2017
lwheatley@mcguirewoods.com

Counsel for Plaintiff, Global Plasma
Solutions, Inc.


                                    */s/ Michael M. Essmyer, Sr.*
                                    Michael M. Essmyer, Sr.