## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

GLOBAL PLASMA SOLUTIONS, INC.,
*Plaintiff*,
v.                                                    CIVIL ACTION NO.21-cv-00884-D
D ZINE PARTNERS, LLC and                              JURY TRIAL DEMANDED
MARWA ZAATARI
*Defendants*.

## <u>ORIGINAL ANSWER, COUNTERCLAIM, AND JURY DEMAND</u>

Defendants D Zine Partners, LLC ("D Zine") and Marwa Zaatari ("Zaatari") (collectively, "Defendants") by and through their undersigned attorneys, without waiver of their outstanding Fourth Amended 12(b)(6) Motions, Dkts. Nos.67 & 68, file this their Original Answer and Counterclaim as to Plaintiff Global Plasma Solutions, Inc.'s ("GPS"), Third Amended Complaint, Dkt. No.58, and respectfully show as follows:

1.  Defendants are not required to provide a responsive answer to the lead-in Paragraph of Plaintiff's Third Amended Complaint.

2.  Defendants deny the allegations set forth in Paragraph No. 1, INTRODUCTION, in Plaintiff's Third Amended Complaint.

3.  Defendants deny the allegations set forth in Paragraph No. 2, INTRODUCTION, in Plaintiff's Third Amended Complaint.

4.  Defendants deny the allegations set forth in Paragraph No. 3, INTRODUCTION, in Plaintiff's Third Amended Complaint.

5.  Defendants deny the allegations set forth in Paragraph No. 4, INTRODUCTION, in Plaintiff's Third Amended Complaint.

6.  Defendants deny the allegations set forth in Paragraph No. 5, INTRODUCTION, in Plaintiff's Third Amended Complaint.

7.  While Defendants admit the existence of a March 21 email, Defendants otherwise deny the allegations set forth in Paragraph No. 6, INTRODUCTION, in Plaintiff's Third Amended Complaint.

8.  Defendants deny the allegations set forth in Paragraph No. 7, INTRODUCTION, in Plaintiff's Third Amended Complaint of misrepresentations by Defendants and otherwise Defendants are without sufficient facts to admit or deny the remainder of Paragraph No. 7 of Plaintiffs' Third Amended Complaint and therefore same is denied.

9.  Defendants are without sufficient facts to admit or deny Paragraph No. 8, INTRODUCTION, of Plaintiffs' Third Amended Complaint and therefore same is denied.

10. Upon information and belief, Defendants can neither admit or deny the facts asserted in Paragraph No. 9, INTRODUCTION, of Plaintiff's Third Amended Complaint. Therefore, same is denied.

11. Defendants are without sufficient facts to admit or deny Paragraph No. 10, INTRODUCTION, of Plaintiffs' Third Amended Complaint and therefore same is denied.

12. Defendants deny the allegations set forth in Paragraph No. 11, INTRODUCTION, in Plaintiff's Third Amended Complaint.

13. While Defendants admit that Dr. Zaatari is a scientific advisor to enVerid, Defendants otherwise deny the allegations set forth in Paragraph No. 12, INTRODUCTION, in Plaintiff's Third Amended Complaint.

14. While Defendants admit that Dr. Zaatari is one of the owners of D Zine and that D Zine intends in the future to offer indoor air filtration consulting and design services, Defendants otherwise deny the allegations set forth in Paragraph No. 13, INTRODUCTION, in Plaintiff's Third Amended Complaint.

15. While Defendants admit that Dr. Zaatari from at least January 2015 through May 2020, Zaatari was the Vice President of Building Solutions for enVerid, Defendants otherwise deny the allegations set forth in Paragraph No. 14, INTRODUCTION, in Plaintiff's Third Amended Complaint.

16. Defendants are without sufficient facts to admit or deny Paragraph No. 15, INTRODUCTION, of Plaintiffs' Third Amended Complaint and therefore same is denied.

17. Defendants deny the allegations set forth in Paragraph No. 16, INTRODUCTION, in Plaintiff's Third Amended Complaint.

18. Defendants are not required to provide a responsive answer to Paragraph Nos. 17-20, The Parties, of Plaintiff's Third Amended Complaint.

19. Defendants admit that the parties are diverse, and Plaintiff's pleaded causes of action seek damages over $75,000. Defendants further admit jurisdiction is proper as a diversity case. Defendants otherwise deny the allegations of Federal jurisdiction in Paragraphs 21through 26. Defendants admit that they are Texas residents, and that venue is proper as to these two Defendants: Paragraph 27.

20. Defendants are without sufficient facts to admit or deny Paragraph No. 26, Jurisdiction and Venue, of Plaintiff's Third Amended Complaint and therefore same is denied.

21. Defendants are without sufficient facts to admit or deny Paragraph Nos. 28 through 38, 40 through 42, 101, 109, and 121, Factual Background, of Plaintiff's Third Amended Complaint and therefore same are denied.

22. Upon information and belief, Defendants can neither admit or deny the facts asserted in Paragraph No. 39, Factual Background, of Plaintiff's Third Amended Complaint. Therefore, same is denied.

23. Defendants admit Paragraph No. 43, Factual Background, of Plaintiff's Third Amended Complaint.

24. Defendants deny the allegations set forth in Paragraph Nos. 44, 45, 46, 48, 49, 51, 52, 54, 58, 59, 60, 61, 62, 63, 66, 67 73, 74, 80, 85, 86, 87, 88, 90, 91, 94, 95, 96, 97, 98, 100, 103, 104, 105, 106, 107, 108, 118, 119, 123, 124, 125, 126,128, and 129,  Factual Background, in Plaintiff's Third Amended Complaint.

25. While Defendants admit the authenticity of the attached emails, twitter links, Open Letter and news articles in the following Paragraphs, Defendants otherwise deny the allegations set forth in Paragraph Nos. 47, 50, 53, 55, 56, 57, 64, 65, 68, 69, 70, 71, 72, 75, 76, 77, 79, 81, 82, 83, 84, 89, 91, 92, 111, 112, 113, 114, 116, 117, 120, and 127, Factual Background, in Plaintiff's Third Amended Complaint.

26. Defendants deny the allegations set forth in **Count I: Federal False Advertising, Product Disparagement, and Unfair Competition (15 U.S.C. § 1125(a)) being** Paragraph Nos. 130 through 136 in Plaintiff's Third Amended Complaint.

27. Defendants deny the allegations set forth in **Count II: Defamation (Texas Law)** being Paragraph Nos. 137 through 145 in Plaintiff's Third Amended Complaint.

28. Defendants deny the allegations set forth in **Count III: Business Disparagement (Texas Law)** being Paragraph Nos. 146 through 154 in Plaintiff's Third Amended Complaint.

