IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| Global Plasma Solutions, Inc. | § | |
| | § | |
| Plaintiff | § | |
| | § | Civil Action No. 3:21-CV-00884-M |
| v. | § | |
| | § | Jury Trial Demanded |
| D Zine Partners, LLC, Marwa Zaatari, | § | |
| and enVerid Systems, Inc. | § | |
| | § | |
| Defendants | § | |

---

## DEFENDANTS D ZINE PARTNERS, LLC, AND MARWA ZAATARI'S BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

---

P. Michael Jung
Texas Bar No. 11054600
mjung@clarkhill.com
Jadd F. Masso
Texas Bar No. 24041411
jmasso@clarkhill.com

CLARK HILL PLC
901 Main Street, Suite 6000
Dallas, Texas 75202
Telephone: (214) 651-4300
Facsimile: (214) 651-4330

James D. Shields
Texas Bar No. 18260400
jshields@shieldslegal.com
Bart F. Higgins
Texas Bar No. 24058303 bhiggins@shieldslegal.com
David A. Shields
Texas Bar No. 24083838
dshields@shieldslegal.com

SHIELDS LEGAL GROUP
16400 Dallas Parkway, Suite 300
Dallas, Texas 75248
Telephone: (972) 788-2040
Facsimile: (972)788-4332

*Attorneys for Defendants D Zine Partners, LLC, and Marwa Zaatari*

## **Table of Contents**

I.  Joinder in enVerid's Motion for Summary Judgment ............................................. 9

II.  Introduction ...................................................................................................................... 9

III.  Facts ................................................................................................................................... 11

IV.  Argument and Authorities ............................................................................................. 17

      A.  All of GPS's claims fail because GPS cannot prove that any act by Zaatari or D Zine caused it any loss ................................................................. 18

      B.  All of GPS's claims based on Zaatari's retweeting of content fail because a retweet is not actionable as a statement of fact. .................................. 21

      C.  GPS's Lanham Act claim fails .................................................................... 22

            1.  Zaatari's statements were not "commercial advertising" or "promotions." .............................................................................. 23

            2.  None of Zaatari's statements is actionable as a false statement of fact regarding GPS or its products. ......................................... 25

      D.  GPS's defamation claim fails .................................................................... 29

            1.  Dr. Zaatari's statements were of scientific opinion and cannot have a defamatory meaning. ............................................................. 30

            2.  GPS is a public figure and cannot show actual malice. ........................... 31

            3.  Because the alleged statements are not defamatory per se, GPS must prove special damages. ...................................................... 34

            4.  GPS's claim for exemplary damages is barred. ....................................... 35

      E.  GPS's business-disparagement claim fails. .................................................... 35

      F.  GPS's tortious-interference claim fails. ......................................................... 36

      G.  GPS's common-law unfair-competition claim fails. ......................................... 39

      H.  GPS's civil-conspiracy claim against D Zine fails. ......................................... 40

V.  Conclusion and Prayer ................................................................................................. 41

## Table of Authorities

**Cases**

*Agar Corp. v. Electro Circuits Int'l*,
    580 S.W.3d 136 (Tex. 2019) ........................................................................ 40

*Am. Broad. Companies, Inc. v. Gill*,
    6 S.W.3d 19 (Tex. App.—San Antonio 1999, pet. denied) .............................. 28

*Anderson v. Durant*,
    550 S.W.3d 605 (Tex. 2018) ................................................................... 18, 29

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ..................................................................................... 33

*Arthur v. Offit*,
    Case No. 09-cv-1398, 2010 WL 883745, at *6 (E.D. Va. Mar. 10, 2010) ............... 26, 27

*Astoria Indus. of Iowa, Inc. v. SNF, Inc.*,
    223 S.W.3d 616 (Tex. App.—Fort Worth 2007, pet. denied) ......................... 38

*Bose Corp. v. Consumers Union of U.S., Inc.*,
    466 U.S. 485 (1984) ..................................................................................... 33

*Brueggemeyer v. Am. Broad. Companies, Inc.*,
    684 F. Supp. 452 (N.D. Tex. 1988) ............................................................... 33

*Burbage v. Burbage*,
    447 S.W.3d 249 (Tex. 2014) ........................................................................ 36

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ..................................................................................... 17

*Chu v. Hong*,
    249 S.W.3d 441 (Tex. 2008) ........................................................................ 41

*COC Services, Ltd. v. CompUSA, Inc.*,
    150 S.W.3d 654 (Tex. App.—Dallas 2004, pet. denied) ........................... 18, 37

*Coinmach Corp. v. Aspenwood Apt. Corp.*,
    417 S.W.3d 909 (Tex. 2013) ........................................................................ 37

*Crowe v. Henry*,
    115 F.3d 294 (5th Cir. 1997) ....................................................................... 18

*Dallas Morning News, Inc. v. Tatum*,
    554 S.W.3d 614 (Tex. 2018) ........................................................................ 29

*Dallas Symphony Ass'n v. Reyes*,
    571 S.W.3d 753 (Tex. 2019) ............................................................................. 41

*David L. Aldridge Co. v. Microsoft Corp.*,
    995 F. Supp. 728 (S.D. Tex. 1998) ................................................................... 38

*Dilworth v. Dudley*,
    75 F.3d 307 (7th Cir. 1996) ............................................................................. 28

*Doe v. Boys Clubs of Greater Dallas, Inc.*,
    907 S.W.2d 472 (Tex. 1995)............................................................................. 21

*Eastman Chem. Co. v. Plastipure, Inc.*,
    775 F.3d 230 (5th Cir. 2014) ........................................................................... 25

*Edward Lewis Tobinick, MD v. Novella*,
    848 F.3d 935 (11th Cir. 2017) ......................................................................... 25

*Einhorn v. LaChance*, 823 S.W.2d 405 (Tex. App.—Houston [1st Dist.] 1992, writ
    dism'd w.o.j.) ................................................................................................... 28

*Ezrailson v. Rohrich*,
    65 S.W.3d 373 (Tex. App.—Beaumont 2001, no pet.) ..................................... 30

*Fort Worth Star–Telegram v. Street*,
    61 S.W.3d 704 (Tex. App.—Fort Worth 2001, pet. denied) ............................ 30

*Garcia v. Seguy*, No. 13-16-00616-CV, 2018 WL 898032, at *4 (Tex. App.—
    Corpus Christi–Edinburg Feb. 15, 2018, no pet.) ........................................... 28

*Garner v. Global Plasma Solutions, Inc.*,
    No. 1:21-CV-00665-SB (D. Del. May 7, 2021) ............................................... 16

*GE Betz Inc. v. Moffitt-Johnson*,
    301 F. Supp. 3d 668 (S.D. Tex. 2014) ............................................................. 40

*GE Betz, Inc. v. Moffitt-Johnston*,
    885 F.3d 318 (5th Cir. 2018) ........................................................................... 40

*Global Plasma Solutions, Inc. v. Elsevier, Inc.*,
    No. 3:22-CV-00034-RJC-DSC (W.D.N.C. Jan. 26, 2022)............................... 16

*Global Plasma Solutions, Inc. v. IEE Indoor Environmental Engineering*,
    No. 4:21-CV-02884-JSW (N.D. Cal. April 21, 2021)...................................... 15

*Granada Biosciences, Inc. v. Forbes, Inc.*,
    49 S.W.3d 610 (Tex. App.—Houston [14 Dist.] 2001), rev'd on other
    grounds, 124 S.W.3d 167 (Tex. 2003 ............................................................. 35

*Hancock v. Variyam,*
    400 S.W.3d 59 (Tex. 2013)............................................................................................ 36

*Heil-Quaker Corp. v. Mischer Corp.,*
    863 S.W.2d 210 (Tex. App.—Houston [14th Dist.] 1993), writ granted,
    judgment vacated w.r.m., 877 S.W.2d 300 (Tex. 1994).................................................. 37

*Huckabee v. Time Warner Entm't Co. L.P.,*
    19 S.W.3d 413 (Tex. 2000)...................................................................................... 32, 33

*Hurlbut v. Gulf Atl. Life Ins. Co.,*
    749 S.W.2d 762 (Tex. 1987);.................................................................................. 18, 36

*IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason,*
    143 S.W.3d 794 (Tex. 2004)......................................................................................... 21

*Immanuel v. Cable News Network, Inc.,* No. CV H-22-2031, 2022 WL 3030290, at
    *5 (S.D. Tex. Aug. 1, 2022)......................................................................................... 28

*In re Lipsky,*
    460 S.W.3d 579 (Tex. 2015)................................................................................... 34, 35

*Innovative Block of S. Tex., Ltd. v. Valley Builders Supply, Inc.,*
    603 S.W.3d 409 (Tex. 2020).......................................................................... 29, 34, 35

*Ioppolo v. Rumana,*
    581 F. App'x 321 (5th Cir. 2014).................................................................................. 26

*Johnson v. Hosp. Corp. of Am.,*
    95 F.3d 383 (5th Cir. 1996) ......................................................................................... 36

*Landry's, Inc. v. Animal Legal Def. Fund,*
    631 S.W.3d 40 (Tex. 2021).......................................................................................... 36

*Laxson v. Giddens,*
    48 S.W.3d 408 (Tex. App.—Waco 2001, pet. denied).................................................. 40

*Lexmark Intern., Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014)..................................................................................................... 18

*Logan v. Burgers Ozark Country Cured Hams, Inc.,*
    263 F.3d 447 (5th Cir. 2001) ....................................................................................... 23

*Mehta v. Fairleigh Dickinson Univ.,*
    530 Fed. Appx. 191 (3d Cir. 2013)............................................................................... 27

*Montgomery v. Risen,*
    875 F.3d 709 (D.C. Cir. 2017)..................................................................................... 28

*Musser v. Smith Protective Servs., Inc.*,
  723 S.W.2d 653 (Tex.1987).................................................................. 30