29. Defendants deny the allegations set forth in **Count IV: Tortious Interference with Prospective Business (Texas Law)** being Paragraph Nos. 155 through 159 in Plaintiff's Third Amended Complaint.

30. Defendants deny the allegations set forth in **Count V: Common Law Unfair Competition** being Paragraph Nos. 160 through 163 in Plaintiff's Third Amended Complaint.

31. Defendants deny the allegations set forth in **Count VI: Conspiracy (Texas Law)** being Paragraph Nos. 164 through 167 in Plaintiff's Third Amended Complaint.

32. Defendants further deny the allegations set forth in Paragraph Nos. 168 through 172 in Plaintiff's Third Amended Complaint.

33. Defendants join GPS in the un-numbered Paragraph demanding trial by jury.

34. Defendants are not required to provide a responsive answer to the Prayer for Relief Paragraph of Plaintiff's Third Amended Complaint, but Defendants deny Plaintiff is entitled to the relief sought and pray the Court to Deny same.

## <u>AFFIRMATIVE DEFENSES</u>

35. Defendants assert the protection of the Public Readiness and Emergency Preparedness Act (PREP Act), 42 U.S.C. § 247d-6d(a)(1), ("The PREP ACT"). Defendants urge that they are covered persons under the PREP Act and Prep act immunity applies.

6

36. Defendants assert their rights under First Amendment protection and the additional protection of "scientific debate" or "scholastic debate."

37. Defendants assert that under Section 230(c)(1) of the Communications Decency Act of 1996 (CDA), a retweet cannot serve as a basis for any defamation claim because a "user of an interactive computer service"—*i.e.* Dr. Zaatari using Twitter—is not "treated as the publisher or speaker of any information provided by another content provider."

38. Defendants assert the defense of Truth and Substantial Truth.

39. Defendants assert the defense of common-law qualified privilege.

40. Defendants assert that the contested speech is opinion and not objectively verifiable.

41. Defendants assert that all of the statements made by Defendants regarding GPS and its products constitute "puffery."

42. Defendants assert that Plaintiff's claims are barred from recovery, in whole or in part, based on the doctrine of the libel and slander-proof plaintiff.

43. Defendants assert that the contested speech is allowable epithets or rhetorical hyperbole.

44. Defendants assert that the contested speech is a matter of public concern.

45. Defendants assert that none of the contested speech is defamatory *per se*.

46. Defendants assert that they acted in good faith and without actual malice, and the doctrine that Plaintiff has unclean hands.

47. Defendants assert the defense of failure to mitigate.

48. Defendants assert the doctrine of proportionate responsibility.

49. Defendants urge they do not commercially compete with GPS.

50. Defendants assert the affirmative defenses of privilege or legal justification.

51. Defendants assert that there is no independent tort or unlawful conduct.

52. Defendants assert that as to the common law unfair competition allegation, Plaintiff fails to state a Texas basis for same.

53. Defendants assert that Plaintiff has failed to assert clear and specific evidence, and cannot prove its allegations by clear and convincing evidence.

54. Defendants assert that as to alleged conspiracy, as pled it is a conspiracy of one and thus fails.

55. Defendants assert that as to alleged civil conspiracy, there is no unlawful purpose or means to accomplish a lawful purpose by unlawful means.

56. Defendants urge Plaintiff is not entitled to exemplary damages, which must be found by clear and convincing evidence, and Plaintiff is statutorily and constitutionally limited in any such award.

57. Defendants alternatively assert the Restatement Second, Torts § 771.

58. Defendants alternatively assert Plaintiff lacks damages or harm.

8

59. Defendants alternatively assert Plaintiff failed to timely issue the required retraction letter and therefore is not entitled to exemplary damages.

60. Defendants alternatively assert Plaintiff lacks malice for speech relating to a topic of public concern.

61. Defendants also alternatively assert that Plaintiff's causes of action are barred by either the statute of limitations and/or the doctrine of laches in that Plaintiff has made the allegation at least as far back as 2019.

## ORIGINAL COUNTERCLAIM

62. COMES NOW, D ZINE PARTNERS, LLC ("D Zine") and Dr. MARWA ZAATARI ("Dr. Zaatari") collectively referred to as "Defendants" herein, and files this their Original Counterclaim, which is made subject to and without waiver of Defendants' previously filed Fourth Amended Motions to Dismiss Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Dkt. Nos.67 & 68, as to Plaintiff Global Plasma Solutions, Inc. ("GPS"), Third Amended Complaint, Dkt. No.58, which is currently before this Court. In support thereof, Defendants would respectfully show unto the Court as follows:

## I.    INTRODUCTION

63.    GPS markets its products as operating at safety and efficacy levels beyond what scientific studies support and attempts to suppress anyone who questions GPS's scientific conclusions through litigation.[1] [2]

64.    Dr. Zaatari is a scientist in the Indoor Air Quality ("IAQ") field who, among other scientists, has raised concerns regarding the safety and efficacy of reactive air cleaning or electronic air cleaning technologies, including that of GPS's products. It is evident, after looking at the discovery produced by GPS, that the Plaintiff knew and had evidence from lab test data commissioned by GPS and from field tests conducted by GPS's customers that what Dr. Zaatari was stating is the truth. GPS did not share these test data with their clients, nor did they back off on their marketing claims.

65.    From 2016 through the present, GPS has engaged in a slew of personal and professional attacks on Dr. Zaatari in an attempt to buy her off, shut her up and discredit her career in order to prevent her from working through ASHRAE to improve its indoor air quality standards by closing existing loopholes and making them more stringent.

66.    GPS's conduct is unlawful and should be stopped by this Court.

## II.    THE PARTIES

---

[1] *Global Plasma Solutions, Inc. v. IEE Indoor Environmental Engineering*, case 4:21-cv-02884-JSW, in the Northern District of California
[2] *Global Plasma Solutions, Inc. v. Elsevier Inc. et al.,* case 3:22-cv-00034, in the United State District Court for the Western District of North Carolina

67.     Plaintiff/Counter-Defendant GPS is a corporation organized under the laws of the State of Delaware with a principal place of business at 3101 Yorkmont Road, Suite 400, Charlotte, North Carolina 28208. GPS, as the Plaintiff is a party to this action.

68.     Defendant/Counter-Plaintiff D Zine is an entity formed under the laws of the State of Texas with a principal place of business at 3811 Turtle Creek Boulevard, Suite 560, Dallas, Texas 75219. D Zine has been served and has filed a responsive pleading.

69.     Defendant/Counter-Plaintiff Dr. Marwa Zaatari is an individual and is a partner of D Zine and is a resident of Austin, Texas and has been served with process at 3000 South 5th Street, Austin, Texas 78704. Dr. Zaatari has filed a responsive pleading.