*Neely v. Wilson*,
  418 S.W.3d 52 (Tex. 2013)................................................................... 31

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964)............................................................................ 33

*ONY Inc., v. Cornerstone Therapeutics Inc.*,
  720 F.3d 490 (2d Cir. 2013).............................................................. 26

*Outlaw Lab., LP v. Shenoor Enter., Inc.*,
  371 F. Supp. 3d 355 (N.D. Tex. 2019) ............................................... 23

*Paschal v. Great W. Drilling, Ltd.*,
  215 S.W.3d 437 (Tex. App.—Eastland 2006, pet. denied) ............................ 40

*Peter Scalamandre & Sons, Inc. v. Kaufman*,
  113 F.3d 556 (5th Cir. 1997) .......................................................... 27

*Phantom Touring, Inc. v. Affiliated Publications*,
  953 F.2d 724 (1st Cir. 1992) .......................................................... 28

*Pizza Hut, Inc. v. Papa John's Intern., Inc.*,
  227 F.3d 489 (5th Cir. 2000) ...................................................... 23, 25

*Richardson-Eagle, Inc. v. William M. Mercer, Inc.*,
  213 S.W.3d 469 (Tex. App.—Houston [1st Dist.] 2006, pet. denied)...................... 37, 38

*Rimkus Consulting Group, Inc. v. Cammarata*,
  688 F. Sup 2d 598 (S.D. Tex. 2010) ............................................... 35

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984)........................................................................ 24

*Schlumberger Well Surv. Corp. v. Nortex Oil & Gas Corp.*,
  435 S.W.2d 854 (Tex. 1968).......................................................... 40, 41

*Schoellkopf v. Pledger*,
  778 S.W.2d at 897 (Tex. App.—Dallas 1989, writ denied)............................ 39

*Seven-Up Co. v. Coca-Cola Co.*,
  86 F.3d 1379 (5th Cir. 1996) ...................................................... 23, 24

*St. Amant v. Thompson*,
  390 U.S. 727  (1968)...................................................................... 33

*Taylor Pub. Co. v. Jostens, Inc.*,
    216 F.3d 465 (5th Cir. 2000) ........................................................................ 39

*Tilton v. Marshall*,
    925 S.W.2d 672  (Tex. 1996)......................................................................... 40

*TMJ Implants, Inc. v. Aetna, Inc.*,
    498 F.3d 1175 (10th Cir. 2007) ...................................................................... 27

*Transcom Enhanced Servs., Inc. v. Qwest Corp.*,
    2010 WL 2505606, at *4 (N.D. Tex. June 18, 2010) ...................................... 23

*Transport Ins. v. Faircloth*,
    898 S.W.2d 269 (Tex. 1995) .......................................................................... 41

*Turner v. KTRK Television, Inc.*,
    38 S.W.3d 103 (Tex. 2000).............................................................................. 28

*Underwager v. Salter*,
    22 F.3d 730 (7th Cir. 1994) ........................................................................... 31

*USA Senior Care Network, Inc. v. Natl Ass'n of Ins. Comm'ners*,
    2011 WL 13238633, at *5 (W.D. Tex. Apr. 27, 2011)..................................... 25

*Valley Elecs. AG v. Polis*,
    No. 21-2108-CV, 2022 WL 893674, at *1 (2d Cir. Mar. 28, 2022)................................. 28

*Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*,
    340 F.3d 233 (5th Cir. 2003) ......................................................................... 18

**Statutes**

11 U.S.C. § 1125(a)(1)................................................................................................ 22

11 U.S.C. § 1125(a)(1)(B) ......................................................................................... 22

47 U.S.C. § 230(c)(1)................................................................................................. 21

47 U.S.C. § 230(e)(3).................................................................................................. 21

Tex. Civ. Prac. & Rem. Code § 73.055(a)(1) ........................................................... 35

Tex. Civ. Prac. & Rem. Code § 73.055(c)................................................................. 35

**Other Authorities**

Francis J. Offermann, *Beware: The COVID-19 Snake Oil Salesmen Are Here* (Nov.
    5, 2020) ................................................................................................. 15, 19

Restatement (Second) Of Torts § 559................................................................... 29

U.S. Department of Health and Human Services, *COVID-19 Vaccine Milestones*,
https://www.hhs.gov/coronavirus/covid-19-vaccines/index.html .................................... 15

**Rules**

Fed. R. Civ. P. 56(a) ...................................................................................................... 17

**Articles and Reports**

Hugo Destaillats, et al., *Evaluation of Pollutant Emissions from Portable Air
Cleaners* (December 2014) ........................................................................ 11, 13

Michael G. Gressel and Lynn C. Wilder, *Evaluation of mitigation strategies for
reducing formaldehyde concentrations in unoccupied Federal Emergency
Management Agency-owned travel trailers* (Dec. 10, 2009) ...................................... 11, 13

Stephanie Licht, et al., *Use of Bipolar Ionization for Disinfection within Airplanes*
("Boeing Report") (2021) .......................................................................... 12

Todd Crawford, et al., *Changes in IAQ Caused by Corona Discharge Air Cleaner*,
ASHRAE JOURNAL (December 2018) ......................................................... 11, 13

Trane Technologies, *A Taxonomy of Air-cleaning Technologies Featuring Bipolar
Ionization* ................................................................................................ 12

U.S. Environmental Protection Agency, *Residential Air Cleaners, a Technical
Summary* (3rd ed., July 2018) ................................................................... 11

Wei Dong, et al., *Different cardiorespiratory effects of indoor air pollution
intervention with ionization air purifier: Findings from a randomized,
double-blind crossover study among school children in Beijing*,
Environmental Pollution (Nov. 2019) .............................................................. 11

Wei Liu, et al., *Negative ions offset cardiorespiratory benefits of PM 2.5 reduction
from residential use of negative ion air purifiers*, INDOOR AIR (Jan. 2021) .................... 11

Yichen Zeng, et al., *Evaluating a commercially available in-duct bipolar ionization
device for pollutant removal and potential byproduct formation*, BUILDING
AND ENVIRONMENT (May 15, 2021) ........................................................ 11, 12

## I.        Joinder in enVerid's Motion for Summary Judgment

Defendants D Zine Partners, LLC, and Marwa Zaatari ("Defendants") hereby join in the motion for summary judgment filed by enVerid Systems, Inc., and adopt and incorporate by reference enVerid's brief in support of its motion for summary judgment. Defendants are entitled to summary judgment on all of the claims asserted by Plaintiff Global Plasma Solutions, Inc., for the same reasons stated in enVerid's motion: (1) GPS cannot show that any of Dr. Zaatari's statements were false; (2) GPS cannot show a causal connection between Defendants' alleged statements and its lost business; (3) GPS's claims under the Lanham Act fail because Defendants' statements are not commercial advertising or promotion; (4) GPS's retraction request was untimely, thus barring exemplary damages relating to its defamation claim; (5) all of Dr. Zaatari's statements were of her scientific opinions, and are thus not actionable; and (6) GPS cannot prove actual malice, a requisite for its defamation claim. For those reasons, as explained in enVerid's brief in support of its motion, Dr. Zaatari and D Zine are also entitled to summary judgment.

## II.       Introduction

Plaintiff Global Plasma Solutions, Inc. ("GPS") is a manufacturer of "needlepoint bipolar ionization" air purifiers. Defendant Marwa Zaatari, Ph.D., is a renowned scientist and indoor air-quality ("IAQ") expert. GPS has brought this suit against Dr. Zaatari and two entities with which she has been affiliated because of her public criticisms of ionization technology—specifically its efficacy and safety. The efficacy and safety of ionization is the subject of scientific debate, and all of Dr. Zaatari's statements at issue in this case are scientific opinions expressed in the context of that debate. GPS seeks to silence her, and thus skew the scientific debate about ionization, to protect the sales of its air-purification products.

All of GPS's claims are in the nature of defamation, as all are premised on Dr. Zaatari's public statements about ionization products. GPS pleads claims against Dr. Zaatari and D Zine for

violation of the Lanham Act, defamation, business disparagement, tortious interference, and unfair competition. (Third Amended Complaint ("Complaint") ¶¶ 130-63, ECF No. 58 at 34-40.) GPS does not allege that D Zine itself made any of the statements at issue but instead seeks to hold D Zine jointly liable with Dr. Zaatari under a theory of civil conspiracy. (Complaint ¶¶ 164-72, ECF No. 58 at 40-41.)

GPS bases its claims on twenty-nine statements described in its February 4, 2022 retraction letter provided to Defendants' counsel.[1] (GPS's Second Amended Resp. to enVerid's First Set of Interrogatories at 8, App. 17; Retraction Letter, App. 22-52.) These statements by Dr. Zaatari consist of tweets (posts on twitter.com), re-tweets of statements or articles authored by others, an open letter Dr. Zaatari co-authored with another scientist and which was co-signed by a dozen other scientists, statements made to CNN which were published in a CNN article and other news media, and slides used at two presentations. (Retraction Letter, App. 22-52.)

GPS's claims fail for the following reasons:

1. GPS cannot prove that any of Dr. Zaatari's alleged actions caused it any loss;

2. None of Dr. Zaatari's statements are actionable as false statements of fact about GPS or its products, but are instead expressions of opinion, made in the context of a scientific debate;

3. GPS's Lanham Act claim fails for the additional reason that Dr. Zaatari's statements were not commercial advertising or promotions; and

---

[1] By order dated June 15, 2022 (ECF No. 149), the Court required GPS to identify the statements on which its claims are based. GPS's second amended response to enVerid's Interrogatory No. 4 states that the retraction letter "specifies each of the false, defamatory statements by enVerid, Zaatari, and/or D Zine regarding GPS and its products." GPS's corporate representative testified that the statements contained in GPS's retraction letter are the only statements at issue in this case. (Boyle Depo. at 149-50, App. 767-768.) Regardless, in the event GPS asserts that its claims can be supported by statements other than those identified, GPS's claims still fail because none of the statements are actionable for the reasons explained below.