### III.    JURISDICTION AND VENUE

70.     This Court has diversity jurisdiction over this lawsuit under 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000, exclusive of costs and interests, and is between citizens of different states.

71.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) and (b)(3) because a substantial part of the events giving rise to the claims asserted in this case occurred within this judicial district and all the Parties are subject to personal jurisdiction in this judicial district.

11

## IV.   <u>BACKGROUND FACTS</u>

72.   Dr. Marwa Zaatari is Chief Science Officer at D Zine Partners, LLC. *See* Appendix A at 1. She leads the research development of "Air as a Service" around heat exchanger coils, ventilation, filters, and IAQ measurements to design and operate buildings for optimal energy and people efficiency. *See* Appendix A at 1. Dr. Zaatari has extensive experience in (i) and quantifying the sources, fate, and transport of indoor air pollutants, (ii) building energy and environmental management, (iii) assessing performance-based procedures of HVAC ventilation and air cleaning, and (iv) developing and applying models for energy efficiency, indoor air quality, exposure assessment, and economic impacts of indoor air pollution. *See* Appendix A at 1, 2.

73.   Dr. Zaatari holds three academic degrees: (1) a Bachelor of Mechanical Engineering from The Lebanese University in Lebanon, (2) a Master of Science in Engineering Management from The American University of Beirut (AUB), Lebanon and (3) a Ph.D. in Architectural and Civil Engineering from University of Texas at Austin with focus on Environmental and Water Resources Engineering. Her Ph.D. thesis focused on applying available disease impact models on pollutant concentrations, characterizing particulate matter (PM) concentrations, emission rates, and fate of ambient and indoor-generated particles indoors, and investigating

the energy and air quality impact of two commonly used exposure control scenarios, ventilation and filtration.

74.    Dr. Zaatari have been an active participant in the American Society of Heating, Refrigerating and Air Conditioning Engineers (ASHRAE) since 2008. ASHRAE's vision is a healthy and sustainable built environment for all. ASHRAE, through its 50,000 members, work on advancing the arts and sciences of heating, ventilation, air conditioning, refrigeration and their allied fields through funding research, writing standards and manuals, with some of these standards get adopted into building codes and become mandatory requirements. Dr. Zaatari is an ASHRAE Distinguished lecturer with 7 approved courses, a member of the ASHRAE Epidemic Task Force, a voting member of ASHRAE Standing Environmental Health committee, Voting Member of ASHRAE Standard 62.1 "Ventilation for Acceptable Indoor Air Quality", Voting member of 62.1 research and education sub-committee, ex-Chair for TRG4 Indoor Air Quality Procedure, Vice Chair of MTG.HWBE Health and Wellness in the built environment, Chair of Technical Committee TC2.3 gaseous removal contaminants, ex-Voting Member Standard 145.2 laboratory test method for gas-phase air cleaning systems, and IAQ2020 Conference organizer.

75.    Dr. Zaatari was elected to serve as a member of USGBC (United Stated Green Building Council) Board of Directors. USGBC's mission is to transform the way buildings and communities are designed, built and operated through LEED rating

system, enabling an environmentally and socially responsible, healthy, and prosperous environment that improves the quality of life. LEED rating system is the most widely used green building rating system in the world, with more than 100,000 buildings participating today in this certification. As a member of USGBC, Dr. Zaatari led the development of indoor air quality performance-based approaches credits and 4 safety-first credits related to the pandemic.

76.    As a respected scientist, Dr. Zaatari have been continually asked to present for designers, engineers, manufacturers, and building owners. Dr. Zaatari is involved in writing standards and test methods, research proposals, work statements, performing field measurements and verification, reviewing research proposals, project reports and peer-reviewed research, and review of products and services on the market. During the pandemic, she volunteered extensively to help concerned parents, arts and entertainments spaces, communities of faith, among other space types.

77.    D Zine is a Nationwide Boutique Design Firm Dedicated to Delivering Performance-Based Solutions that Achieves Your Indoor Air Quality and Energy Efficiency Goals. *See* Appendix B at 5. Due to GPS' interference, D Zine has yet to make a sale of any product.



We Are A Nationwide Boutique Design Firm
Dedicated To Delivering Performance-Based Solutions
That Achieves Your Indoor Air Quality And Energy Efficiency
Goals

78.     D Zine does not use a limited number of products or services (technology-agnostic) but uses those that are right for its customers. *See.* Appendix B at 7. D Zine simply states that "Our mission is to advance the built environment through expertise in design, implementation and verification. *Id.* We don't believe in one size fits all approach. *Id.* We lead by design to implement the best solutions within your budget." *Id.*



WHY WE DO IT

Simply Because There Is No One Size Fit All Solution

Our mission is to advance the built environment through expertise in design, implementation and verification. We don't believe in one size fits all approach. We lead by design to implement the best solutions within your budget.

15

79.    Although D Zine was founded in November 2, 2020, Dr. Zaatari had been on the receiving end of GPS' ire long before. *See* Appendix A at 2, 3.

     A.    Dr. Zaatari Is Appointed to the ASHRAE 62.1 Committee

80.    In 2016, ASHRAE employed its members to assemble a Standing Standard Project Committee to conduct its regular update on internal standards. *See* Appendix A at 2. One such committee was led by Committee Chair Hoy Bohanon relating to update of standards for Acceptable Indoor Air Quality Ventilation ("62.1 Committee"). *See* Appendix G at 74, 75. Dr. Zaatari was asked to work in this committee as a member because of her vast experience and depth of knowledge on the topic of IAQ. *See* Appendix A at 1, 2.

81.    The 62.1 Committee conducted an in-depth investigation into the current Standard requirements and the state of emerging technologies in the industry coupled with relevant concerns to raise the indoor air quality standards and close existing loopholes and therefore resolved to strengthen the standards regulating the indoor air quality standards for ASHRAE. *Id.* These initial 62.1 Committee's efforts were submitted as proposals for a series of reviews by other ASHRAE members following a rigid procedure of internal and public reviews. *See* Appendix A at 1,2, C at 12-16, D at 17-24, E at 25-33, F at 34-61 and P at 267.

82.    GPS fervently objected to the 62.1 Committee's proposals during subcommittee meetings and asked the committee to either reject the proposals or delay voting on the resolutions. *See* Appendix G at 62-76.