4.  GPS's defamation claim fails for the additional reason that GPS cannot prove that Defendants acted with actual malice or caused it any special damages.

For these reasons, as explained in greater detail below, Dr. Zaatari and D Zine are entitled to summary judgment on all of GPS's claims and causes of action asserted against them.

## III.   Facts

GPS develops and sells air purification products using "needlepoint bipolar ionization" technology. (Boyle Depo. at 26-27, App. 644-645.) GPS's bipolar ionization technology creates and releases ions into the airstream using existing HVAC systems as the delivery method. *Id.* As these ions disperse throughout a space, they seek out and form bonds with particles in the air through a process called agglomeration. (Waddell Depo. at 151, App. 1124.) Needlepoint bipolar ionization technology is not exclusive to GPS; numerous other companies also use it in their products. (Boyle Depo. at 28-29, App. 646-647; Waddell Depo. at 98, App. 1071.)

The safety of bipolar ionization technology is the subject of ongoing scientific debate because these products have the ability to produce high levels of ions, ozone, and other understudied products and byproducts.[2] (*See* Weeks Depo. at 102, 187, 196-97, App. 1417, 1502, 1511-1512 (noting that even GPS's UL 2998 products emit ozone below 5 PPB, which potentially cause

---

[2] *See, e.g.*, Yichen Zeng, et al., *Evaluating a commercially available in-duct bipolar ionization device for pollutant removal and potential byproduct formation*, BUILDING AND ENVIRONMENT (May 15, 2021), included in enVerid's Appendix at 7-22; Hugo Destaillats, et al., *Evaluation of Pollutant Emissions from Portable Air Cleaners* (December 2014), included in enVerid's Appendix at 24-166; Todd Crawford, et al., *Changes in IAQ Caused by Corona Discharge Air Cleaner*, ASHRAE JOURNAL (December 2018), included in enVerid's Appendix at 168-171; Michael G. Gressel and Lynn C. Wilder, *Evaluation of mitigation strategies for reducing formaldehyde concentrations in unoccupied Federal Emergency Management Agency-owned travel trailers* (Dec. 10, 2009), included in enVerid's Appendix at 173-352; U.S. Environmental Protection Agency, *Residential Air Cleaners, a Technical Summary* (3rd ed., July 2018), included in enVerid's Appendix at 524-597; Wei Liu, et al., *Negative ions offset cardiorespiratory benefits of PM 2.5 reduction from residential use of negative ion air purifiers*, INDOOR AIR (Jan. 2021), included in enVerid's Appendix at 354-362; Wei Dong, et al., *Different cardiorespiratory effects of indoor air pollution intervention with ionization air purifier: Findings from a randomized, double-blind crossover study among school children in Beijing*, Environmental Pollution (Nov. 2019), included in enVerid's Appendix at 364-405. *See also* Feb. 9, 2021 email from GPS, noting that many of GPS's best-selling models would not pass UL 2998, included in enVerid's Appendix at 1088; Lee Depo. (same), included in enVerid's Appendix at 749.

concern); Boyle Depo. at 46, App. 664 (Ozone "is not a good thing in indoor environments in high concentrations. It's a—it's a known irritant. And so you really don't want products that are contributing to your breathable air."); Sobek Depo. at 207, App. 1840 (acknowledging that ozone can be harmful).)

GPS has itself criticized the safety of other ionization and bipolar ionization products, including companies such as Atmos Air that also achieved UL 2998 certification. (*See* Emails from C. Waddell to distributors on June 16, 2020 (stating that Atmos Air products "produce high levels of ozone and do create ultrafine particles, aldehydes and other undesirable byproducts"), App. 2409; May 7, 2020 ("They produce high levels of ozone, but claim 0"), App. 2386; and May 1, 2020 ("The state of CA has them listed as potentially dangerous ozone generator!"), contained in enVerid's Appendix at 679.)

In 2020, GPS scientific advisor Dr. Faramarz Farahi stated in a confidential report to GPS that safe ion levels that "people are exposed to be limited to 10,000 ions/cm3" and "concentrations of air ions in the range of 100,000 ions/cm3, for example, would have biological effects similar to one of the most toxic chemicals (e.g., botulism)." (App. 2443.) Few lab tests data commissioned by GPS (App. 2394-2405) to measure the reduction of SARS-COV-2 had ion count higher than 10,000 ions/cm3 and up to 200,000 ions/cm3 and Dr. Faramarz Farahi acknowledged "this level of negative ion count is still high," and GPS's employees and customers measured ion levels up to 100,000 ions/cm3 in real-world installations. (App. 2406.)

Scientists and studies have also shown that these products are not effective.[3] (*See* Sept. 3, 2020 Email from GPS's CTO Charles Waddell and GPS manufacturer representative (noting that

---

[3] *See, e.g.*, Stephanie Licht, et al., *Use of Bipolar Ionization for Disinfection within Airplanes* ("Boeing Report") (2021), included in enVerid's Appendix at 407-429; Yichen Zeng, et al., *Evaluating a commercially available in-duct bipolar ionization device for pollutant removal and potential byproduct formation*, BUILDING AND ENVIRONMENT (May 15, 2021), included in enVerid's Appendix at 7-22; Trane Technologies, *A Taxonomy of Air-cleaning Technologies Featuring Bipolar Ionization*, included in enVerid's

a GPS product FC3 is being sold to schools even though it is documented that "the output will

decrease and will not have any effectiveness against pathogens", App. 2412.) Because of a lack

of real-world testing on such products, both the U.S. Environmental Protection Agency ("EPA")

and the U.S. Centers for Disease Control ("CDC") classify bipolar ionization as an "emerging

technology," cautioning that "little research is available that evaluates it outside of lab conditions."

(*See* enVerid's Appendix at 483-487.) Even GPS's own chief science officer, Edward Sobek, has

acknowledged that the technology used in GPS's products is an "emerging technology." (Sobek

Depo. at 156-57, 199-201, App. 1789-1790.) And many of GPS's customers' independent tests

showed poor performance. (App. 2414-2440.) (A review of health guidelines, industry reports,

scientists' guidelines, and media articles debating the safety and efficacy of bipolar ionization

technology including needle point bipolar ionization in 2021 and early 2022 is shown contained

in Exhibit 19 to Defendant's motion to strike Quentin Mimms as an expert.)

Dr. Marwa Zaatari is a scientist and one of the primary voices in the IAQ field regarding

air purification devices, including the technology used by GPS, of which she has been an avid

critic for many years. (Brinckman Depo. at 125, App. 377 (Zaatari has been a critic of GPS since

at least 2018); Complaint ¶¶ 4, 56; Weeks Depo. at 128, App. 1443 (Zaatari is a leader in the IAQ

industry). Zaatari believes that it is her responsibility, as a scientist, to provide academic criticism

regarding IAQ technology to promote public well-being. (Zaatari Depo. at 24-28, App. 2050-2054

(she holds a B.S. in mechanical engineering, M.S. in engineering management, and a Ph.D. from

the University of Texas at Austin with a concentration in civil and architectural engineering); 214,

---

Appendix at 431-440; Hugo Destaillats, et al., *Evaluation of Pollutant Emissions from Portable Air Clean-ers* (December 2014), included in enVerid's Appendix at 24-166; Todd Crawford, et al., *Changes in IAQ Caused by Corona Discharge Air Cleaner*, Ashrae Journal (December 2018), included in enVerid's Appendix at 168-171; Michael G. Gressel and Lynn C. Wilder, *Evaluation of mitigation strategies for reducing formaldehyde concentrations in unoccupied Federal Emergency Management Agency-owned travel trailers* (Dec. 10, 2009), included in enVerid's Appendix at 173-352.

App. 2240 (testifying that the motivation for her allegedly defamatory statements was a desire to protect children and the greater good).

Like many air purification industry leaders, Zaatari is actively involved in the American Society of Heating, Refrigerating, and Air-Conditioning Engineers ("ASHRAE"), serving as a member of various committees and a voting member of the Standard 62.1 Committee. (Zaatari Depo. at 39, App. 2065 (testifying that she has been involved with ASHRAE since 2007), 43, App. 2069 (testifying that she is heavily involved in numerous ASHRAE committees, including the 62.1 committee). Over the years, Zaatari's involvement in ASHRAE and commitment to promoting public well-being has resulted in clashes with GPS. (Brinckman Depo. at 125, App. 377 (clashes between GPS and Zaatari started in 2018); Zaatari Depo. at 58, App. 2084 (beginning in 2016 or 2017, she was constantly harassed by GPS).

Zaatari began working for enVerid in 2015. (Weeks Depo. at 108, App. 1423.) During her employment with enVerid, enVerid consulted Zaatari regarding compliance with ASHRAE stand-ards, outside publications regarding air purification technology, understanding the mechanics of other air purification productions, and marketing enVerid products. (*Id.;* Zaatari Depo. at 52-54, App. 2078-2080 (testifying that her job responsibilities at enVerid focused on science and that she was not involved in competition and did not focus on GPS).

In or around May 2020, Zaatari left her employment with enVerid to work for another company, Blue Box Air, LLC. (Weeks Depo. at 73, 108, App. 1388, 1423.) Zaatari then became an independent scientific advisor to enVerid, in which role she continues to consult with enVerid regarding compliance with air purification standards and legislation affecting the air purification industry. (Weeks Depo. at 210-11, 297, App. 1525-1526, 1612 (testifying that Zaatari is a source for understanding the technology underlying different IAQ products); 293 (testifying that enVerid uses Zaatari to ensure that its statements regarding the science of its products are true). In her

involvement with ASHRAE, Zaatari did not conceal her association with enVerid. (Boyle Depo. at 159, App. 777.)