83.    During a series of four public review sessions GPS publicly criticized the increase of quality standards. GPS's criticism was not based on science but personal motivation a as the seller of an emerging technology that would fail the new quality standards if adopted. *See* Appendix G at 62 -64, 70-73, 74-76. GPS also attempted to delay the review process by submitting duplicate comments which had previously been answered in the initial review. *See* Appendix C at 12-16, D at 17-24, E at 25-33 and F at 34-61. GPS further used the comment process to make personal attacks on Dr. Zaatari. *See* Appendix A at 1-3 and E at 33, G at 62, 64, 70-73, and 75. GPS questioned Dr. Zaatari's ethics and claimed that she had "extreme bias". *Id.* At all relevant times, the Committee and GPS knew that Dr. Zaatari worked with other air filtration companies, such as enVerid (Each member's affiliation is written in the committee roster, in their resume, in their ASHRAE profile, and reaffirmed at the beginning of every ASHRAE meeting during members introductions, and on various social media platforms). During the process of commenting on proposed addenda, GPS and its allies kept complaining on the very topics they advertise. For example, 1) adding a requirement in the Standard regarding no-ozone generation by air cleaning devices and 2) adding formaldehyde, a known cancerogenic, to the list of

17

contaminants of concerns with a threshold dictated by California EPA. It is now evident after obtaining the discovery why GPS objected to these additions. The fact is GPS possessed lab data commissioned and paid by GPS and test data from their customers that contradicts their advertisements. For example, GPS commissioned Intertek Laboratories to conduct a dozen of tests to understand the efficiency of their products to remove formaldehyde and other VOCs in early 2020. GPS learned from the results of the lab that their products do not remove formaldehyde nor VOCs. These results match what GPS learned from previous tests conducted years before the Intertek Lab tests. GPS chose not to share these lab tests with its customers and continued to advertise that their products remove formaldehyde and VOCs. GPS kept advertising that they comply with the mechanical code and their products allow to reduce fresh air ventilation while knowing it is not the truth.  Another example is the fact that GPS top selling product produces ozone. It is now clear why GPS kept halting the process in the Standards committees.

84.    On May 14, 2019, Charles Waddell, Founder & CTO at GPS, engaged in a campaign of baseless personal attacks against Dr. Zaatari demonstrating a clear intent to damage her professional reputation, including accusing her of "hijacking" the 62.1 Committee and engaging in "unethical" and "deceptive" conduct in written correspondence directed to more than 150 members of the ASHRAE community. *See* Appendix G at 63-69.

85.    On June 18, 2019, GPS and Top Product Innovations conspired with few electronic air cleaning companies (3 other companies) to submit an ethical complaint to ASHRAE about Dr. Zaatari. GPS CEO instructed that the other companies hide the fact that they all conspired to write the complaint because GPS knew that this is unethical behavior and against the rules of the society. *See GPS02_00000804.* Charlie Waddell had no problem to wrongfully attesting and signing the "pledge of full confidentiality" required in the complaint. *See GPS02-0000001.*

86.    Per the rules of the society, ASHRAE formed an ethics investigative panel to look into the submitted complaint. On November 25, 2019, GPS followed up with ASHRAE and tried to weaponize the submitted complaint by asking that Dr. Zaatari should not be re-appointed to the committee even before a decision was made by the ethics committee. *See GPS02_00000856.*

87.    On January 16 of 2020, the Ethics Investigative Panel (EIP) concluded its investigations that the ethical complaint is unfounded. *See GPS02_00001353.* However, GPS decided to ignore the investigation because it does not fit their narrative and pressed on with their defamation wrongfully accusing that Dr. Zaatari was unethical in the Standard process.

88.    In July of 2019, Dr. Zaatari was forced to send GPS an immediate cease and desist letter for the continual defamatory statements made about her and her work at ASHRAE. *See* Appendix H at 77-78.

19

89.     GPS's aggressive suppression campaign was not exclusive to Dr. Zaatari and was used against anyone critical of its products. GPS often emailed ASHRAE members and guest speakers asking them to stop sharing unfavorable articles to GPS and threatening to sue speakers if they did not comply. *See* Appendix G at 74-76. This behavior was accelerated during the pandemic where GPS sent numerous threat e-mails and cease and desist letters to scientists disagreeing with GPS marketing claims. GPS issued misleading and defamatory white paper responses to different scientific papers and well-respected organizations like ASHRAE and used these papers to convince their clients (such as school boards) that all the science done questioning their device's effectiveness is wrong. In fact, there is not a single study that was performed independent of GPS that found that their device works as advertised.  This is also reflected in the enormous budget GPS allocated to their legal and communications team.

90.     Although publicly attacking Dr. Zaatari by stating that she had questionable ethics and professional bias, GPS privately praised Dr. Zaatari and attempted to hire her as a consultant on March 20, 2021. *See* Appendix J at 80-81. Glenn Brinckman, CEO at GPS said "I would love to bring you [Dr. Zaatari] into our research efforts and support our science advisory board" in an attempt to buy her off. *Id.* This email further stated that she would "not be disappointed", that GPS "would even compensate [Dr. Zaatari] for a trip to Charlotte and [her] time for consultation", and

that "[Mr. Brinckman] believed this would be so much more productive than the constant webinar wars and social media post attacks". *Id.* In addition, when GPS CTO learned that Dr. Zaatari changed jobs, he communicated with GPS CEO and other GPS executives that they should hire her and ion wash her. *See GPS04_00003573.*

91.   Believing that GPS's products were potentially unsafe and ineffective, Dr. Zaatari declined the offer by not responding to the email attempting to buy her off.

C.   Dr. Zaatari Co-Authors an Open Letter

92.   On April 12, 2021, Dr. Zaatari and Dr. Marcel Harmon, a Lawrence-based building scientist published an Open Letter to address the use of electronic air cleaning equipment in buildings and raising concern regarding the efficacy of GPS's products. *See* Appendix K at 82-93. The Open Letter was reviewed and supported by 12 other prominent scientists in the IAQ industry and cites 23 independent scientific articles as references. *See id*. It was not financially supported by any third-parties, including Defendant enVerid, and contained a "Disclaimer" stating: "The views and opinions expressed in this article are those of the authors and do not necessarily reflect the official policy or position of any agency, institution, or firm." *Id.* The experts decided to write the open letter after dozens of requests from concerned parents about the use of unproven technologies in their kid's schools. The open letter addressed the state of the emerging technologies by providing a scientific

review of what is known about safety and effectiveness of these devices. All the scientists involved volunteered numerous hours during the pandemic to provide guidance to protect the public, and especially children.

93.    The April 12, 2021, Open Letter and Dr. Zaatari's statements therein were used as the basis for multiple news articles.