In March 2020, GPS's sales dramatically increased due to the emergence of COVID-19 and GPS's representations that its products could mitigate its effects. (Brinkman Depo. at 56, App. 308.) GPS's increased market presence and bold marketing claims subjected it to increased scientific scrutiny and criticism. (Brinkman Depo. at 73-74, App. 325-326 (discussing lawsuit related to article allegedly defaming GPS); 78-80, App. 330-332 (discussing lawsuit against publisher of article against GPS); 85-123, App. 337-375 (discussing multiple cease-and-desist letters sent to third parties criticizing GPS).

Beginning in the fall of 2020, vaccines fighting COVID-19 were approved for mass distribution.[4] GPS understood the effect this scientific development would have on its 2021 sales and forecasted a decline in its sales beginning in the first quarter of 2021. (GPS Fiscal Year 2021 Budget (Feb. 8, 2021), App. 2372-2385.)

On November 5, 2020, a scientist with 30 years of experience in the IAQ industry, Francis J. Offermann, published *Beware: The COVID-19 Snake Oil Salesmen Are Here*, which in GPS's own words contains "disparaging statements about GPS and GPS's products, identifying them expressly by name and indicating, among other things, that GPS is untrustworthy and willing to lie, and that GPS's products do not just fail to better air quality but actually worsen it by releasing ozone and formaldehyde." Complaint ¶ 7, *Global Plasma Solutions, Inc. v. IEE Indoor Environmental Engineering*, No. 4:21-CV-02884-JSW (N.D. Cal. April 21, 2021), ECF No. 1, App. 96. Offerman has no affiliation with Zaatari. (Zaatari Depo. at 156, App. 2182 (testifying that she did not know Offerman in 2020 when the paper was published).)

---

[4]   U.S. Department of Health and Human Services, *COVID-19 Vaccine Milestones*, https://www.hhs.gov/coronavirus/covid-19-vaccines/index.html.

In January 2021, Boeing published a study finding that GPS's products did "not show[] significant disinfection effectiveness."[5] In March 2021, a study conducted at Illinois Institute of Technology by ten independent scientists, *Evaluating a commercially available in-duct bipolar ionization device for pollutant removal and potential byproduct formation*, was published ultimately finding that "GPS's technology was ineffective and harmful to consumers." Complaint ¶ 2, *Global Plasma Solutions, Inc. v. Elsevier, Inc.*, No. 3:22-CV-00034-RJC-DSC (W.D.N.C. Jan. 26, 2022), ECF No. 1.

A class action complaint was filed in May 2021 against GPS claiming that it made numerous false representations regarding the efficacy of its products and the benefits purchasers should expect to gain therefrom. Complaint ¶¶ 1-19, *Garner v. Global Plasma Solutions, Inc.*, No. 1:21-CV-00665-SB (D. Del. May 7, 2021).

In early 2021, Zaatari joined the scientific chorus of public criticism and began publishing numerous tweets questioning the safety and efficacy of ionization, bipolar ionization, and GPS's products. (*See* GPS's Feb. 4, 2022 Retraction Letter, App. 22 (alleging that Zaatari's first defamatory statement was published on January 18, 2021); Complaint ¶ 75 (same).) Although GPS fails to distinguish Zaatari's tweets that specifically mention GPS from tweets that discuss ionization, bipolar ionization, and needlepoint bipolar ionization generally, this distinction is important and has been often cited by GPS which has similarly criticized the safety and efficacy of other ionization and bipolar ionization products. (Waddell Depo. at 90-92, 114, 168, App. 1063-1065, 1087, 1141.)

During the spring of 2021, in a final attempt to silence Zaatari, GPS offered Zaatari a position to serve on its science advisory board. (*See* enVerid Appendix at 677, March 20, 2021 Email

---

[5] Boeing's study is contained in enVerid's appendix, filed in support of its motion for summary judgment, at pages 407-429.

from G. Brinckman, stating: "In an ideal world I would love to bring you into our research efforts and support our science advisory board. . . . I'll pay for a trip to Charlotte and consultation with our team.")

In April 2021, Dr. Zaatari and Dr. Marcel Harmon drafted an "open letter" to address the use of electronic air cleaning equipment in buildings. (Open Letter, App. 53.) The Open Letter was reviewed and supported by twelve other scientists in the industry and cites twenty-three independent scientific articles as references. *See id.* Just days after release of the Open Letter—and after GPS's efforts to hire Zaatari failed and faced with numerous scientific articles debating the safety and efficacy of GPS's products and lost sales due to pandemic fatigue—GPS filed this lawsuit.

In line with GPS's stated litigation tactic of silencing critics, this lawsuit's goal was to "control the narrative" around its products and to halt the dissemination of Zaatari's research and scientific opinions and chill her right to freely debate the safety and efficacy of ionization technology. (*See* enVerid Appendix at 711, March 12, 2021 Email to G. Brinckman; enVerid Appendix at 759-761, April 28, 2021 Email From GPS Employee (regarding lawsuits filed in Federal Court, including this one, "It is our goal to control the narrative"); enVerid Appendix at 754-756, March 12, 2021 Email from Ken Walker (Executive Chairman of GPS Board of Directors) to G. Brinckman (encouraging Brinckman to "flex our GPS muscle with vocal detractors").)

## IV.   Argument and Authorities

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Once the movant meets its initial burden to show that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce competent evidence showing the existence of a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). A factual issue is material "if its resolution could affect the outcome of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d

233, 235 (5th Cir. 2003). A factual dispute is "'genuine,' if the evidence is such that a reasonable [trier of fact] could return a verdict for the non-moving party." *Crowe v. Henry*, 115 F.3d 294, 296 (5th Cir. 1997).

### A. All of GPS's claims fail because GPS cannot prove that any act by Zaatari or D Zine caused it any loss.

As set forth below with regard to each of GPS's pleaded causes of action, each of GPS's claims requires a showing of harm or injury resulting from Defendants' alleged wrongful acts. Although the standard of causation required for each cause of action differs, each requires more than mere "but for" causation. Liability under the Lanham Act, for example, requires a showing of proximate causation. *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014). The same is required for defamation. *Anderson v. Durant*, 550 S.W.3d 605, 618 (Tex. 2018). Business disparagement and tortious interference require proof that the statement was a "substantial factor" in causing the plaintiff's alleged injury. *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 767 (Tex. 1987); *COC Services, Ltd. v. CompUSA, Inc.*, 150 S.W.3d 654, 679 (Tex. App.—Dallas 2004, pet. denied).

GPS has been unable to develop any evidence that a single existing or prospective customer ceased doing business with it as a result of the alleged wrongful statements. Indeed, GPS admits that it cannot attribute the loss of a single customer to any of Defendants' statements besides the Open Letter. (Boyle Depo. at 182-256, App. 800-874 (admitting that GPS could not attribute a specific lost customer to statements 1 (182), 2 (186), 3 (191), 4 (195-96), 5 (196-97), 6 (197-98), 7 (205), 8 (206), 9 (208), 10 (208), 11 (212-13), 12 (214-15), 13 (215-16), 14 (217), 15 (219), 16 (220), 17 (223), 18 (225), 20 (243), 21 (245), 22 (246), 23 (248), 24 (249), 25 (251), 26 (252), 27 (253-54), 28 (256), and 29 (258)); *see* Boyle Depo. at 231, App. 849 (stating that GPS lost a *single* customer due to statements made in the Open Letter). Further, GPS has failed to present any

contracts, email communications, or other evidence demonstrating that it lost customers due to any of Dr. Zaatari's tweets or presentations.

Even if GPS presents evidence that one customer cited the Open Letter as the basis for its departure from GPS, its claims still fail because GPS cannot show a causal connection between the statements and GPS's alleged lost business. Although GPS attempts to paint the picture of Zaatari as the lone voice criticizing its ionization technology, the Open Letter was originated and co-authored by another prominent scientist, Marcel Harmon, and endorsed by twelve other independent scientists—none of whom been included in this lawsuit by GPS. (Brinckman Depo. 338, App. 590; Open Letter, App. 53; Zaatari Depo. at 193, App. 2219 (testifying that Dr. Marcel Harmon wrote the first draft of the open letter).) The Open Letter is also supported by twenty-three underlying scientific references. (Open Letter, App. 53.)

Further, the Open Letter was far from the only piece of scientific discussion criticizing GPS's products in the relevant time period. As discussed above, Francis Offerman published his "Beware: The COVID-19 Snake Oil Salesmen Are Here" article in November 2020. Boeing published the findings of its study of GPS's products in January 2021. And in March 2021, a team of scientists published their findings from a study conducted at Illinois Institute of Technology. GPS was also sued in a class-action case in May 2021 for alleged false statements it made regarding the efficacy of its products. (*See* Waddell Depo. at 172-73, 215-16, App. 1145-1146, 1188-1189 (admitting that GPS lost business with various customers because of the class action lawsuit against GPS).

With a large chorus of scientific criticism regarding its technology all at the same time, GPS cannot prove that its alleged losses are attributable to statements made by Dr. Zaatari instead of others. In fact, in other documents GPS has attributed its lost business to statements of non-parties, filing two lawsuits relating to statements made by other scientists during the same time

period (discussed above) and serving numerous cease-and-desist letters. (Brinkman Depo. at 85-123, App. 337-375 (discussing multiple cease and desist letters sent to third parties criticizing GPS).)