94.    Faced with mounting scientific scrutiny, GPS resumed its attack on Dr. Zaatari. In an effort to suppress Dr. Zaatari's scientific opinions and analysis, GPS began calling and emailing her speaking engagements in an effort to interfere with them going forward. *See* Appendix A at 2-3, Appendix A at 2-3 and *See* Appendix M at 155-157.

95.    GPS also promoted a "Use Letter" campaign accusing Dr. Zaatari of engaging in "reckless campaign by competitors of GPS" and spreading "false and misleading statements to advance the false narrative". *See* Appendix L at 96-154 and Appendix M at 155-157. This Letter was published to over 120 customers to spread the disinformation. *See* GPS04_00021207. On October 27, 2021, GPS even encouraged one of their large manufacturer representatives to spread defamatory statement against Dr. Zaatari and enVerid Systems.

96.    On April 21, 2021, GPS wrote a scathing email to the board of governors of ASHRAE in an effort to cancel Dr. Zaatari's April speaking engagement. The email attached Dr. Zaatari's work as "spreading unlawful, false and defamatory statements

regarding ionization technology" and stated that she was getting a "wrongful competitive advantage" and was engaged in an "unlawful smear campaign" *See* M at 155-258. In the letter to ASHRAE, GPS proffered this lawsuit with all exhibits as definitive proof of its allegations. *Id*. GPS' intentional acts have resulted in Dr. Zaatari losing her scheduled ASHRAE presentation for the months of April and May. *See* Appendix A at 2, 3, Appendix M at 155-157, and Appendix N at 259-263.

97.    GPS also added baseless claims against enVerid in an attempt to ruin Dr. Zaatari's business relationship with the company.

98.    In addition to interfering with Defendants' business relationships, GPS used this lawsuit in an active add campaign by advertising the allegations in the lawsuit as fact. GPS cites this lawsuit in its letters attacking Dr. Zaatari's professional integrity while alleging competitive motives and finally calling and threatening organizations if speaking events are not canceled.  *See* Appendix A at 2,3, Appendix L at 96-154, and Appendix M at 155-258. By attaching this lawsuit to these letters attacking Defendants, GPS is making affirmations of truth when the truth of those statements has not been determined by this Court. *See* Appendix M at 155-258.

99.    Because of GPS attempts to prohibit Dr. Zaatari from speaking, Defendants' current attorneys sent out a second cease and desist to GPS due to GPS failure to stop and retract their aggressive behavior. *See* Appendix A at 3, and Appendix O at 264, 265.

100.   Despite this request to cease and desist, on August 6, 2021 GPS was up to its old tricks. GPS used court discovery that is subject to our current protection order, and public pleadings to further attack Dr. Zaatari by creating a false narrative that Dr. Zaatari engaged in a misinformation campaign and that she led a "public media campaign smearing GPS technology" among other things. *See* Appendix P at 266.

101.   It is evident from the e-mails that GPS misrepresented the facts in their third complaints. Nonetheless GPS proceeded to use inflammatory statements and attacks in their complaints "Zaatari ignored the science and nevertheless proceeded to smear GPS to advance enVerid's increasingly desperate agenda" and "This effort is aimed to drive GPS's current and prospective customers away from GPS to purchase products from enVerid and utilize the services of D Zine and other competing companies with which Zaatari is involved or has pecuniary interests."

102.   GPS knew from the discovery it obtained early on and before issuing the third amendment complaint that 1) enVerid did not learn about the open letter until it was published on the website and 2) no single customer was taken from GPS to enVerid or to D ZINE Partners.  In fact, Dr. Zaatari volunteered numerous hours to create HEPA (high efficiency particulate air filtration) portable consumer devices comparison (more than 140 devices) to help customers choose the right product for their spaces. Dr. Zaatari shared the information publicly and her work is highly

24

quoted and appreciated by customers. She is not affiliated with any of these companies.

103.    As a direct result of Plaintiff's actions to interfere with Dr. Zaatari's personal and professional relationships Dr. Zaatari and D Zine have suffered and will continue to suffer harm and irreparable damage to their business and reputation. *See* Appendix A at 2-3.

104.   GPS' wrongful attacks on Dr. Zaatari continued into 2022, when GPS' counsel send an update letter to GPS partners on January 28, 2022. This letter specifically accused Dr. Zaatari to have "spread this false information for a GPS competitor, has been proven not to be creditable." *See* GPS08_00002084-00002085.

105.   GPS' legal team has been extremely active in intimidating the media and scientific periodicals and has taken these additional opportunities to further attack Dr. Zaatari. Specifically, January 11, 2022; February 6, 2022; February 22, 2022; and March 4, 2022, GPS' counsel stated "Zaatari has been proven not to be credible" and alleged that Zaatari was engaged in a "campaign was to spread the false narrative that GPS' technology created harmful byproducts and was not effective." (GPS08_00001811-00001818;   GPS08_00002036-00002037;   GPS08_00002082-00002083; GPS08_00001803-00001804) when GPS knew at the time that their products were potentially harmful and ineffective. *See* GPS07_00004030.

106.   Instead of using a scientific approach to respond to questions from their customers about their products' effectiveness and safety, GPS reverted to distribute defamatory letters against Dr. Zaatari and other scientists in an effort to divert from the real issue. It is evident from the discovery that GPS's motivation to defame scientists is that GPS did not want their customer to become aware of their product issues. At the same time, GPS's own scientific executives and other prominent consultants that GPS hired were asked to investigate some of the issues raised. The hired scientists came to the same conclusion regarding safety and effectiveness as what Dr. Zaatari and other colleagues said. GPS chose to keep these reports secret and pressed on in defamation instead.

107.   This lawsuit is being used by GPS to further attack Dr. Zaatari and D Zine's professional ethics and business reputation.

## V.   CAUSES OF ACTIONS

### A.   Defamation

108.   Paragraphs 1 through 107 are incorporated herein for all purposes.

109.   Plaintiff has engaged in systemic personal and professional attacks both verbally and in writing that surpasses permissible public debate.

110.   To state a defamation claim, a Defendant must show (1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the Defendant, (3) with the requisite degree of fault, at least amounting to negligence,

and (4) damages, in some cases. *Innovative Block of S. Tex., Ltd.*, 603 S.W.3d 409, 417 (Tex., 2020). A defamatory statement is one that "tends [ ] to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement (Second) of Torts § 559 (Am. L. Inst. 1977); *see also Hancock v. Variyam*, 400 S.W.3d 59, 63 (Tex. 2013) (defining defamation "as the invasion of a person's interest in her reputation and good name"). For a statement to be actionable, a reasonable fact-finder must be able to conclude that the statement implies an assertion of fact. *Milkovich*, 497 U.S. at 20–21; *see Bentley*, 94 S.W.3d at 579; *Gaylord Broad. Co. v. Francis*, 7 S.W.3d 279, 284 (Tex. App.—Dallas 1999), *pet. denied*, 35 S.W.3d 599 (Tex.2000). To make this determination, the court must look at the entire context in which the statement was made. *See Scripps NP Oper., LLC v. Carter*, 573 S.W.3d 781, 795 (Tex.2019); *Bentley*, 94 S.W.3d at 581.