GPS designated Quintin Mimms as its damages expert and to testify that Defendants' alleged defamatory statements "correlates" to GPS's supposed damages. (GPS Designation of Experts, ECF No. 92 at 5.) Mimms's expert report, however, purports to offer an opinion that Defendants' statements *caused* GPS to lose sales. (Mimms Report at 10, App. 2338-2339.) Mimms offers no analysis to support that bald conclusion. Mimms notes only that Zaatari's statements (and the critical statements of others in the scientific community) corresponded time-wise with a decrease in market demand for GPS's products. (Mimms Report at 12-13, App. 2338-2339.) Critically, Mimms offers no explanation as to *how or why* Dr. Zaatari's statements caused any customer to cease doing business with GPS, particularly in light of (1) the ongoing debate regarding the safety and efficacy of GPS's products and (2) the end of the period of high demand for air purifiers that occurred during the first year of the COVID-19 pandemic, not to mention the availability of vaccines. (*See* Mimms Report at 15-16, App. 2341-2342 (discussing the "spike" in demand for GPS products after COVID-19 was declared a pandemic and significant government funding became available to purchase GPS products).) Mimms acknowledges that demand for GPS's products dropped starting in early 2021 due to (1) the rollout of COVID-19 vaccines and (2) GPS's dramatic reduction in its sales commission rate. (Mimms Report at 17, App. 2343) Thus, in addition to not offering any support for his conclusion that Dr. Zaatari's statements were a cause of GPS's decline in sales, Mimms fails to account for other apparent causes. These flaws in Mimms's analysis are the subject of Defendant's motion to strike Mimms due to the unreliability of his opinions. For the reasons explained above and in that motion, Mimms's testimony is not evidence that Defendants' alleged statements caused GPS any damages.

Even if Mimms's testimony were otherwise admissible, it would still be insufficient to meet the standard of causation for any of GPS's claims. Mimms does not opine that Defendants' actions were a proximate cause of, or a substantial factor in causing, any of GPS's alleged losses. His opinion that the losses could not have occurred "but for" Defendants' statements is insufficient as a matter of law to meet either standard. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 799 (Tex. 2004); *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995).

Because GPS has no evidence that Defendants' statements caused it any loss, particularly in light of the other likely causes—the ongoing public debate regarding the safety and efficacy of ionizers, criticism of GPS's technology by other scientists, litigation against GPS regarding the safety and efficacy of its products, competition in the marketplace, decrease in demand due to the availability of COVID vaccines (and ebb in the COVID pandemic generally), and GPS's dramatic changes to its sales commission structure—summary judgment for Defendants on all of GPS's claims is appropriate.

### B.   All of GPS's claims based on Zaatari's retweeting of content fail because a retweet is not actionable as a statement of fact.

Many of the allegedly defamatory statements that underly GPS's claims are not, in fact, statements made by Dr. Zaatari, but are instead statements of third parties whom Zaatari retweeted or cited in her tweets. Such statements by others are not actionable as statements of fact.

Under the Communications Decency Act, users of an interactive computer service like Twitter are not liable for defamation or similar claims based on content provided by others: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). This provision of the CDA supersedes state law that would otherwise impose liability. *Id.* § 230(e)(3).

As a result, Defendants can only be potentially liable for their own statements—not statements made by others that Defendants may have retweeted or cited in Defendants' tweets.

Of the twenty-nine statements underlying GPS's claims, twenty-one are at least partly comprised of statements made by others in tweets, news articles, scientific papers, or reports of test results. (*See* Retraction Letter, App. 22; Index of Alleged False and Defamatory Statements, App. 1; Statement 22 KCUR Article, App. 64; Statement 23 CNN Article, App. 74; Statement 27 NBC News Article, App. 83; Statement 28 Mercury News Article, App. 92.) One, Statement 9, is a retweet by Dr. Zaatari of another author's tweet: Zaatari wrote only the word "This," with a finger pointing to the original author's tweet. (Retraction Letter at 12, App. 33.) Pursuant to Section 230(c)(1) of the CDA, GPS may not rely on any of these statements of others as a basis for any of its claims.

### C.     GPS's Lanham Act claim fails.

For its Lanham Act claim, GPS alleges that Defendants made "false and misleading statements in commercial advertisements, presentations, and publications." (Third Amended Complaint ¶ 131, ECF No. 58 at 34.) GPS thus seek to hold Defendants liable under 11 U.S.C. § 1125(a)(1)(B), which provides:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> *        *        *
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

11 U.S.C. § 1125(a)(1).

Thus, the elements of GPS's Lanham Act claim are:

> (1) that the defendant made a false statement of fact about its product in a commercial advertisement; (2) that the statement actually deceived or has a tendency to deceive a substantial segment of its audience; (3) the deception is likely to influence the purchasing decision; (4) the defendant caused the false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result.

*Outlaw Lab., LP v. Shenoor Enter., Inc.*, 371 F. Supp. 3d 355, 362 (N.D. Tex. 2019) (quoting *Logan v. Burgers Ozark Country Cured Hams, Inc.*, 263 F.3d 447, 462 (5th Cir. 2001). "The failure to prove the existence of any element of the prima facie case is fatal to the plaintiff's claim." *Pizza Hut, Inc. v. Papa John's Intern., Inc.*, 227 F.3d 489, 495 (5th Cir. 2000).

As discussed above, GPS's claim fails due to lack of evidence that Defendants' actions caused it any damages. It also fails because (1) Zaatari's statements were not "commercial advertising" or "promotions" and (2) Zaatari's statements were opinions, not facts.

### 1.   Zaatari's statements were not "commercial advertising" or "promotions."

To make out a claim for false advertising, a plaintiff must first show "that a party made a false or misleading statement of fact about his own or another's product in the context of 'commercial advertising or promotion.'" *Outlaw Lab.*, 371 F. Supp. 3d at 362-63 (quoting *Transcom Enhanced Servs., Inc. v. Qwest Corp.*, 2010 WL 2505606, at *4 (N.D. Tex. June 18, 2010)). To qualify as a statement made in the context of commercial advertising or promotion, the representation must be made for "the purpose of influencing consumers to buy defendant's goods or services" and "disseminated sufficiently to the relevant purchasing public." *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1384 (5th Cir. 1996). The defendant must be in commercial competition with the plaintiff. *Id.* While the representations need not be made in a "classical advertising campaign," but may consist instead of more informal types of "promotion," the representations must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or

"promotion" within that industry. *Id.* In essence, commercial speech is "speech intended and used to propose a commercial transaction with the speaker." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 634 (1984).

First, GPS has developed no evidence to show that Dr. Zaatari's statements were made in the context of commercial advertising or promotion. None mentioned enVerid or D Zine or either of their products or services, and none was contained in either of those business's advertising or promotional materials. (Retraction Letter, App. 22-52.) They were, instead, made on Twitter, to news outlets, and at scientific conferences. (*Id.*)

Second, though a few of Zaatari's statements mention GPS, most of the challenged statements do not mention GPS or its products. (Retraction Letter, App. 22-52; *see also* Index of Alleged False and Defamatory Statements, App. 4-9.) GPS has been similarly critical of the safety and efficacy of other ionization products, engaging in extensive marketing efforts to distinguish its products from ionizers generally. (Brinckman depo. at 204-05, App. 456-457.)

Third, Zaatari's statements were not economically motivated. Zaatari is a scientist and one of the "primary voices" regarding air purification devices. (Complaint ¶¶ 4, 56; Zaatari Depo. at 24-27, App. 2050-2053 (testifying that she holds a B.S. in mechanical engineering, M.S. in engineering management, and a Ph.D. from the University of Texas at Austin with a concentration in civil and architectural engineering).) Zaatari believes that it is her responsibility to provide academic criticism regarding GPS's technology to promote public well-being. (Zaatari Depo. at 214, App. 2240 (testifying that her motivation sprung from a desire to protect children and the greater good). She made all of her statements in this context. (*See* Retraction Letter, App. 22 (all statements alleged concern the safety and efficacy of ionizers, bipolar ionizers, and needlepoint bipolar ionizers).) Although GPS broadly alleges that Zaatari's statements were made to benefit enVerid or D Zine, there is no competent summary judgment evidence that Zaatari's statements benefited

enVerid or D Zine. Without this evidence, GPS's Lanham Act claims cannot survive summary judgment. *See USA Senior Care Network, Inc. v. Nat'l Ass'n of Ins. Comm'ners*, 2011 WL 13238633, at *5 (W.D. Tex. Apr. 27, 2011) (upholding summary judgment in favor on Lanham Act claim because speculative evidence that Defendants might theoretically realize a profit from publication of draft letters regarding legal and regulatory issues associated with plaintiff's Medicare products was insufficient to support a finding of economic motivation); *Edward Lewis Tobinick, MD v. Novella*, 848 F.3d 935, 950 (11th Cir. 2017) (affirming summary judgment for defendant neurologist who posted statements in a blog titled "Science-Based Medicine" criticizing a dermatologist's method for administering arthritis medicine reasoning that statements were not commercial speech as they had an "educational purpose" and did not propose a commercial transaction.).

And finally, GPS admits that it does not consider filtration, the technology utilized by enVerid and D Zine, to be a competitor. (Boyle Depo. at 99-100, App. 717.) Accordingly, summary judgment in favor of Defendants on GPS's Lanham Act claim is appropriate because Zaatari's speech was not commercial.

### 2. None of Zaatari's statements is actionable as a false statement of fact regarding GPS or its products.

Essential to any claim under this provision of the Lanham Act is a determination of whether the challenged statement is one of fact—and thus actionable—or one of opinion—which is not actionable. *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495-96 (5th Cir. 2000). "A statement of fact" cognizable under the Lanham Act is one that is "capable of being proved false." *Eastman Chem. Co. v. Plastipure, Inc.*, 775 F.3d 230, 235-36 (5th Cir. 2014) (internal quotations omitted).

Defendants' specific arguments for why each statement identified by GPS is not actionable as a false statement of fact are set forth in the Index of Alleged False and Defamatory Statements, included as the first document in the Appendix supporting this motion. Each of the statements fits into one or more of the following categories, rendering it not actionable under the Lanham Act (or any other cause of action described below):

Statements Not Relating to GPS or its Products. Half of the statements at issue make no mention of GPS or its products. Many discuss only "ionization" or bipolar ionization generally, technologies used by many manufacturers. GPS has itself criticized the safety and efficacy of other ionization and bipolar ionization products. (Waddell Depo. at 90-92, 114, 168, App. 1063-1065, 1087, 1141.) GPS thus cannot claim that any statement *not* specifically about GPS is a defamatory statement of fact.