111.   GPS published a false statement of fact to the public comment section of ASHRAE (Appendix E), over 150 members of ASHRAE (Appendix G, Appendix L, and Appendix M), countless third-party individuals and businesses to whom GPS sent out the Use Letter (*Id.*) and the Board of Governors of ASHRAE (*Id.*). In the 3rd public review, GPS questioned Dr. Zaatari's ethics and claimed that she had "extreme bias". *See* Appendix A and E. GPS attempted to publicly shame Dr. Zaatari by stating she was "hijacking" the 62.1 Committee and engaging in "unethical" and

"deceptive" conduct in written correspondence directed to more than 150 members of the ASHRAE community. *See* Appendix A and Appendix G. In the letter titled "The Use of GPS Needlepoint Bipolar Ionization Equipment in Buildings", GPS specifically intended to address the Open Letter distributed by Dr. Zaatari and Dr. Marcel Harmon among others and attacked Dr. Zaatari's professional competency, competitive motives and questionable integrity of testing methods. *See* Appendix L. All such statements were not true. *Id.* Further, GPS continued the same defamatory comments in the letter to the board of governors. Appendix M.

112.   GPS either knew or should have known that the comments, published to prevent Defendants' speaking engagements, to peers, customers and colleagues would cause harm to Defendants. This fault amounts to negligence at the very least. *See* Appendix A, Appendix E, Appendix G, Appendix L, and Appendix M.

113.   As a direct result of GPS contacting the board of governors, Dr. Zaatari lost her scheduled ASHRAE presentation for the months of April and May. *See* Appendix A. Since filing this suit, GPS has caused Defendants' loss of at least three speaking engagements that were previously scheduled all of which have been a direct result of GPS exercising improper pressure. *See* Appendix A and Appendix N. By citing GPS's lawsuit as truth and making derogatory false statements to Defendant's potential clients, peers, customers and colleagues, GPS has caused harm to the

reputation of Defendants and has hindered the prospects for future business and speaking engagements. *See* Appendix A and Appendix L, and Appendix M.

### B.   Business Disparagement

114.   Paragraphs 1 through 113 are incorporated herein for all purposes.

115.   Defendants further allege that Plaintiff has engaged in actionable business disparagement. The tort of business disparagement encompasses falsehoods concerning the condition or quality of a business's products or services that are intended to, and do in fact, cause financial harm. *See* RESTATEMENT (SECOND) OF TORTS § 629. Its elements are more stringent than those of defamation because business disparagement protects against pecuniary loss. *See Hurlbut v. Gulf Atl. Life Ins*., 749 S.W.2d 762, 766 (Tex. 1987). The focus of the cause of action lies on recompensing pecuniary loss. *See Innovative Block of S. Tex., Ltd*., 603 S.W.3d 409, 417 (Tex., 2020). The elements of the claim are 1) the existence of a false statement, 2) published with malice, 3) with the intent that it causes pecuniary loss or the reasonable recognition that it will cause such loss, and 4) actual pecuniary loss, or special damages, resulting from it. *Id.*

116.   Malice is established when the perpetrator knew of the falsity or acted with reckless disregard concerning it, or if he acted with ill will or intended to interfere in the economic interest of the other party in an unprivileged fashion. *See*

RESTATEMENT (SECOND) OF TORTS § 623A, cmt.g (1977)); *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003).

117.   GPS published a false statement of fact to the public comment section of ASHRAE (see Appendices A-N), over 150 members of ASHRAE, countless third-party individuals and businesses to whom GPS sent out the Use Letter, (see Appendix L), and the Board of Governors of ASHRAE letter. *See* Appendix M. In the 3rd public review, GPS questioned Dr. Zaatari's ethics and claimed that she had "extreme bias". *See* Appendix E. GPS attempted to publicly shame Dr. Zaatari by stating she was "hijacking" the 62.1 Committee and engaging in "unethical" and "deceptive" conduct in written correspondence directed to more than 150 members of the ASHRAE community. *See* Appendix G. In the letter titled "The Use of GPS Needlepoint Bipolar Ionization Equipment in Buildings," GPS specifically intended to address the Open Letter distributed by Dr. Zaatari and Dr. Marcel Harmon among others and attacked Dr. Zaatari's professional competency, competitive motives and questionable integrity of testing methods. *See* Appendix L. By claiming that Dr. Zaatari and D Zine were "spreading unlawful, false and defamatory statement", to obtain a "wrongful competitive advantage", and by using the legal petition to perpetuate a false narrative to the Board of Governors of ASHRAE GPS published a false statement of fact. *See* Appendix M. All such statements were not true. See Appendix A.

118.   Plaintiff published its statements with malice. Plaintiff deliberately sought out forums to discredit Dr. Zaatari and D Zine. See Appendix L and Appendix M. In the 62.1 Committee public comment section of ASHRAE GPS addressed Dr. Zaatari by name and made accusations that there was "extreme bias" and "perceived ethical conflicts of interest". *See* Appendix E. GPS knew or acted with reckless disregard in making these statements and make those comments with ill will and deliberately intended to interfere in the economic interest of Defendants in an unprivileged fashion. GPS attempted to publicly shame Dr. Zaatari by stating she was "hijacking" the 62.1 Committee and engaging in "unethical" and "deceptive" conduct in written correspondence directed to more than 150 members of the ASHRAE community. *See* Appendix G. By sending out said email to so many parties GPS knew or acted with reckless disregard in making the harmful statements and made those comments with ill will and deliberately intended to interfere in the economic interest of Defendants in an unprivileged fashion. GPS sought a greater visibility with their Use Letter when they questioned the professional competency, competitive motives and questionable integrity of testing methods of Dr. Zaatari. *See* Appendix L. By publicly shaming Defendants in GPS' Use Letter, GPS knew or acted with reckless disregard in making the harmful statements and made those comments with ill will and deliberately intended to interfere in the economic interest of Defendants in an unprivileged fashion. *See* Appendix L. By claiming that Dr. Zaatari and D Zine were

31

"spreading unlawful, false and defamatory statement, to obtain a "wrongful competitive advantage", and by using the legal petition to perpetuate a false narrative to the Board of Governors of ASHRAE, GPS published a false statement of fact. *See* Appendix M.