Quotes and Retweets of Statements by Others. As explained above, Defendants can have no liability for retweets of content authored by others.

Scientific Debate. Dr. Zaatari's statements that *do* address GPS's products deal with their safety and efficacy. Statements of different, even conflicting, opinions, about unsettled matters of scientific or medical treatment that are the subject of ongoing public debate and deep public interest, cannot give rise to defamation claims. *See, e.g., ONY Inc., v. Cornerstone Therapeutics Inc.*, 720 F.3d 490, 497–98 (2d Cir. 2013); *Arthur v. Offit*, Case No. 09-cv-1398, 2010 WL 883745, at *6 (E.D. Va. Mar. 10, 2010); *cf. Ioppolo v. Rumana*, 581 F. App'x 321, 330–31 (5th Cir. 2014).

In *Arthur v. Offit*, the plaintiff sued a magazine publisher over a statement accusing the plaintiff of lying about the effectiveness of vaccines. The court dismissed, holding that given the scientific uncertainty at the time, the media statement "lack[ed] the provably false content that is required to support a defamation action." 2010 WL 883745, at *3, 6. The court noted that judges were ill equipped to decide "the thorny and extremely contentious debate over the perceived risks

of certain vaccines, their theoretical association with particular diseases or syndromes, and, at bottom, which side of th[e] debate has 'truth' on their side." *Id.* at *6. The *Arthur* court recognized that the plaintiff might wish to defend her views, but that was not enough to support a defamation action. The questions to be decided were "academic questions that are not the sort of thing that courts or juries resolve in the context of a defamation action." *Id.* GPS's claims present the same problem. To determine the truth or falsity of any of Dr. Zaatari's statements would require the Court to wade into the scientific debate on the safety and efficacy of ionizers and, ultimately, determine the winning side.

Statements made in the context of scientific debate are considered opinions, not facts, and are thus not actionable. GPS's chief science officer, Edward Sobek, admitted that Dr. Zaatari's statements made in the Open Letter, for example, were merely statements of her scientific opinions in the context of the debate over the safety and efficacy of ionizers like GPS's products. (Sobek Depo. at 338-39, App. 1971-1972.) Sobek believes that comments on Twitter, like those made by Dr. Zaatari, are generally not worthy of concern. (*See* Sobek Depo. at 341-42, App. 1974-1975.)

All of Zaatari's statements at issue are made as part of the ongoing scientific debating regarding ionizers and indoor air quality, particularly as to how best to protect schoolchildren and the public generally from COVID-19. As a result, Zaatari's statements are not actionable.

Safety and Efficacy. Similarly, courts have long held that statements regarding safety or efficacy are statement of opinion, not fact, and are thus not actionable. *See, e.g.*, *Peter Scalamandre & Sons, Inc. v. Kaufman*, 113 F.3d 556, 562 (5th Cir. 1997) (claims that the land application of sewer sludge as "poison" and otherwise dangerous); *Mehta v. Fairleigh Dickinson Univ.*, 530 Fed. Appx. 191, 198 (3d Cir. 2013) (statement that plaintiff was a "threat to public safety" was opinion); *TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1195 (10th Cir. 2007) (reasonable persons may differ in whether sufficient evidence exists to call a product "safe" or "effective," or

"experimental," rendering such designations opinion since they cannot be proven true or false.); *Valley Elecs. AG v. Polis*, No. 21-2108-CV, 2022 WL 893674, at *1 (2d Cir. Mar. 28, 2022) (statements regarding efficacy of plaintiff's treatments). Because statements about safety and effectiveness of a product are inherently subjective, they cannot be proven true or false and thus cannot support a claim for defamation or violation of the Lanham Act.

Hyperbole and Rhetoric. Because rhetorical hyperbole is not subject to objective verification, it is not provable as false and therefore not actionable. *Am. Broad. Companies, Inc. v. Gill*, 6 S.W.3d 19, 29 (Tex. App.—San Antonio 1999, pet. denied), disapproved of on other grounds by *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103 (Tex. 2000); *Garcia v. Seguy*, No. 13-16-00616-CV, 2018 WL 898032, at *4 (Tex. App.—Corpus Christi–Edinburg Feb. 15, 2018, no pet.).

Courts have held that characterizations of a business or product as "an elaborate and dangerous hoax," "snake oil," a "fraud," a "rip-off," and "phony" are all figurative and hyperbolic, not capable of being proven true or false, and are thus not actionable. *Montgomery v. Risen*, 875 F.3d 709, 714 (D.C. Cir. 2017); *Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 728 (1st Cir. 1992); *Immanuel v. Cable News Network, Inc.*, No. CV H-22-2031, 2022 WL 3030290, at *5 (S.D. Tex. Aug. 1, 2022). Calling a professional a "crank" is, for the same reason, not actionable. *Dilworth v. Dudley*, 75 F.3d 307, 309 (7th Cir. 1996); *see also Einhorn v. LaChance*, 823 S.W.2d 405, 412 (Tex. App.—Houston [1st Dist.] 1992, writ dism'd w.o.j.) (references to plaintiffs as incompetent, troublemakers, and liars were assertions of pure opinion).

Statements such as those referring to ionizers as "snake oil" or comparing their safety to that of cigarettes are thus rhetorical hyperbole. Such statements are not capable of being proven true or false and so may not form the basis of a claim.

### D.      GPS's defamation claim fails.

GPS claims that "[e]ach of [Defendants'] statements are unambiguously defamatory based on the context." (Third Amended Complaint ¶ 138, ECF No. 58 at 58.) GPS thus appears to plead that Defendants' individual statements are defamatory by implication (as opposed to explicitly defamatory). *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 627-28 (Tex. 2018). GPS does not appear to assert a defamation claim based on the "gist" of Defendants' statements as a whole. *Id.* at 629.

To prove a defamation claim, a plaintiff must show (1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, at least amounting to negligence but in some cases malice, and (4) damages (depending on the case). *Innovative Block of S. Tex., Ltd. v. Valley Builders Supply, Inc.*, 603 S.W.3d 409, 417 (Tex. 2020). A defamatory statement is one that "tends . . . to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Id.* (quoting Restatement (Second) Of Torts § 559).

A plaintiff must show that its alleged damages were proximately caused by the defamatory statement. *Anderson v. Durant*, 550 S.W.3d 605, 618 (Tex. 2018). A defendant's action is the cause in fact of damages "if it was a substantial factor in causing the injury and without which the injury would not have occurred." *Id.*

GPS's defamation claim fails for at least three reasons: (1) the statements at issue were statement of opinion, not fact, and are thus not actionable; (2) many of the statements at issue do not refer to GPS or its products; and (3) because GPS is a public figure, it must prove that Dr. Zaatari acted with malice, which it cannot do. Further, and as discussed above, GPS cannot show that it suffered any damages as a result of Defendants' alleged defamation.

1.    **Dr. Zaatari's statements were of scientific opinion and cannot have a defamatory meaning.**

For the same reasons discussed above relating to GPS's claim under the Lanham Act, Zaatari's statements do not support a claim for defamation under Texas law because they are scientific opinions and therefore, not defamatory. Whether a statement is capable of a defamatory meaning is a question of law. *See Fort Worth Star–Telegram v. Street*, 61 S.W.3d 704, 708 (Tex. App.—Fort Worth 2001, pet. denied) (citing *Musser v. Smith Protective Servs., Inc.*, 723 S.W.2d 653, 655 (Tex.1987)). Texas courts view the statements alleged to be defamatory as a whole and considering the surrounding circumstances; the determination is based upon how a person of ordinary intelligence would perceive the entire statement. *Ezrailson v. Rohrich*, 65 S.W.3d 373, 376 (Tex. App.—Beaumont 2001, no pet.). Statements alleged to be defamatory must be viewed in their context; they may be false, abusive, unpleasant, or objectionable to the plaintiff and still not be defamatory considering the surrounding circumstances. *Id.* This is especially true in medical science research where "court[s] should weigh the need to protect intellectual reputation against society's great need to permit an unfettered discussion of medical science hypotheses." *Id.* at 382.

Here, the summary judgment evidence shows that there is a scientific debate regarding the safety and efficacy of GPS's needlepoint bipolar ionization technology. (Boyle Depo. at 342-44, App. 960-962.) GPS similarly debates the efficacy of enVerid's products. (Complaint ¶ 105 (stating that statements made by enVerid on its website regarding its product are false); Brinckman Depo. at 179-187, Exhibit 22, App. 431-439.) Viewed through this lens, no person of ordinary intelligence would perceive Zaatari's statements as defaming GPS because there is an ongoing academic debate regarding these issues. *See Ezrailson*, 65 S.W.3d 382 (affirming summary judgment in favor of defendant because false statements contained in a medical science article were not defamatory due to the academic debate surrounding the topic at issue and reasoning that

"calling the medical science research article here defamatory would serve to unduly restrict the free flow of ideas essential to medical science discourse."); *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994) (affirming summary judgment for defendants who made statements in the context of a scientific debate reasoning that "[s]cientific controversies must be settled by the methods of science rather than by the methods of litigation" and that "[m]ore papers, more discussion, better data, and more satisfactory models—not larger awards of damages—mark the path toward superior understanding of the world around us.").

GPS will likely argue that Zaatari's statements are not scientific because they were not published in a scientific journal. There is no support for the argument that a statement must be published in a scientific journal to be considered scientific opinion or part of a scientific debate. Further, the Open Letter—which serves as the primary basis for GPS's claim for damages—was peer-reviewed by its co-author Dr. Marcel Harmon and twelve other scientists in the IAQ industry who endorsed it.

As a result, summary judgment in favor of Defendants on GPS's claim for defamation should be granted because Zaatari's statements were scientific opinion insufficient to support a defamation claim.