119.   The attacks on the Defendants were made by GPS with deliberate intent or reasonable recognition that their conduct would cause pecuniary loss to Defendants. Dr. Zaatari had built her career on integrity and competency in her field. *See* Exhibit A. As a consultant her clients trust her reputation and her skill to give them good advice. *See* Exhibit A. By GPS actively attacking Dr. Zaatari's ethical integrity and professional competency GPS has jeopardized the economic livelihood of Dr. Zaatari and D Zine *See* Appendix A, Appendix E, Appendix G, Appendix L and Appendix M. GPS demonstrated its intent and reasonable recognition by targeting Defendants' current and potential clients. *Id.* If GPS scares off Dr. Zaatari's speaking engagements, peers, customers and colleagues and convinces them not to work with her and D Zine or if the reckless claims made by GPS are believed then Defendants have and will suffer irreparable harm and pecuniary loss.

120.   The consequences of the aggressive smear campaign have already produced poisonous fruit resulting in pecuniary loss and special damages. GPS pressured the ASHRAE Board of Governors to first cancel the scheduled presentation for April then cancel the one scheduled for May. Appendix A and Appendix N. The longer

GPS is allowed to continue smearing Defendants without consequence the more irreparable harm Defendants will suffer. The full extent of the harm is unknown, but the Defendants are aware of the special damages of at least three speaking engagements that were previously scheduled but did not or will not occur as direct result of GPS exercising improper pressure. *See* Appendix A, Appendix L, Appendix M and Appendix N.

### C.   Tortious Interference with Existing and/or Prospective Business (Texas Law)

121.   Paragraphs 1 through 120 are incorporated herein for all purposes.

122.   Plaintiff has engaged in Tortious Interference with existing and/or future business relationships. To prove an action for tortious interference with an existing contract, the plaintiff must show it had a valid contract. *Juliette Fowler Homes, Inc. v. Welch Assocs*., 793 S.W.2d 660, 664 (Tex.1990); the plaintiff must establish the defendant committed a willful and intentional act of interference; *Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 926–27 (Tex.1993); the plaintiff must establish the defendant either (A) had actual knowledge of the contract and of the plaintiff's interest in it or (B) had knowledge of facts and circumstances that would lead a reasonable person to believe there was a contract in which the plaintiff had an interest; *Crossroads Hospice, Inc. v. FC Compassus, LLC*, S.W.3d __ , 2020 WL 1264188 (Tex.App.—Houston [1st Dist.] 2020, no pet.) (No. 01-19-00008-CV; 3-

17-20); the plaintiff must show the defendant interfered with the plaintiff's contract. *Fluor Enters. v. Conex Int'l*, 273 S.W.3d 426, 442 (Tex.App.—Beaumont 2008, pet. denied); and the plaintiff must establish the defendant's interference proximately caused the plaintiff's injury. *Immobiliere Jeuness Establissement v. Amegy Bank*, 525 S.W.3d 875, 880 (Tex.App.—Houston [14th Dist.] 2017, no pet.); and the plaintiff must establish the interference caused actual damage or loss. *See, Turner v. KTRK TV, Inc.*, 38 S.W.3d 103 (Tex.2000).

123.   The elements of the claim of Tortious Interference with Prospective Business (Texas Law) are: 1) a reasonable probability that the plaintiff would have entered into a business relationship with a third party; 2) the [respondent] either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; 3) the [respondent]'s conduct was independently tortious or unlawful; 4) the interference proximately caused the plaintiff injury; and 5) the [movant] suffered actual damage or loss as a result. *See Coinmach Corp. v. Aspenwood Apt. Corp*., 417 S.W.3d 909, 923 (Tex. 2013); *Batra v. Covenant Health System*, 562 S.W.3d 696, 712 (Tex.Civ.-Amarillo 2018, pet. denied).

124.  Dr. Zaatari has long standing relationships with her clients with both completed binding agreements and the reasonable probability of continued business relationships with such clients and others. ASHRAE is one such business

34

relationship in which Defendants have maintained a business relationship and had scheduled speaking engagements. *See* Appendix A and Appendix N. Defendants had existing business relationship with ASHRAE and were likely to continue this business relationship into the foreseeable future.

125.   Plaintiff either acted with a conscious desire to prevent the relationship with ASHRAE from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct. GPS engaged in a sophisticated smear campaign in which blackballed Dr. Zaatari and others who disagreed with the efficacy of GPS' products.  *See* Appendix A, Appendix E, Appendix G, Appendix I, Appendix L and Appendix M. GPS made false statements about Defendants in a comment section of ASHRAE (Appendix E), it emailed over 150 members of ASHRAE and attacked Defendants (Appendix G), it further emailed countless third-party individuals and businesses within Defendants' circle of clients and colleagues (Appendix I and L.) and used this lawsuit to convince ASHRAE Board of Governors to cancel speaking engagements (Appendix "M"). By GPS targeting Defendants' speaking engagements, peers, customers and colleagues it either acted with conscious desire to prevent relationships from occurring or knew the interference was substantially certain to occur as a result of their conduct. *See* Appendix A, Appendix L, Appendix M, and Appendix N.

126.    Plaintiff's conduct of attacking Defendants and interfering with Defendants' speaking engagements was independently tortious or unlawful conduct. *Id.* Plaintiff's defamatory remarks are independently tortious and support a claim of tortious interference with prospective business relationships.

127.    Plaintiff's interference with D Zine and Dr. Zaatari's customer relationships are the approximate cause of Defendants' injury. *See* Appendix "A".

128.    This interference has caused Defendants actual damages in excess of the minimal jurisdictional levels of this Court. *Id.*

### D.    <u>Intentional/Reckless Infliction of Emotional Distress</u>

129.    Paragraphs 1 through 128 are incorporated herein for all purposes.

130.    Plaintiff/Counter Defendant has engaged in intentional or reckless infliction of emotional distress that has cause Dr. Zaatari harm.

131.    To state a claim for intentional or reckless infliction of emotional distress claim, a Defendants/Counter Plaintiff must show (1) that Defendant/Counter Plaintiff suffered severe emotional distress, (2) that Plaintiff/Counter Defendant's conduct was extreme and outrageous, (3) that Plaintiff/Counter Defendant 's conduct was the proximate cause of Defendants/Counter Plaintiff's emotional distress, and (4) that no alternative cause of action would cause remedy for the extreme emotional distress. *See Texas Farm Bur. Mut. Ins. v. Sears*, 84 S.W.3d 604, 610 (Tex.2002).