### 2.      GPS is a public figure and cannot show actual malice.

For purposes of its defamation claim, GPS is a "limited purpose public figure." Texas courts use a three-part test to assess whether an individual is a limited purpose public figure: (1) the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution; (2) the plaintiff must have more than a trivial or tangential role in the controversy; and (3) the alleged defamation must be germane to the plaintiff's participation in the controversy. *Neely v. Wilson*, 418 S.W.3d 52, 70 (Tex. 2013). Public figure status is a question of law for the court. *Id.*

GPS is a limited purpose public figure because it is engaged in the ongoing public debate regarding ionizers, and in particular their safety and efficacy. As the manufacturer of air purification devices used worldwide to mitigate COVID-19's effects, GPS advertises itself as an expert and leader in the air purification industry. (*See* Complaint ¶¶ 36-39 (boasting that (1) GPS has "earned a reputation as a leader in the air quality/purification industry," (2) GPS's NPBI air purification systems have been installed in approximately 250,000 worldwide facilities including federal government buildings, hospitals, corporate facilities, universities, and in hundreds of primary and secondary schools, (3) GPS's "technology is also trusted by some of the world's leading companies involved in aviation manufacturing, aerospace technology, and performance equipment,", and (4) GPS "has employees who are prominent members in good standing of the ASHRAE" and "regularly lead lectures and speak at ASHRAE meetings.").) GPS has conducted numerous media interviews, promulgated numerous press releases related to the safety and efficacy of its products, and funded studies regarding the effectiveness of its products in an attempt to garner public good will. (Boyle Depo. at 136-37, 326, App. _754-755, 944 (characterizing GPS as a leader in the indoor air quality industry and noting that GPS has done half a dozen to a dozen media interviews since 2019); Waddell Depo. at 157, 161, App. 1130, 1134 (describing his interviews with media outlets).) GPS has also been the subject of numerous news articles discussing the safety and efficacy of its products. (*See* Complaint Exhibits Y, BB, GG, & HH.) Zaatari's allegedly defamatory statements are all germane to GPS's participation in the COVID-19 pandemic and concern whether GPS's products mitigate COVID-19 as advertised and whether they are safe for public consumption. (*See generally* Retraction Letter, App. 22.)

As a public figure, GPS must prove that Defendants published a false and defamatory statement with actual malice. *Huckabee v. Time Warner Entm't Co. L.P.*, 19 S.W.3d 413, 420 (Tex. 2000). Actual malice in a defamation case is a term of art; unlike common-law malice, it does not

include ill-will, spite, or evil motive. *Id.* Rather, to establish actual malice, a plaintiff must prove that the defendant made the statement "with knowledge that it was false or with reckless disregard of whether it was true or not." *Id.* (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 279-80 (1964)). Reckless disregard is also a term of art. To establish reckless disregard, a public official or public figure must prove that the publisher "entertained serious doubts as to the truth of his publication." *Id.* (quoting *St. Amant v. Thompson,* 390 U.S. 727, 731 (1968)). Finally, to prevail at trial, a plaintiff must establish actual malice by clear and convincing evidence. *Id.* (citing *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 511 (1984)).

In deciding a motion for summary judgment, the question is "whether the evidence in the record could support a reasonable jury finding that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255-56 (1986). When the speaker believes in the truth of their statements regarding a matter of public concern, summary judgment for the defendant is appropriate. *Brueggemeyer v. Am. Broad. Companies, Inc.*, 684 F. Supp. 452, 461 (N.D. Tex. 1988).

GPS has developed no evidence that would support a finding that Dr. Zaatari acted with malice in making any of her statements at issue. To the contrary, the evidence demonstrates that Dr. Zaatari earnestly believes in the correctness of the statements she has made on the topic and has made them in reliance on her own research and expertise, plus that of other scientists, public-interest groups, and governmental agencies. (*See* Zaatari Depo. at 207, 209, 211-14, 264, 282-83, App. 2233, 2235, 2237-2240, 2290, 2308-2309.) Zaatari made her comments due to her sincere concern for public health and safety. (*See* Zaatari Depo. at 127, 158-59, App. 2153, 2184-2185.) GPS can demonstrate no genuine issue of material fact as to whether Defendants acted with malice.

For this additional reason, Defendants are entitled to summary judgment.

### 3. Because the alleged statements are not defamatory per se, GPS must prove special damages.

When an offending statement qualifies as defamation per se, a plaintiff may recover general damages without proof of any specific loss. *In re Lipsky*, 460 S.W.3d 579, 596 (Tex. 2015). Defamation per se refers to statements that are so obviously harmful that general damages, such as mental anguish and loss of reputation, are presumed. *Id.* Defamation per se is itself broken down into separate categories of falsehoods. Accusing someone of a crime, of having a foul or loathsome disease, or of engaging in serious sexual misconduct are examples of defamation per se. *Id.* Remarks that adversely reflect on a person's fitness to conduct his or her business or trade are also deemed defamatory per se. *Id.* Disparaging a plaintiff's goods or services is not defamatory per se because commercial disparagements do not necessarily impugn character or reputation. *Innovative Block*, 603 S.W.3d at 425.  Whether a statement is defamatory per se is a question of law. *Lipsky*, 460 S.W.3d at 596.

All of Defendants' statements at issue deal with GPS's products. (Retraction Letter, App. 22.) As the Texas Supreme Court addressed in *Innovative Block*, even severely disparaging statements regarding a company's products do not impugn the character of the business itself so as to support a defamation claim. All of Dr. Zaatari's tweets and other statements are directed to ionizers—particularly their efficacy and safety, based on her research and that of others. Although a few of her statements mention GPS as the maker of certain ionizer products, none of those statements say (or imply) anything about GPS's character or reputation as a business. Instead, they focus entirely on GPS's products. For that reason, the statements at issue are not defamatory per se, and GPS is required to present evidence of actual damages suffered as a result of the alleged defamation. As discussed above, it has no evidence of any such damages. Thus, summary judgment is appropriate.

### 4.   GPS's claim for exemplary damages is barred.

GPS failed to timely serve its retraction request under Texas Civil Practice & Remedies Code Section 73.055, which provides that "a person may maintain an action for defamation only if (1) the person has made a timely and sufficient request for correction, clarification, or retraction from the defendant." Tex. Civ. Prac. & Rem. Code § 73.055(a)(1). Because GPS filed suit more than 90 days before any retraction request, its February 4 request was untimely, and GPS is not entitled to exemplary damages. *See id.* § 73.055(c).

### E.   GPS's business-disparagement claim fails.

GPS's business-disparagement claim is premised on the same statements that underly its defamation claim. (Third Amended Complaint ¶¶ 147-149, ECF No. 58 at 37-38.)

Under Texas law, the elements of a claim for business disparagement are: (1) the defendant published disparaging words about the plaintiff's economic interests, (2) the words were false, (3) the defendant published the words with malice, (4) the defendant published the words without privilege, and (5) the publication caused special damages. *In re Lipsky*, 460 S.W.3d 579, 592 (Tex. 2015). A plaintiff must prove that the allegedly disparaging words actually caused a pecuniary loss. *Innovative Block*, 603 S.W.3d at 417. The elements of business disparagement are more stringent than those of defamation because business disparagement protects against pecuniary loss, whereas defamation seeks to protect reputational interests. *Id.*

First, GPS's business-disparagement claim fails because GPS cannot prove that Defendants published false, disparaging words about it, as discussed above. *See Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Sup 2d 598, 671 (S.D. Tex. 2010) ("To support a claim for business disparagement, the published statements must be, at a minimum, defamatory.") (citing *Granada Biosciences, Inc. v. Forbes, Inc.*, 49 S.W.3d 610, 616 (Tex. App.—Houston [14 Dist.] 2001), rev'd on other grounds, 124 S.W.3d 167 (Tex. 2003)).

Second, as explained above in the context of GPS's defamation claim, GPS cannot prove malice.

Finally, GPS's business-disparagement claim fails because, as discussed above in Part IV.A., GPS did not suffer special damages as a result of any of Defendants' statements. Texas law requires proof that alleged business disparagement caused a direct pecuniary loss. *Johnson v. Hosp. Corp. of Am.*, 95 F.3d 383, 391 (5th Cir. 1996). The communication of the disparaging words must be the legal cause of the pecuniary loss—that is, the communication must play a sub-stantial part in inducing others not to deal with the plaintiff. *Hurlbut*, 749 S.W.2d at 767. If dis-paraging statements came from the defendant and from other sources, evidence must demonstrate a causal link between the defendant's particular statements and the plaintiff's damages. *Landry's, Inc. v. Animal Legal Def. Fund*, 631 S.W.3d 40, 54 (Tex. 2021). A "jury cannot reasonably infer that defamation caused . . . cancellations when the cancellations could have occurred for any num-ber of reasons." *Burbage v. Burbage*, 447 S.W.3d 249, 262 (Tex. 2014). Special damages are syn-onymous with economic damages and are distinguishable from general damages. General damages are recoverable under a defamation claim for non-economic losses, such as loss of reputation and mental anguish. *Hancock v. Variyam,* 400 S.W.3d 59, 65 (Tex. 2013). GPS has demonstrated no causal connection between the statements and its alleged lost business.

For any of these reasons, Defendants are entitled to summary judgment on GPS's claim for business disparagement.

### F.    GPS's tortious-interference claim fails.

For its tortious-interference claim, GPS alleges that Defendants' allegedly false or mislead-ing statements were made willfully and intentionally to interfere with GPS's prospective business relationships. (Third Amended Complaint ¶ 156-59, ECF No. 58 at 39.)

The elements of a claim for tortious interference with prospective business relations are: (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third person; (2) the defendant intentionally interfered with the relationship; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff's injury; and (5) the plaintiff suffered actual damage or loss. *Coinmach Corp. v. Aspenwood Apt. Corp.*, 417 S.W.3d 909, 923 (Tex. 2013).