36

### E.    Doctrine of Continuing Tort

132.   Paragraphs 1 through 131 are incorporated herein for all purposes.

133.   The present and prospective Tortious Interference, defamation and Business Disparagement referenced in these counterclaims are torts continuing in nature, which involve wrongful conduct inflicted over a period of time that has repeated and has yet desisted. Much of these continuing torts were perpetrated in hiding to distributors and to news media therefore is rooted in a Defendants' inability to know that the ongoing conduct that was causing Defendants injury.

134.   These continuing torts involve continuing wrongful conduct. They constitute continuing torts.

### F.    Tolling of Limitations under the Discovery Rule

135.   Paragraphs 1 through 134 are incorporated herein for all purposes.

136.   Due to the private nature of some of publishing of defamatory and harmful statements, Defendants/Counter Plaintiffs only became fully aware of some of the communications after Plaintiff/Counter Defendant produced them in discovery almost a year after the lawsuit began.

137.   Some of the defamatory and harmful conduct perpetrated by GPS was inherently undiscoverable to Defendants, and the evidence of injury is objectively verifiable through GPS own discovery. Therefore, the Discovery Rule applies.

## VI.    DAMAGES

138.   Counter-Plaintiffs seek such damages as each cause of action alleged herein allows; both at common law and statutorily. Counter-Plaintiffs seek actual damages, such as for loss of reputation, loss of employment wages or profit, statutory damages, such as alternative nominal damages, nonpecuniary damages such as mental or emotional distress, attorneys' fees as allowed by statute, pre- and post-judgment interest and all costs of Court.

## VII.   EXEMPLARY DAMAGES

139.   Counter-Plaintiffs reiterate the factual allegations contained above.

140.   The wrongful acts and/or omissions of GPS described herein were committed intentionally, knowingly, maliciously, wantonly and willfully, and in conscious disregard of the well-established (and acknowledged) rights of Counter-Plaintiffs. As a result of their malice, actual fraud, and/or gross negligence, GPS has caused significant harm to Counter-Plaintiffs. Thus, Counter-Plaintiffs are entitled to recover exemplary and/or punitive damages under TEX. CIV. PRAC. & REM. CODE § 41.003(a) and the common law.

## VIII.  JURY DEMAND

141.   Counter-Plaintiffs, D Zine and Dr. Marwa Zaatari hereby demand a trial by jury on all claims and issues so triable.

## IX.   VICARIOUS LIABILITY
### (Agency, Respondeat Superior, Ratification, Vice-Principal Liability)

38

142.   Counter-Plaintiffs reiterate the factual allegations contained above. Additionally, and/or alternatively, GPS is vicariously liable for the wrongful acts and omissions of GPS' agents, employees, and representatives as alleged herein, under the doctrines of agency (authorized agency, apparent agency, ostensible agency, and agency by estoppel), respondeat superior, ratification, and/or vice-principal liability. In all circumstances, the acts or omissions complained of were committed or omitted with authorization and/or ratification of GPS and/or were done in the course and scope of the actor's employment or agency relationship with said GPS. Additionally, and/or alternatively, GPS is vicariously liable for the wrongful acts and omissions of GPS' agents, representatives and principals who (i) were agents, employees, and/or vice-principals of GPS in furtherance of GPS' business and for the accomplishment of the object for which such agent, employee, or vice-principal was formed; especially, without limit, especially GPS distributors and sales agents.

## XI.   CONCLUSION & PRAYER

143.   WHEREFORE, PREMISES CONSIDERED, Defendants/Counter-Plaintiffs, D Zine and Dr. Marwa Zaatari, pray that Plaintiff recover nothing of and from Defendants, and that Defendants/Counter-Plaintiffs receive a judgment for actual damages, special damages, attorneys' fees, pre and post judgment interest and all

costs of Court and such other and further relief, both at law and in equity, to which

Defendants/Counter-Plaintiffs may show themselves to be justly entitled.

Respectfully submitted,

THE ESSMYER LAW FIRM

*/s/ Michael M. Essmyer, Sr.*
MICHAEL M. ESSMYER, Sr.
State Bar No. 06672400
messmyer@essmyerlaw.com
5111 Center Street
Houston, Texas 77007
(713) 898-1320 Cell
(713) 869-1155 Telephone
(713) 869-8659 Facsimile

The Law Office of
Paul M. Sullivan, PLLC

*/s/ Paul M. Sullivan*
Paul Sullivan
State Bar No. 24102546
paul.sullivan@psullivanlawfirm.com
5111 Center St.
Houston, Texas 77007
(713) 869-1155 Telephone
(281) 783-2220 Fax
Pro hac vice

STALCUP LAW

*/s/ Brett B. Stalcup*
Brett B. Stalcup
Texas Bar No. 19011800
Email: bstalcup@stalcuplaw.com
Michael Theo Smith
Oregon Bar No. 032128
Texas Bar No. 24117985

40

Email: smith@stalcuplaw.com
3811 Turtle Creek Blvd., Suite 175
Dallas, Texas 75219
Tel. (214) 219-1000
Fax. (214) 219-1003
**Attorneys for D Zine Partners, LLC and Marwa Zaatari**


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has

been forwarded to all known counsel of record in accordance with the applicable

Federal Rules of Civil Procedure on this 18th day of April 2022.

McGuireWoods LLP
Justin Opitz
Matthew W. Cornelia
2000 McKinney Avenue, Suite 1400
Dallas, Texas 75201
Tel. 214-932-6400
Fax: 214-932-6499
jopitz@mcguirewoods.com
mcornelia@mcguirewoods.com

Robert A. Muckenfuss (pro hac vice)
Kelly A. Warlich (pro hac vice)
201 North Tryon Street, Suite 3000
Charlotte, NC 28202
Tel: 704-343-2000
Fax: 704-343-2300
rmuckenfuss@mcguirewoods.com
kwarlich@mcguirewoods.com
Lucy Jewett Wheatley (pro hac vice)
800 East Canal Street
Richmond, VA 23219
Tel: 804-775-4320
Fax: 804-698-2017

lwheatley@mcguirewoods.com
**Counsel for Plaintiff, Global Plasma Solutions, Inc.**

Aaron Z. Tobin
Texas Bar No. 24028045
atobin@condontobin.com
Kendal B. Reed
Texas Bar No. 24048755
kreed@condontobin.com
Leah K. Lanier
Texas Bar No. 24080068
llanier@condontobin.com
CONDON TOBIN SLADEK THORNTON NERENBERG PLLC
8080 Park Lane, Suite 700
Dallas, Texas 75231
Telephone: (214) 265-3800
Facsimile: (214) 691-6311
**ATTORNEYS FOR DEFENDANT ENVERID SYSTEMS, INC.**

*/s/ Michael M. Essmyer, Sr.*
Michael M. Essmyer, Sr.