To prove an action for tortious interference with prospective business relations, the plaintiff must establish it had (1) a business relationship that had not yet been reduced to a contract or (2) a continuing business relationship that was not formalized by a written contract. *Heil-Quaker Corp. v. Mischer Corp.*, 863 S.W.2d 210, 214 (Tex. App.—Houston [14th Dist.] 1993), writ granted, judgment vacated w.r.m., 877 S.W.2d 300 (Tex. 1994).

To establish a claim for tortious interference, a plaintiff must prove that more than mere negotiations occurred. *Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 475 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). Though it is not necessary to prove that the contract would have certainly been made but for the interference, that result must have been reasonably probable, considering all the facts and circumstances attendant to the transaction. *Id.* at 475-76. The plaintiff must prove that the defendant's interference was at least a substantial factor in causing its alleged injury. *COC Services, Ltd. v. CompUSA, Inc.*, 150 S.W.3d 654, 679 (Tex. App.—Dallas 2004, pet. denied).

GPS has not provided the specific identities of any alleged lost potential customers, much less relevant contracts or other evidence that negotiations occurred with those customers regarding the products that resulted in a probability of business. GPS further presents no evidence supporting a causal link between Defendants' statements and specific lost potential customers or that Defendants' directed any statements to specific, potential GPS customers.  Instead, the only evidence that

GPS presents to support its claim is (1) a document titled "GPS (NDTX) Zaatari—Lost Projects" containing a list of alleged "Customer Names" and "Revenue to GPS" and (2) testimony from GPS's corporate representative that some of the customers —without identifying any specifically—on the list were potential customers that were lost due to Defendants' statements. (Brinckman Depo. at 247, App. 499.) Perhaps most egregious is GPS's expert, Quintin Mimms, admitting that his damages calculations are merely based on GPS personnel projecting—*i.e.,* assuming—that customers ceased doing business with GPS based on Zaatari's actions rather than for some other reason. (Mimms Response Report ¶ 28, App. 2363.)

This evidence without proof that communications and negotiations occurred that were reasonably probable to result in a business relationship between the third party and GPS is wholly insufficient to support a claim for tortious interference with a prospective business. *See Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 476 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) (affirming summary judgment for defendant because "no reasonable probability exist[ed] that, without Mercer's involvement, HISD would have agreed to Richardson-Eagle's non-conforming proposals").

Further, GPS's claim fails because it fails to prove that each of Defendants' twenty-nine statements were false and therefore, independently tortious or unlawful. *David L. Aldridge Co. v. Microsoft Corp.*, 995 F. Supp. 728, 747 (S.D. Tex. 1998) (noting that the plaintiff must prove the falsity of each allegedly actionable statement and rendering summary judgment in favor of defendant in part and plaintiff in part where some of the statements were not proven to be true); *Astoria Indus. of Iowa, Inc. v. SNF, Inc*., 223 S.W.3d 616, 625 (Tex. App.—Fort Worth 2007, pet. denied) ("In a business disparagement or false advertising case, however, there is no presumption of falsity; instead, the plaintiff has the burden of proving the falsity of the publication as part of its cause of action.").

As explained above, the statements made by Zaatari were in the context of a scientific debate and are supported by numerous scientific studies cited in GPS's complaint alone. The Open Letter was co-authored by Marcel Harmon, an independent scientist, and reviewed and endorsed by an additional twelve independent scientists and supported by twenty-three independent studies. (Open Letter, App. 53.) Even if GPS presents evidence that questions or contradicts Zaatari's conclusions, it cannot overcome the large number of scientific studies supporting her conclusions to meet its burden of proving the falsity of her publications. Accordingly, because GPS has failed to identify *a single* lost potential customer and because Defendants' statements were not false, summary judgment is proper in favor of Defendants on GPS's claim for tortious interference with prospective business relations.

### G.   GPS's common-law unfair-competition claim fails.

GPS's claim for common-law unfair competition relates to Defendants' alleged "false and misleading descriptions of fact" in commercial advertisements, presentations, and promotional materials. (Third Amended Complaint ¶¶ 161-63, ECF No. 58 at 39-40.)

"Unfair competition under Texas law is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters." *Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 486 (5th Cir. 2000) (citations and internal quotations omitted). The tort requires that the plaintiff show an illegal act by the defendant which interfered with the plaintiff's ability to conduct its business. *Id.* (citing *Schoellkopf v. Pledger,* 778 S.W.2d at 897, 904-05 (Tex. App.—Dallas 1989, writ denied). Although the illegal act need not necessarily violate criminal law, it must at least be an independent tort. *Id.* If the defendant's acts are not tortious, they do not constitute unfair competition. *Id.* Thus, when summary judgment is appropriate on a plaintiffs' underlying tort claims, summary judgment is also warranted on an unfair-competition claim based on the same alleged acts. *GE Betz Inc. v.*

*Moffitt-Johnson*, 301 F. Supp. 3d 668, 699 (S.D. Tex. 2014), *aff'd in part sub nom. GE Betz, Inc.*
*v. Moffitt-Johnston*, 885 F.3d 318 (5th Cir. 2018).

For the reasons stated above, each of GPS's independent tort claims against Defendants
fails as a matter of law. Because summary judgment is warranted on those claims, summary judg-
ment is likewise warranted on GPS's unfair-competition claim.

### H.     GPS's civil-conspiracy claim against D Zine fails.

GPS makes only scant allegations regarding D Zine: that Dr. Zaatari is a part owner of D
Zine, that D Zine is a competitor to GPS, and that D Zine's website includes a link to Dr. Zaatari's
Twitter account. (Third Amended Complaint ¶¶ 13, 90, 148, ECF No. 58 at 4, 24, 37.) GPS alleges
that, as a co-conspirator with Dr. Zaatari, D Zine is jointly liable with her for each of the claims
discussed above. (Third Amended Complaint ¶¶ 164-72, ECF No. 58 at 40-41.) GPS does not
allege that Dr. Zaatari was D Zine's agent.

Under Texas law, the elements of civil conspiracy are: (1) the defendant was a member of
a combination of two or more persons, (2) the object of the combination was to accomplish an
unlawful purpose or a lawful purpose by unlawful means, (3) the members had a meeting of the
minds on the object or course of action, (4) one of the members committed an unlawful, overt act
to further the object or course of action, and (5) the plaintiff suffered injury as a proximate result
of the wrongful act. *Agar Corp. v. Electro Circuits Int'l*, 580 S.W.3d 136, 141 (Tex. 2019).

To impose joint liability via conspiracy, a plaintiff must prove that at least one of the co-
conspirators is liable for an underlying tort. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996).
The basis of a conspiracy claim is the damage resulting from the commission of the tort, not the
conspiracy itself. *Schlumberger Well Surv. Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 856
(Tex. 1968); *Paschal v. Great W. Drilling, Ltd.*, 215 S.W.3d 437, 450 (Tex. App.—Eastland 2006,
pet. denied); *Laxson v. Giddens*, 48 S.W.3d 408, 410 (Tex. App.—Waco 2001, pet. denied). Thus,

if the underlying claim fails because the plaintiff cannot prove one of its elements, the conspiracy claim also fails. *See Dallas Symphony Ass'n v. Reyes*, 571 S.W.3d 753, 763 (Tex. 2019).

GPS's conspiracy claim fails for two reasons. First, each of GPS's underlying claims fails for the reasons discussed above. Because GPS cannot succeed on any of its tort claims, its conspiracy claim also fails. *Reyes*, 571 S.W.3d at 763.

Second, even if evidence could support a tort claim against Dr. Zaatari, GPS cannot prove any "meeting of the minds" between Dr. Zaatari and D Zine about the object of their alleged conspiracy. *See Transport Ins. v. Faircloth*, 898 S.W.2d 269, 278 (Tex. 1995). A meeting of the minds for purposes of a conspiracy claim requires that (1) the conspirators have knowledge of the object and purpose of the conspiracy and (2) there was an agreement or understanding among the conspirators to inflict injury on another party. *Schlumberger*, 435 S.W.2d at 857; *Chu v. Hong*, 249 S.W.3d 441, 446 (Tex. 2008). A mere agreement to engage in certain conduct is insufficient. *Chu*, 249 S.W.3d at 446. Despite taking numerous depositions and conducting extensive written discovery in this case, GPS has developed no evidence regarding any agreement between Zaatari and D Zine that could support the finding of a conspiracy. As a result, summary judgment is warranted.

## V.    Conclusion and Prayer

For all the foregoing reasons, and for the reasons asserted in enVerid's motion for summary judgment, Defendants Marwa Zaatari and D Zine Partners, LLC, are entitled to summary judgment in their favor on all of Plaintiff's claims asserted against them.

Dated: August 8, 2022

                                                    Respectfully submitted,

                                                    /s/ Jadd F. Masso
P. Michael Jung                                     James D. Shields
Texas Bar No. 11054600                              Texas Bar No. 18260400
mjung@clarkhill.com                                 jshields@shieldslegal.com
Jadd F. Masso                                       Bart F. Higgins
Texas Bar No. 24041411                              Texas Bar No. 24058303 bhig-
jmasso@clarkhill.com                                gins@shieldslegal.com
                                                    David A. Shields
CLARK HILL PLC                                      Texas Bar No. 24083838
901 Main Street, Suite 6000                         dshields@shieldslegal.com
Dallas, Texas 75202
Telephone: (214) 651-4300                           SHIELDS LEGAL GROUP
Facsimile: (214) 651-4330                           16400 Dallas Parkway, Suite 300
                                                    Dallas, Texas 75248
                                                    Telephone: (972) 788-2040
                                                    Facsimile: (972)788-4332

          *Attorneys for Defendants D Zine Partners, LLC, and Marwa Zaatari*


                              **Certificate of Service**

       I hereby certify that the foregoing document was electronically filed on August 8, 2022,
using the Court's CM/ECF system, which will send notice of such filing to all counsel of record
who are deemed to have consented to electronic service.

                                                    /s/ Jadd F. Masso
                                                    Jadd F. Masso