```
                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF TEXAS
                        DALLAS DIVISION

GLOBAL PLASMA SOLUTIONS, INC.,     )
                                   )
                    Plaintiff,     )
                                   )
     VS.                           ) No. 3:21-CV-00884-M
                                   )
D ZINE PARTNERS, LLC;              )
MARWA ZAATARI; and ENVERID         )
SYSTEMS, INC.,                     )
                                   )
                    Defendants.    )
_____)


D ZINE PARTNERS, LLC; and          )
MARWA ZAATARI;                     )
                                   )
           Counter-Plaintiffs,     )
                                   )
     VS.                           ) No. 3:21-CV-00884-M
                                   )
GLOBAL PLASMA SOLUTIONS, INC.,     )
                                   )
           Counter-Defendant.      )
_____)
```

```
                       MOTION HEARING
              BEFORE THE HONORABLE BARBARA M.G. LYNN
                 UNITED STATES DISTRICT COURT JUDGE
                        NOVEMBER 8, 2022
                         DALLAS, TEXAS
```

FOR THE PLAINTIFF/COUNTER-DEFENDANT:

     ROBERT A. MUCKENFUSS
     KELLY A. WARLICH
     McGUIREWOODS, LLP
     201 N. Tryon Street, Suite 3000
     Charlotte, NC  28202
     (704) 343-2052

     JUSTIN R. OPITZ
     ADDISON FONTEIN
     BRITTNEY M. ANGELICH
     McGUIREWOODS, LLP

        2000 McKinney Avenue, Suite 1400
        Dallas, TX  75201
        (214) 932-6471

        LUCY JEWETT WHEATLEY
        McGUIREWOODS, LLP
        800 East Canal Street
        Richmond, VA  23219
        (804) 775-4320


FOR THE DEFENDANTS/COUNTER-PLAINTIFFS:


 (Marwa Zaatari and D Zine Parners, LLC)

        JAMES D. SHIELDS
        DAVID A. SHIELDS
        BART F. HIGGINS
        SHIELDS LEGAL GROUP
        16400 Dallas Parkway, Suite 300
        Dallas, TX 75248
        (972) 788-2040

        JADD F. MASSO
        CLARK HILL, PLC
        901 Main Street, Suite 6000
        Dallas, TX  75202
        (214) 651-4716

 (Enverid Systems, Inc.)

        KENDAL B. REED
        AARON Z. TOBIN
        TARYN E. OURSO
        CONDON TOBIN SLADEK THORNTON NERENBERG, PLLC
        8080 Park Lane, Suite 700
        Dallas, TX  75231
        (214) 691-6300


        Proceedings reported by mechanical stenography; transcript
produced by computer-aided transcription.
_____

                 DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
                    Federal Official Court Reporter
                   1100 Commerce Street, 15th Floor
                        Dallas, TX  75242
                        (214) 753-2325

```
 1                    (PROCEEDINGS BEGAN AT 9:55 AM.)

 2              COURT SECURITY OFFICER:  All rise.

 3              The United States District Court for the Northern

 4   District of Texas is now in session.  The Honorable United States

 5   District Judge Barbara M.G. Lynn is presiding.

 6              THE COURT:  Be seated, please.

 7              Happy birthday, Robert.

 8              COURT SECURITY OFFICER:  Thank you.

 9              THE COURT:  Mr. Crawford here is 29 again this year.

10              All right.  Good morning, everyone.

11              The Court has set a hearing on various pending motions.

12   We're going to begin with the Motion for Summary Judgment.

13              I want to make an observation before we get started.

14              I find the tone of the dialogue between counsel

15   extremely inappropriate and disappointing.  This is a

16   hotly-contested case.  I think I can surmise from what I've read

17   that the clients detest each other.  That's not unusual in

18   litigation.

19              What is unusual is when lawyers reflect that they

20   detest each other.  Just not good.  Not good for you, not good

21   for me, not good for your clients.  It results in excessive costs

22   and wear and tear on you.

23              So I'm not going to harp on it, but time to take a

24   breath.  There are fine counsel in this case.  You should not be

25   identifying with your clients' disputes.  Lawyers, in my view,
```

```
 1    are like gunslingers.  And when the day's over, you retire to the
 2    bar and have a drink with each other.  And if clients direct you
 3    otherwise that you have to take on their disdain for each other
 4    as your disdain for your fellow counsel, you should resist that
 5    with all your might.
 6          So that's all I'm going to say about that.
 7          All right.  I want to talk about the Motions for
 8    Summary Judgment.  I am very concerned with the issue of
 9    causation, so I want to talk about that.
10          We're just going to go through what we need to go
11    through for the Court to decide it.  This case is in the category
12    on my docket of ridiculous quantities of paper that have been
13    filed.  I don't have everything in here, but it's taking up an
14    entire shelf.  It's unrealistic to think that a court can review
15    the thousands and thousands and thousands of documents that you
16    all have filed.  I've done the best I can.  But I want to begin
17    with causation because I think there are serious problems with
18    causation in the case.  So I want to begin by talking to
19    Plaintiff's counsel about caution.
20          So come on up, Mr. Muckenfuss.
21          MR. MUCKENFUSS:  Thank you, Your Honor.  Your Honor,
22    would you prefer I keep my mask on?
23          THE COURT:  When you're standing at the lectern, if
24    you've been vaccinated, you can take your mask off.  If you
25    haven't been vaccinated, keep your mask on.
```

```
 1                    MR. MUCKENFUSS:  Thank you, Your Honor.

 2                    THE COURT:  All right.  So let's cover a couple of

 3       issues.

 4                    If this is defamation, per se, then your position will

 5       be you don't need to prove causation or damages; that damages are

 6       presumed.

 7                    MR. MUCKENFUSS:  That's correct, Your Honor.

 8                    THE COURT:  All right.  Do you have any other concepts

 9       like that that would save your other causes of action if you

10       cannot prove causation?

11                    MR. MUCKENFUSS:  Yes, Your Honor.

12                    So just as a general principle, as Your Honor knows,

13       there -- there are general damages and special damages in terms

14       of -- of defamation.  So for -- In the context of general

15       damages, we do have a claim for reputational harm in the case.

16                    THE COURT:  Okay.  I don't know if you heard my

17       question.  For your other causes of actions, not defamation.

18                    MR. MUCKENFUSS:  Oh, I'm sorry, Your Honor.

19                    THE COURT:  Do you have a theory like defamation, per

20       se, that would save your claims if you could not prove causation?

21                    MR. MUCKENFUSS:  My apologies, Your Honor.  No, there

22       would be not be a similar --

23                    THE COURT:  Okay.

24                    MR. MUCKENFUSS:  -- doctrine for the other.

25                    THE COURT:  All right.  Now go back and finish what you
```

 1    were saying.

 2              MR. MUCKENFUSS:  Thank you, Your Honor.

 3              So for the defamation claim, Your Honor, the --

 4    obviously, there are general damages and special damages for

 5    defamation in Texas.

 6              With regard to general damages which relate to

 7    reputational harm, things of that sort, we do have a claim for

 8    reputational harm in the case.  So for general damages under

 9    Texas law, we would be required to, at this stage, to have

10    evidence of reputational harm.  The record is replete with --

11    with that evidence.

12              For example, two of the 30(b)(6) witnesses, Mr. Boyle

13    and Mr. Brinckman, testified in the case that following the

14    statements, that -- at issue in this case, that their business

15    dropped off dramatically.  They also lost school district

16    customers specifically.  Mr. Boyle testified as to that.

17              There's also evidence in the record, Your Honor, as it

18    relates to a specific school district, after the statements were

19    made, specifically the Open Letter which is one of the

20    statements, turned off GPS' products which is -- This is the

21    Newark School District in California.  They're in Southern

22    California.  So that -- that is evidence.  In addition, there are

23    other examples of this in the record, but there's direct evidence

24    of reputational harm in terms of after the statements were made.

25              And I would note, Your Honor, it's important in the

1    context of the chronology.  These statements were made in a very

2    tight timeline.  So basically from February of 2021 through

3    basically May of 2021, there were a series of statements, tweets,

4    other statements and presentations that were made.  So that it's

5    a very compressed timeframe.  These statements are not being made

6    over a couple of years or something like that.

7              So in terms of the context of reputational harm, it

8    came quickly, but there was direct evidence of after those

9    statements were made, that there was reputational harm.

10             The other element of the other type of damage ---

11             THE COURT:  Well, reputational harm is a different

12   concept from pecuniary harm.

13             MR. MUCKENFUSS:  It is.  Yes, Your Honor.

14             THE COURT:  Okay.  So what's the reputational harm?

15             MR. MUCKENFUSS:  The reputational harm ---

16             THE COURT:  Let me -- Let me clarify my question and

17   then I'll let you answer.  Because it doesn't seem to me that --

18   your just telling me about, "Oh, we lost this sale; we lost this

19   sale; they turned off our product in Newark," that this is

20   reputational harm.  Reputational harm is the perception of GPS in

21   the world in which it operated was negative so that customers

22   would not deal with it.

23             MR. MUCKENFUSS:  Yes, Your Honor.

24             THE COURT:  And where's the evidence of that?

25             MR. MUCKENFUSS:  So the evidence, Your Honor, I think

1    it -- obviously, it overlaps with the evidence of pecuniary harm

2    or special damages.

3           For example, take the school district, the Newark

4    School District.  That is not specifically pecuniary harm, but

5    that is a customer.  It was a customer that bought the product

6    that turned off the technology after the statements were made;

7    specifically, the Open Letter.  So that is direct evidence that

8    in the market, in the -- in the world, after those statements

9    were made, there was a specific school district that took those

10   statements, did not want to deal, obviously, with GPS, turned off

11   the technology, turned off the products.  So after a search,

12   Your Honor, that is direct evidence of the impact on the

13   reputation of GPS in the market.

14          There are -- There are other parts of the testimony of

15   Mr. Boyle and Mr. Brinckman that relate to that.  Certainly some

16   of it overlaps with pecuniary harm when you have customers that

17   don't want to deal with GPS, that don't want to buy their

18   product.  It certainly overlaps with the reputational harm as it

19   does with special damages.

20          But you are -- I concede, Your Honor, obviously,

21   pecuniary harm goes to special damages.  It goes to business

22   disparagement, but the reputational harm is a broader -- broader

23   element in terms of what the courts have recognized, if there's

24   some evidence in the market.  And certainly after these tweets

25   were made, there are -- in the record there are a number of

1   statements and other -- There are -- There are news stories.

2   There are media reports of -- of these statements that are

3   negative to GPS.  There are specific customers that refuse to

4   deal with GPS, that refuse to buy its product.

5            THE COURT:  Okay.  Let me -- Let me interrupt you

6   there.

7            Am I correct that there is no evidence -- I presume no

8   depositions were taken -- of any actual customer or prospective

9   customer about how these statements impacted, if at all, their

10  decision-making?

11           MR. MUCKENFUSS:  There -- There was no deposition of an

12  end user or customer.  That is correct, Your Honor.

13           THE COURT:  Or a prospect.

14           MR. MUCKENFUSS:  Or a prospect customer.

15           THE COURT:  So that all the testimony that you're

16  offering me in connection with any causation/damages from these

17  statements is from Mr. Boyd and Mr. Brinckman.

18           MR. MUCKENFUSS:  Well, there is -- That -- That's

19  correct.  Those were the two 30(b)(6) witnesses, Your Honor,

20  Mr. Boyle and Mr. Brinckman.  We, obviously, have the affidavit

21  of Mr. Boyd that was submitted with summary judgment.  Mr. Boyd

22  was a Sales Director at GPS.

23           THE COURT:  Yeah.  I know who he was.

24           MR. MUCKENFUSS:  Thank you, Your Honor.

25           THE COURT:  So explain to me, because I don't

1    understand it:  You've argued this is not being offered for the

2    truth.  It seems like hearsay to me, but you're saying it's not

3    being offered for the truth.  That is the litany that I hear

4    every single time there's a hearsay objection.  And sometimes

5    it's not offered for the truth, but in this case it seems obvious

6    to me it is offered for the truth.  The truth being the client

7    either stopped dealing with GPS or decided not to deal with GPS,

8    and you present that through Mr. Boyd and Mr. Brinckman who are

9    reporting what customers said to them.  And the best evidence of

10   what customers were thinking is customers.

11          So why is that not hearsay that's inadmissible?

12          MR. MUCKENFUSS:  So, Your Honor, the -- the statement

13   -- So, first of all, I'll back up.

14          THE COURT:  Okay.  Let me ask everyone in the audience:

15   You're welcome to be here.  Keep your thoughts about anything I

16   say or counsel does to yourself.  No head nodding, no

17   questionable looking.  Just keep it all to yourself.  If you have

18   to have a reaction, go out in the hall.

19          Okay.

20          MR. MUCKENFUSS:  Thank you, Your Honor.

21          So just to back up, Mr. Brinckman testified -- So I'll

22   get to the statements by, for example, with Carrier, for example.

23          Mr. Brinckman testified in his deposition that Carrier

24   ceased doing business with them shortly after the Open Letter was

25   published.  The -- So there is a letter from Carrier that was

1    sent to Mr. Brinckman.  The letter terminates the contract, the

2    relationship with GPS.

3           Your Honor, I don't -- With that -- That -- That letter

4    which goes to the fact that Carrier terminated the business would

5    not be hearsay.  It doesn't go for the truth of the matter

6    asserted in the sense of, obviously, as it relates to GPS'

7    products, whether they work or not.  It was a -- It was in the

8    context of the contractual relationship with Carrier.  It

9    certainly is a business record in the sense that it was a

10   transmission of the cancellation of the contract with GPS.

11          THE COURT:  Okay.  What's the appendix number?

12          I'm sorry.  Is it Mr. Boyd's declaration, Appendix

13   1810?  Where's -- Which is the letter?

14          Paragraph 11 of this affidavit of Mr. Boyd sets out a

15   number of things that happened with other customers.  And

16   Paragraph 10 just says, "I am aware that Carrier employee

17   Chris Opie informed GPS that Carrier was canceling an agreement

18   with GPS," quote, "because of Zaatari's statements," closed

19   quote.

20          Is there a letter that says that?

21          MR. MUCKENFUSS:  So there is a -- No, there is not a

22   letter that states "because of Zaatari's statements."

23          THE COURT:  Okay.  So what they're talking about here

24   is the "because."

25          MR. MUCKENFUSS:  Yes, Your Honor.

```
1              THE COURT:  Clearly, you can establish through the

2   testimony of representatives of GPS that Client A canceled, that

3   Client -- that potential Client B never went forward.  Those

4   facts you can establish.

5              What I started this conversation with is my concern

6   about causation.  So I don't -- I don't know why -- I'm not

7   questioning this strategy of nobody deposing any of these people

8   who actually know why they canceled or didn't go forward, but the

9   fact is you didn't.  So you've got to live with what's in the

10  record about why they canceled or didn't go forward.

11             And other than hearsay, what have you got?

12             MR. MUCKENFUSS:  So, Your Honor, to address hearsay,

13  this would fall under the state of mind in terms of an exception

14  to hearsay.  I don't believe it would go to the truth of the

15  matter asserted of what they stated.  It goes to what, in this

16  case, Carrier's state of mind would be as to why they're

17  canceling the contract.

18             THE COURT:  I'm not buying that.  I'm sorry.  You can

19  give it your best shot because I'm not buying it.  If that were

20  the way the hearsay rule worked, we wouldn't have a hearsay rule.

21             The purpose of this evidence from Mr. Boyd -- There's

22  some evidence to this effect from Mr. Brinckman, but let's talk

23  about Mr. Boyd because I've got his affidavit open.

24             Mr. Boyd is saying to the Court -- And I'm -- I'm using

25  the affidavit even though it's objected to for this purpose.  I'm
```

 1    going to refer to the affidavit.  He is saying what customers

 2    said was the reason they canceled.

 3            For you to prevail on causation, you have to convince

 4    the jury that customers canceled or did not go forward because of

 5    these statements and that's why you're offering the evidence.  It

 6    isn't the state of mind about Carrier that's relevant.  It's -- I

 7    mean it is the -- It is their state of mind, but it's not an

 8    exception to the hearsay rule.  It is the essence of why they did

 9    not go forward, and you've got to put that forward in an

10    admissible way.  I don't think the "state of mind" exception

11    about the speaker is the essence of what the "state of mind"

12    exception would cover.  "State of mind" exception might cover why

13    Mr. Boyd took certain action because of what he heard, but that's

14    not the relevant issue.  The relevant issue is:  Why did these

15    people not go forward?  And you're presenting what they allegedly

16    said to Mr. Boyd, and I'm very concerned that that violates the

17    hearsay rule.

18            MR. MUCKENFUSS:  So, Your Honor, just to back up a

19    second, too.  So the Defendants don't -- There's no case law

20    that's cited that requires the plaintiff in a defamation case to

21    only have direct evidence of, say, a customer actually saying, "I

22    canceled" or "I didn't do something because of these statements."

23    There is -- There is plenty of case law that we cited and go

24    through this case law both on the Lanham Act, also under the

25    defamation claim that is absolutely to survive summary judgment,

```
 1   go to trial.  A plaintiff can have circumstantial evidence of

 2   damages.  In this case, it's undisputed in the chronology of what

 3   happened with these statements.  It's undisputed -- Putting aside

 4   Mr. Boyd's statement about Carrier's statement, it is in the

 5   record that Carrier, within days -- within days of the Open

 6   Letter being published, which -- which is separate from any

 7   statement that Carrier would make, that Carrier canceled the

 8   contract.

 9           THE COURT:  Okay.  So let me -- I'm going to -- You can

10   come back.  I'm never going to cut you off and not let you

11   return, so make a note in your head where you were.

12           So let's assume we didn't have Mr. Boyd saying what

13   Carrier, Chris Opie said; that what we had was statements, action

14   and that's it.  So if the record was GPS had a contract with

15   Carrier, Open Letter, Carrier cancels, can that go to the jury?

16   You're telling me that's sufficient evidence of the statements

17   having caused Carrier to cancel the contract with nothing else?

18           MR. MUCKENFUSS:  Yes, Your Honor.  And I would submit

19   that it's not nothing else in the sense of what's happening.

20           So Carrier signed this contract well before, in 2020.

21   So Carrier signs the contract with GPS, I believe, in November of

22   2020, around that time in the Fall of 2020.

23           As -- As you go through late 2020 into 2021, obviously,

24   there's a lot of evidence in terms of what was happening with the

25   statements.  So in February and into March of 2021, Dr. Zaatari
```

1    starts making her public statements.  The Open Letter is

2    published on April -- I think April 12th.  Around that time,

3    Your Honor, the Open Letter is published.  Within five days, I

4    believe, or within less than a week, Carrier sends a

5    communication to GPS canceling the contract.

6         So, yes, I think in the -- There is no case -- The

7    cases that I reviewed that we've looked at, there is no case that

8    requires -- Most of these cases, to be honest, are around

9    circumstantial evidence.  And there's a case we cite, the Lanham

10   Act case where the court -- where the court states that

11   circumstantial evidence is permissible.

12        THE COURT:  Okay.  But there has to be some connection.

13   I understand the difference between direct and circumstantial

14   evidence.  But in the example that you and I are discussing,

15   there isn't even any evidence that Carrier saw the letter except

16   for the hearsay statement of Mr. Boyd.

17        So if the circumstances are as I just posited them to

18   you where I have a contract, statement, action, the jury is

19   supposed to assume from what you're calling "circumstantial

20   evidence" -- I'm not accepting that characterization of it --

21   that Carrier must have seen the Open Letter and, as a result of

22   seeing the Open Letter, Carrier decided not to go forward, with

23   zero evidence that they saw the letter or made that decision

24   because of it?

25        MR. MUCKENFUSS:  Well, Your Honor, again, I think the

1  -- Mr. Brinckman did testify as to the timing of the letter.  I

2  understand that there is no statement from Carrier as to

3  reviewing the letter and -- and canceling it because of the

4  letter.  But the cases that we cite in -- in the brief, there is

5  no case where there's, you know, sort of that perfect testimony

6  where that customer, the person says, "I didn't do something,"

7  or, "I didn't buy the product because of the statement."

8          In fact, in many cases, the Lanham Act cases, for

9  example, there could be public statements and consumers stopped

10  buying a particular product.  It's certainly permissible from

11  the -- from the -- from the chronology of what happened in

12  certainly the condensed time of these statements, with no other

13  explanation certainly.  And the jury's entitled to look at, "Here

14  are the arguments from the Defendants," and, obviously, consider

15  all of the -- all of the facts that are happening in terms of the

16  market, other statements, but it would be extraordinary and I

17  think very difficult for a plaintiff to ever go to the jury if it

18  were required that -- that every single customer that it was

19  claiming ---

20          THE COURT:  How about any customer?  This isn't a case

21  of every single customer.  I'm looking for any customer who says,

22  (A) "I read the letter;" (B) "I made a decision because of the

23  letter."  I don't have either of those.  I have no direct or

24  circumstantial evidence that the customer saw the letter or

25  considered the letter significant except for what Mr. Boyd and

1   Mr. Brinckman say.

2          MR. MUCKENFUSS:  So there -- there is evidence.  So

3   just to back up a little bit, too, the intent of the Open Letter,

4   for example, Your Honor, was to be transmitted to my client's

5   customers.  So the Defendants admit and, in fact, there is

6   evidence throughout the case that -- and Dr. Zaatari published a

7   list of my client's customers and the intent -- and they followed

8   through with it -- they did transmit the letter to customers of

9   GPS.  So I don't think it's ---

10         THE COURT:  Who is "they" in your ---

11         MR. MUCKENFUSS:  I'm sorry, Your Honor.  Dr. Zaatari

12  and enVerid.  So Dr. Zaatari, both through her tweets and in

13  e-mails with enVerid and on the first page of the Open Letter --

14  So the Open Letter, the intent of the Open Letter was to be

15  transmitted and directed to the school district customers that my

16  client had for the purpose of trying to convince them not to buy

17  my client's products.  So the intent of these statements -- So

18  this is not case where, you know, you have somebody sort of

19  openly just say, "Joe Blow is a liar," right, and it's just sort

20  of in a vacuum and it's a defamation case.  The -- It's

21  undisputed and Dr. Zaatari admitted that the intent of her

22  statements in the Open Letter was to be directed to GPS'

23  customers.

24         THE COURT:  Okay.  But is there evidence that they went

25  to their -- that the Open Letter went to the customers?

1          MR. MUCKENFUSS:  There absolutely is evidence that the

2     Open Letter went to school districts, absolutely.

3          THE COURT:  Okay.  I'm assuming Carrier is not in the

4     category of "school district."

5          MR. MUCKENFUSS:  No, the Carrier is not in the -- So

6     these are end users.  Carrier, I would describe, as sort of a

7     rep; right?

8          So the way my customer -- I'm sorry.  The way my client

9     sells this, it doesn't sell its product directly to the end user.

10    So companies like Carrier or companies like that will use or buy

11    my client's -- buy GPS' products, right, and install it for the

12    end user.  So companies like GPS were very important to my client

13    in terms of using that technology to employ in schools or office

14    buildings or wherever it might be.

15         THE COURT:  Companies like "Carrier"?  Is that what you

16    meant?  You said "GPS."

17         MR. MUCKENFUSS:  I'm sorry, like Carrier.

18         THE COURT:  Okay.

19         MR. MUCKENFUSS:  But those were -- I call it sort of

20    the middle man or the, you know, the rep would do that.

21         So, Your Honor, the -- the -- I guess my point is --

22    And there is evidence in the record in terms of -- of reacting to

23    these statements.  The Newark School District in California, for

24    example, there is direct evidence in the record that Newark --

25    Newark School District, reacting to the Open Letter, turned off

 1  GPS' technology.

 2          THE COURT:  But that didn't cause any damages to it,

 3  did it?

 4          MR. MUCKENFUSS:  Well, I was just addressing Your Honor

 5  to ---

 6          THE COURT:  Yeah.

 7          MR. MUCKENFUSS:  Well, I mean I disagree.  I think it's

 8  evidence of reputational harm.

 9          THE COURT:  Okay.

10          MR. MUCKENFUSS:  I go back to:  There are two types of

11  damages.  There's special damages and general damages.  I -- I

12  understand the Court's questioning about special damages, what's

13  the evidence on certain pecuniary harm, but there is -- there is

14  plenty of evidence in the record as to the end users, like Newark

15  School District, and other schools and certainly other people,

16  obviously, in the public receiving the Open Letter.

17          I concede, Your Honor, there's no evidence specifically

18  of Carrier saying, "I got the Open Letter and read it."

19  Mr. Brinckman testified that -- because he was communicating with

20  Carrier.  He doesn't talk about a statement that Carrier makes,

21  but he testifies in his deposition that when he's -- He's asked

22  about Carrier.

23          He says, "Let's go back to Carrier.  Is it your

24  testimony today that GPS is not currently doing business with

25  Carrier?"

1      "That is correct."

2      "When you were doing business with Carrier, did it

3  actually keep the inventory products or did it buy for individual

4  projects?"

5      And he explains that, "Carrier is an OEM.  They

6  canceled the agreement before we actually started executing it."

7      "Okay.  So it never went forward."

8      "The agreement was signed but then it canceled shortly

9  thereafter."

10      Mr. Brinckman goes on to testify further about Carrier.

11      THE COURT:  Excuse me just a moment.  Stop.  Stop for a

12  minute, and we'll come back to this.

13      Am I recalling correctly that the contract with Carrier

14  allowed Carrier to cancel?

15      MR. MUCKENFUSS:  I'm sorry, Your Honor?

16      THE COURT:  Did the contract permit Carrier to cancel

17  for any reason?

18      MR. MUCKENFUSS:  No, Your Honor, --

19      THE COURT:  Okay.

20      MR. MUCKENFUSS:  -- it did not.  It was -- It was -- It

21  was a contract executed in late 2020.

22      THE COURT:  Okay.  And did you take action with respect

23  to Carrier canceling?

24      MR. MUCKENFUSS:  No, Your Honor.  I think the testimony

25  -- I think the testimony from Mr. Brinckman, I mean you had a

 1    situation, obviously, with my client.  It's sort of a delicate

 2    business situation.  They want to continue to do or try to do

 3    business with Carrier in the future.  But, no, they did not take

 4    any legal action against Carrier.

 5             THE COURT:  Well, your client knows the way to the

 6    courthouse.

 7             MR. MUCKENFUSS:  I'm sorry?

 8             THE COURT:  Your client knows the way to the

 9    courthouse.

10             MR. MUCKENFUSS:  Yes, Your Honor.

11             THE COURT:  The customers in Paragraph 11, Bard HVAC,

12    S&P, JCI, Daikin, Greenheck, Berner -- I know my court reporter

13    is hating me now -- Nailor Industries and ABM -- That's at

14    Appendix 1811, and Laura will provide all those spellings to you,

15    Debbie.

16             Do I have any evidence with respect to any of them and

17    their decision-making other than Mr. Boyd or Mr. Brinckman saying

18    what they said?

19             MR. MUCKENFUSS:  No, Your Honor.  Other than what is in

20    Mr. Boyd's affidavit as to those particular -- You do have

21    Mr. Brinckman's testimony in general about the damages to GPS.

22             And if I may, Your Honor, just to go back to the

23    evidence regarding the letter and where it was directed to,

24    Mr. Brinckman testified ---

25             THE COURT:  I'm going to assume that when you're

1   referring to "the letter," you mean the Open Letter?

2           MR. MUCKENFUSS:  I -- I apologize.

3           THE COURT:  No.  That's okay.  I'm just clarifying for

4   the record.

5           MR. MUCKENFUSS:  Yes, the Open Letter.

6           THE COURT:  The Open Letter is dated April 12th, 2021.

7           MR. MUCKENFUSS:  Yes, Your Honor.

8           THE COURT:  Okay.

9           MR. MUCKENFUSS:  Mr. Brinckman -- If I may, Your Honor,

10  I'll read briefly Mr. Brinckman's testimony.

11          THE COURT:  Okay.

12          MR. MUCKENFUSS:  "Mr. Brinckman, what is your

13  understanding of who Marwa Zaatari directed the letter to?"

14          "It was directed to our customer base."

15          "It was -- Was there a specific customer base she

16  directed the letter to?"

17          "Predominantly schools."

18          "And what is your understanding of why she directed the

19  Open Letter to your customers?"

20          "To get them to not purchase GPS or turn it off."

21          "Do you think she was successful in her efforts to do

22  that?"

23          "Yeah.  Our financial results demonstrate that."

24          So I -- Going back, Your Honor, to the circumstantial

25  evidence of harm in this case, so just the school districts were

1    the primary end user/customer of my client's product through 2020

2    and 2021.  You may have read that in the brief or in the

3    testimony.  So, obviously, they comprise the majority of my

4    client's sales.

5            THE COURT:  Are they any of the customers and potential

6    customers that I just read out?

7            MR. MUCKENFUSS:  Not -- Not with Mr. Boyd.  I was

8    referring to Mr. Brinckman's testimony in general.

9            THE COURT:  Okay.  Okay.  Did -- What is the evidence

10   of school districts that either canceled or did not contract with

11   GPS other than Newark?

12           MR. MUCKENFUSS:  I'm sorry.  Other than Newark?

13           THE COURT:  Yes.

14           MR. MUCKENFUSS:  So there were no -- there were other

15   -- There were no other schools.  I mean, obviously, my client

16   doesn't -- There are schools that just never bought GPS' product,

17   never had a relationship with GPS.

18           There was a school district -- There's other school

19   districts, for example, in Atlanta, Your Honor -- I believe this

20   is in Mr. Brinckman's testimony; I would have to get the cite --

21   that never followed through with the purchase.  Now, obviously,

22   this goes to the chronology.  We -- We did not depose, obviously,

23   the Atlanta School District or those specific school districts,

24   but Mr. Brinckman testified specifically that the Open Letter --

25   and the Open Letter itself says it's intended for schools, and

```
1    it's -- I don't think the Defendants -- I don't think they

2    dispute that my client's business declined dramatically after

3    these statements were made.

4           And I would submit -- And the case law that we cited is

5    one with the Lanham Act defamation.  That's sufficient

6    circumstantial evidence for the jury to decide whether the

7    decline in business, and certainly like with Newark School

8    District which is direct evidence of the impact of the

9    statement -- I understand -- I'm not stating, Your Honor, that

10   Newark School District, because they had already bought the

11   product, I understand that, but they are reacting in the public

12   to the -- to the statement and turning off the technology.

13          THE COURT:  Well, you are surmising that is why they're

14   turning it off.

15          MR. MUCKENFUSS:  I believe it was stated.  So there was

16   a video published by the Newark School District which, I think,

17   is referenced in the testimony in which they referenced the Open

18   Letter.  There was no other event that occurred.

19          THE COURT:  Okay.  You're going to give me that cite.

20   I'm not familiar with what you're telling me.

21          MR. MUCKENFUSS:  Okay.  We can look it up.  But the

22   Newark School District is referenced in Mr. Brinckman's testimony

23   as to turning off the technology.

24          THE COURT:  Okay.  I'm trying to get you to direct me

25   to admissible evidence of causation and damages.
```

1          So the first question is:  Who saw the letter?

2          The second question is:  Why did they take action?

3          The Open Letter, as you point out, is directed to

4   School District Facility Managers and Administration Leadership,

5   and other professional organizations which, I assume, does not

6   include Carrier or S&P, JCI, Daikin, Greenheck, Berner, Nailor

7   and ABM.  Is that right?

8          MR. MUCKENFUSS:  Yes, Your Honor.

9          THE COURT:  Okay.  Let me come back to the Open Letter.

10  It's a little off the topic but since I have it in my hand, the

11  Open Letter is authored on its face by Dr. Zaatari and

12  Dr. Harmon.

13         MR. MUCKENFUSS:  Yes, Your Honor.

14         THE COURT:  Is that correct?

15         Have you sued Dr. Harmon?

16         MR. MUCKENFUSS:  We have not.

17         THE COURT:  What is the evidence that the Open Letter

18  would not have gone out as is if Dr. Zaatari had not signed it as

19  well?

20         MR. MUCKENFUSS:  So the -- There is e-mail evidence --

21  There is e-mail evidence, Your Honor, in which Dr. Zaatari,

22  within enVerid, comes up with the idea of the Open Letter.  And

23  the first mention of the Open Letter is an e-mail from

24  Dr. Zaatari to Dr. Harmon.  It is true that Dr. Harmon helped

25  draft the Open Letter.  However, he was -- I think there is

 1   evidence in the record, and I don't really think it's disputed,

 2   that it was Dr. Zaatari who wanted to write the Open Letter, who

 3   recruited Dr. Harmon to help her write the Open Letter.  So it

 4   was -- It was without a doubt Dr. Zaatari's idea, and certainly

 5   her motivation to write the Open Letter, to -- to send it to

 6   school districts.  And, again, our -- our -- our claim in this

 7   case and the evidence and the e-mail evidence is that that

 8   strategy was -- was concocted within enVerid and with

 9   Dr. Zaatari.  It was not with Dr. Harmon independent of

10   Dr. Zaatari.

11           THE COURT:  Okay.  What is false in this Open Letter?

12           MR. MUCKENFUSS:  So there are numerous things that we

13   lay out in our brief that are false in the Open Letter.

14           Number one, she refers to -- And, again, I would go

15   back to the Texas cases, Your Honor, because she talks about

16   ionization at certain points in the Open Letter, you know,

17   generally.  She also refers to NPBIs specifically in the Open

18   Letter.

19           THE COURT:  Okay.  Let me -- Let me stop you for a

20   minute --

21           MR. MUCKENFUSS:  Sure.

22           THE COURT:  -- and come back to this.

23           Do you dispute that certain kinds of ionization

24   techniques generate ozone which is harmful to humans?

25           MR. MUCKENFUSS:  I'm sorry.  Do I dispute that certain

1    ionization technologies produce ozone that are harmful to humans?

2    We dispute that there is any ionization technology.  I don't

3    think -- First of all, I understand there are other ionization

4    technologies that produce ---

5          THE COURT:  Yeah.  I don't think that was a tough

6    question, but I can ask you a tough question.

7          MR. MUCKENFUSS:  I know.

8          THE COURT:  I'm starting with the easy questions.

9          MR. MUCKENFUSS:  Yeah.

10         THE COURT:  We'll get to the tough questions later.

11    This is a simple question.

12         Do you dispute that certain kinds of ionization

13    technologies generate ozone which is harmful to humans?

14         MR. MUCKENFUSS:  We do dispute that.

15         THE COURT:  Okay.  So your position is that no

16    ionization technologies generate ozone or that ozone is harmful

17    to humans?

18         MR. MUCKENFUSS:  So there's two parts of that question.

19    We dispute that it would be harmful to humans.  We don't dispute

20    that certain ionization technologies produce ozone.

21         THE COURT:  Okay.  All right.  So your dispute is with

22    the concept that generation of ozone can be harmful to humans.

23         MR. MUCKENFUSS:  We are disputing the fact that in any

24    ionization technology that produces ozone would be harmful --

25    that there's evidence that it's harmful to humans.  We don't

1   dispute that ozone, in general, at certain levels would be

2   harmful to humans; right?  So I'm not -- We're not disputing that

3   concept.

4           THE COURT:  Okay.  So I want to go through this letter,

5   so you should have it in front of you.  Page 1, five studies are

6   referenced in the third paragraph and then some of those again

7   referenced in the second line of that paragraph, along with

8   additional studies, 6, 7 and 8.

9           Do you dispute the accuracy of the description of what

10  those studies indicate?

11          MR. MUCKENFUSS:  Yes, Your Honor.

12          THE COURT:  Okay.  What is the nature of that dispute?

13          MR. MUCKENFUSS:  So in her deposition Dr. Zaatari

14  actually admitted that -- or referenced to one of the cites.  The

15  Trane study was incorrectly cited in -- in her --

16          THE COURT:  Right.

17          MR. MUCKENFUSS:  -- in the paper for a proposition.

18          THE COURT:  Yes.

19          MR. MUCKENFUSS:  There's also -- So there is a section

20  I'm getting a copy of -- I'm sorry -- of the Open Letter.

21  There's a section in the Open Letter that talks about the impacts

22  on health.

23          THE COURT:  Okay.  Well, I want to do this page by

24  page --

25          MR. MUCKENFUSS:  I'm sorry, Your Honor.

1          THE COURT:  -- so you're not ahead of me.  So one of

2    the studies, the Trane, T-R-A-N-E, study you claim is miscited.

3    So if we just took that one out, are the other references to the

4    studies that are in the third paragraph on Page 1 accurate?

5          MR. MUCKENFUSS:  They are not accurate, Your Honor, as

6    it relates to my client's technology.

7          THE COURT:  Okay.  But it doesn't purport to be

8    referring to your client there, does it?

9          MR. MUCKENFUSS:  Well -- So one of the studies,

10   Reference 1, which is the -- what's known as the "Illinois Tech

11   Study," does refer to my client's technology.  We do intend that

12   her reference to that study in the -- in this paper is false in

13   terms of what she purports to use it for.  For example, she

14   purports to use the Illinois Tech Study to state that my -- that

15   NPBI produces harmful levels of by-products.  That is a -- That

16   is a false statement as it relates to that study.

17         THE COURT:  Okay.  What is the connection between the

18   Illinois Institute of Technology and Elsevier?

19         MR. MUCKENFUSS:  And Elsevier?  So Elsevier is the

20   publisher of the -- So Illinois Tech is a school where the study

21   occurred.

22         THE COURT:  Okay.

23         MR. MUCKENFUSS:  Elsevier is a published -- scientific

24   publisher that published that study.

25         THE COURT:  Okay.  Have you sued them?

1          MR. MUCKENFUSS:  We have, correct.

2          THE COURT:  And you sued Elsevier, the publisher.  And

3   Illinois Institute of Technology?

4          MR. MUCKENFUSS:  Not the -- Not the school.  So the

5   school is just where the study occurred.  Elsevier published the

6   study.

7          THE COURT:  Okay.  And is it your position that the

8   study is false?

9          MR. MUCKENFUSS:  It is.

10          THE COURT:  Okay.  And what is the evidence that the

11   Defendants knew this study was false?

12          MR. MUCKENFUSS:  So the -- Well, first of all, when I

13   deposed Dr. Zaatari, she admitted that, for example, there's data

14   in the study that is -- on the face of the study is false.  So

15   there -- there is reported data in the study, in what's called

16   the "Supplementary Data" of the study, that is -- does not

17   support what the study purports to say which is -- For example,

18   the study purports to conclude that acetone increased with the

19   use of ionization.  The data that's actually within the study

20   does not support that conclusion in the study.

21          So that the source of our claim against Elsevier

22   relates to the fraudulent data.  And, again, I would note,

23   Your Honor, after we sued Elsevier, they -- only after we sued

24   Elsevier, they -- they attempted to correct that issue within the

25   report.  We still contend that even by their own conclusory

1 correction of the incorrect presentation or the inconsistent

2 presentation of the data, that it's still false, and that that's

3 an ongoing case.

4   But before they corrected the study, on the face of the

5 study -- And I deposed one of the lead authors in the case who

6 admitted that the data reported in the supplementary data did not

7 support the conclusion that Dr. Zaatari tries to use it for which

8 is that it increases harmful levels of by-products.

9   THE COURT:  Okay.  What else is false about the letter?

10   MR. MUCKENFUSS:  So, Your Honor, I would note there is

11 a reference -- For example, we've talked about the Trane study,

12 using the Trane study for -- to support the statement that NPBI

13 or ionization produces harmful levels of by-products.  That is a

14 false statement.

15   On Page -- I believe it's the third page of the Open

16 Letter, there's a reference to impact on health.  One of the

17 strategies of the Open Letter was to conflate technologies, and I

18 would -- I would submit, Your Honor, this is an important point

19 because it's intentional.  When Dr. Zaatari's making statements,

20 she refers to NPBI and then she will refer to ionization in

21 general.

22   Under the -- Under the *Klentzman* case and the *Levine*

23 case, Texas Supreme Court cases, there is the concept that

24 when -- when the defendant makes references to a group, and it's

25 reasonable that these references are directed or they would be

 1   associated with the plaintiff, the defendant does not have to

 2   name the plaintiff by name.

 3           THE COURT:  Yeah.  I know that law.  I don't need to be

 4   schooled on that.  I'm aware of that.

 5           MR. MUCKENFUSS:  Apologies, Your Honor.  I just wanted

 6   to make ---

 7           THE COURT:  No, no.  I wasn't being offended.  I just

 8   -- You don't need to waste your time on that.

 9           MR. MUCKENFUSS:  Thank you, Your Honor.

10           THE COURT:  I -- I agree with you on that.

11           MR. MUCKENFUSS:  Yeah.  And I just -- I just wanted to

12   preface that when I'm making this statement.

13           So it is important, for example, that when she says

14   electronic air cleaners' ionisers produce ozone, that is not

15   correct as it relates to my client's products, in terms of my

16   client's products.

17           THE COURT:  But there are a category -- Let me say that

18   differently.  Ionization is a large category of what your client

19   that uses needlepoint bipolar ionization, NPBI, which is a

20   sub-category of ionization techniques, and your client has been

21   critical of other businesses that use different ionization

22   techniques.  Is that correct?

23           MR. MUCKENFUSS:  Well, my client has been -- I think

24   not in the sense of making -- So my client, Your Honor,

25   obviously, has received zero ozone certification for a reason

1    under UL 2998.  So, yes, I think that is a distinction of their

2    product that makes it marketable.  That was -- That was an area,

3    regardless -- even though my client has zero ozone emission for

4    its product, Dr. Zaatari, nevertheless, and even in her tweets,

5    aside from the Open Letter -- I know we're on the Open Letter.  I

6    don't mean to leave that document, but she intentionally

7    conflates and confuses the technologies.

8           But, yes, there absolutely are ionization technologies

9    that don't measure up to my client's technology in terms of

10   ozone, in terms of a lot of different things, but Dr. Zaatari

11   never distinguishes or attempts to note that my client's

12   technology is, in fact, different, for example, with ozone.  It's

13   the exact opposite.  She -- She lumps NPBI in with the group that

14   -- where she makes these statements.  So these statements are, in

15   fact, false as it relates to GPS' technology.

16          THE COURT:  When did GPS -- If they did, when did GPS

17   offer Ms. -- Dr. Zaatari a seat on the GPS Science Advisory

18   Board?

19          MR. MUCKENFUSS:  When did -- So this is an interesting

20   e-mail.  Mr. Brinckman, the CEO, I think you're referencing, sent

21   -- reached out to Dr. Zaatari and to be quite honest, Your Honor,

22   I think he testified to this.  He was simply trying to --

23   Obviously, it got very contentious.  He didn't offer her a job as

24   it's represented.  What he states in the e-mail is he invites her

25   to come to GPS to talk with them to see the technology, to

1    understand.  Again, my client's efforts throughout was to make

2    the point that they should not be lumped in with other ionization

3    technologies.  He was reaching out to her to make that offer to

4    "come talk with us," to look at the lab.

5                THE COURT:  When?  When?  That's all I asked you.

6                MR. MUCKENFUSS:  I'm sorry, Your Honor.  It was in

7    March, 2021.  I'm sorry, Your Honor.

8                THE COURT:  All right.

9                MR. MUCKENFUSS:  And so it was -- And I don't know if

10   Your Honor had another question about that.

11               THE COURT:  I didn't.

12               MR. MUCKENFUSS:  Okay.

13               THE COURT:  Okay.  I'm going to pick on the other side

14   here in a moment.

15               MR. MUCKENFUSS:  Thank you, Your Honor.

16               THE COURT:  Have a cup of water or something.

17               I want to talk about causation -- Excuse me.  I want to

18   talk about agency and responsibility.  So give me your best shot

19   about agency and conspiracy with reference to enVerid.

20               So enVerid -- Is that the correct pronunciation?

21               No.  I'm still with you.

22               MR. MUCKENFUSS:  Oh, you're still on me.

23               THE COURT:  Yes.  Is that the correct pronunciation?

24               MR. MUCKENFUSS:  I thought you were moving on.

25               THE COURT:  I'm going to.  I just have a last question

 1    I want to ask you.

 2              "EnVerid," is that correct?

 3              MR. REED:  EnVerid, yes, Your Honor.

 4              THE COURT:  Okay.  Give me your best shot about

 5    conspiracy with the other Defendants and agency.  You concede

 6    that there is an agreement between Dr. Zaatari and enVerid for

 7    the period of time when the statements were made, correct?  You

 8    concede that?

 9              MR. MUCKENFUSS:  Yes, Your Honor.

10              THE COURT:  Okay.  So give me your best shot about why

11    enVerid is responsible for what Dr. Zaatari said.

12              MR. MUCKENFUSS:  Yes, Your Honor.  So there are two

13    theories:  Agency and civil conspiracy.  I'll start -- I'll start

14    with civil conspiracy, and I will -- I will concede to the Court:

15    I believe that conspiracy is probably the stronger argument here,

16    if I'm understanding the -- Your Honor's point about the advisory

17    agreement, but I still think there is enough evidence on agency.

18    So for civil conspiracy and, again, I -- if Your Honor would

19    like, I can repeat the elements of conspiracy and sort of go

20    through the facts.

21              THE COURT:  No thanks.

22              MR. MUCKENFUSS:  Understood, Your Honor.  I wanted to

23    make sure.  I didn't want to go back down that road.

24              So I think if you look at the evidence, and there's

25    really a mountain of e-mails and I can go through specifics, but

1   for every -- for every specific act that we complain about, this

2   was strategized with really the CEO at enVerid, Mr. Weeks, and

3   with others at enVerid.  So, for example, there is the -- what I

4   call the "bipolar backlash e-mail," Your Honor, and you may not

5   -- that may not ring a bell.

6           THE COURT:  Yes, it does.

7           MR. MUCKENFUSS:  Okay.  Thank you, Your Honor.

8           So the bipolar backlash e-mail was an e-mail from

9   Heather Robb, enVerid -- someone who -- she was in charge of

10  enVerid's social media.  And so this was a strategy that was

11  developed within enVerid to specifically go after GPS.  And we --

12  There's the e-mail from Mr. Weeks where he basically ---

13          THE COURT:  Can you give me a reference number on that,

14  please?

15          MR. MUCKENFUSS:  Yes.  I apologize, Your Honor.  I'll

16  get the reference.

17          THE COURT:  Okay.  All right.  Go ahead.  Tell me when

18  you get it.

19          MR. MUCKENFUSS:  Thank you, Your Honor.  So we'll get

20  that reference.

21          There's also the reference from Mr. Weeks that he was

22  the CEO, the President of enVerid, where he -- there's this

23  e-mail where he says, "We -- We're getting our" -- So the

24  Appendix 568 is for that particular e-mail, the bipolar backlash

25  e-mail, Your Honor.

```
 1              THE COURT:  Okay.

 2              MR. MUCKENFUSS:  There is the e-mail where Mr. Weeks

 3   states that -- basically that GPS is eating their lunch in terms

 4   of the market and states that they have to come up with a plan to

 5   go after GPS.  And one of -- one of his ideas in his e-mail is to

 6   basically say that GPS' technology produces harmful by-products.

 7   And this was -- this was actually in August of 2020, earlier than

 8   the March, 2021, but it -- it goes back to that timeframe.

 9              If you look at the timeline, Your Honor, in terms of

10   how this develops within enVerid, it was -- it starts with

11   enVerid.  It was very specific with enVerid.

12              So Mr. Weeks references the fact that they have to come

13   up with something to go after GPS with because GPS is eating

14   their lunch.  What he means by that, and it's in the e-mails,

15   he's frustrated with the fact that GPS is selling this product

16   because it has zero ozone emission.  It's certified under

17   UL 2998, and so they can't really compete with the product.  In

18   fact, there are e-mails where they acknowledge that, you know,

19   GPS' products work and that they are a zero ozone emission.

20              These e-mails are with Dr. Zaatari who at the time is

21   an advisor.  So she has her advisory agreement with enVerid, but

22   there are scores of e-mails where -- and there's another e-mail

23   where Mr. Weeks lays out the strategy, basically talks about how

24   they need to go after GPS publicly, and ultimately it culminates

25   in Dr. Zaatari tweeting out and using social media which enVerid
```

1    specifically encourages and directs Dr. Zaatari.

2         There's an e-mail with Heather Robb, Your Honor, where

3    she -- she is basically stating to Dr. Zaatari that they look

4    forward to her or expect her to tweet out something that was

5    happening negative or that they perceive they could tweet out

6    negative about GPS.

7         THE COURT:  Okay.  But what -- what is the evidence to

8    the extent -- Just to assume for the moment that what Dr. Zaatari

9    was saying was false, where is the evidence that enVerid knew or

10    encouraged Dr. Zaatari to put out false information?

11         MR. MUCKENFUSS:  So, for example, Heather Robb, who is

12    the Director, and I can get this ---

13         THE COURT:  I have her e-mail of March 11th, 2021.  If

14    you want to direct me to something else, there's a series of

15    correspondence going back to March 2nd.

16         MR. MUCKENFUSS:  Yes, Your Honor.  So there --

17    Obviously, there are a number of e-mails that I referenced with

18    Mr. Weeks where he is in the e-mails laying out the strategy.

19         THE COURT:  Okay.  Can you -- When you come back up,

20    give me the whole list of those.

21         MR. MUCKENFUSS:  Yes, Your Honor.

22         THE COURT:  Or pass an e-mail up to my law clerk so I

23    can look that up.

24         MR. MUCKENFUSS:  I can -- I can do that.  Yes,

25    Your Honor.

1          THE COURT:  All right.  Okay.  I'm going to give you a

2     break.

3          MR. MUCKENFUSS:  I'm sorry, Your Honor?

4          THE COURT:  I'm going to give you a break.

5          MR. MUCKENFUSS:  Okay.  Thank you, Your Honor.

6          THE COURT:  Thank you.

7          All right.  I don't know who's going to argue next.  I

8     don't care.

9          MR. MASSO:  Good morning, Your Honor.

10          THE COURT:  Good morning.

11          MR. MASSO:  Jadd Masso for the Defendants,

12     Marwa Zaatari and D Zine.  I know that Mr. Reed, on behalf of

13     enVerid, may have additional comments.  They had a Motion for

14     Summary Judgment as well, but I'm happy to address certainly the

15     causation and damages issues and anything else from our motion

16     that Your Honor has questions about.

17          THE COURT:  Okay.  So you could have taken the

18     depositions of the customers, too.  Why didn't you?

19          MR. MASSO:  Because it's not our burden.

20          THE COURT:  Okay.

21          MR. MASSO:  It's their burden -- I mean their burden to

22     present evidence of causation and damages.  They have the

23     capability to prove it but they -- Well, if there is evidence

24     that exists, certainly they had the capability to gather it.

25     Instead, they decided to rely on statements of their own that a

 1  contract was terminated after statements were made or something

 2  like that which is not evidence of causation.

 3          THE COURT:  Okay.  Is that not circumstantial evidence

 4  of causation?  Timing, statement made, contract, statement made,

 5  contract canceled?

 6          MR. MASSO:  I think they got to do more than that.

 7  Just because Event 1 occurs and then Event 2 occurs, they haven't

 8  given us a single case.  I mean their entire argument on

 9  causation is a single paragraph on Page 46 of their response.

10  They don't offer us anything like that to say, "Oh, well, it can

11  be circumstantial, and the fact that Event 2 followed Event 1 is

12  circumstantial evidence."

13          THE COURT:  Does the contract permit Carrier to cancel

14  for -- without cause?

15          MR. MASSO:  The contract, I believe -- Whether it needs

16  to be terminated is even a question itself.  It's a Memorandum of

17  Understanding that says they have a goal of selling 20 million

18  dollars' worth of products.  There's no obligation to do

19  anything.

20          THE COURT:  Okay.  Let's talk about defamation, per se.

21  Why isn't this defamation, per se?

22          MR. MASSO:  Because ---

23          THE COURT:  If it's defamatory.  For the sake of my

24  question, I'm assuming it's defamatory.

25          MR. MASSO:  It is not defamatory, per se, because all

1    of these statements deal with the safety efficacy of the product

2    itself.  *Innovative Block*, of course, is the Texas Supreme Court

3    case that gives us this standard.  So long as we are talking

4    about the product, it is about the product, it is not defamation,

5    per se.  It is not about the character or the reputation of the

6    business.

7              THE COURT:  Well, in effect, it is that GPS is fudging

8    its testing results.  Either it doesn't have any tests at all and

9    it's misrepresenting that it does or it's fudging its test

10   results in terms of the details of the testing so that the

11   results will be misleading and inaccurate.  Doesn't that, in

12   effect, accuse GPS of fraudulent behavior?

13             MR. MASSO:  On this issue, I think we have to look at

14   the statements themselves.  There are statements where GPS is

15   mentioned.  There are statements where -- I mean in those --

16   There were 29 statements and now there's 27.  They've conceded

17   two.  But if we look at ---

18             THE COURT:  Which two?

19             MR. MASSO:  No. 3 and No. 9.

20             THE COURT:  I don't think they have.

21             Have you, Mr. Muckenfuss?  Conceding 3 and 9?

22             MR. MUCKENFUSS:  No, Your Honor.

23             THE COURT:  3 and 9, back at you.

24             MR. MASSO:  Very well.

25             THE COURT:  I would have considered it a major victory

1    if 2 of the 29 had, but no such luck.

2          MR. MASSO:  As far as the number of statements we're

3    dealing with, we're back to 29.  If we look at those and say,

4    "Okay, which one of these should be construed as impugning the

5    character of the manufacturer," if there are any, I mean I know

6    that there's a couple that used the word "cheating."  I looked at

7    those this morning.  They don't mention GPS.  They don't mention

8    NPBI.  They talk about ionisers because ionisers cheat in the way

9    they -- the way they can be tested or something like that.  But,

10   you know, this almost gets us back to causation, of course.  But

11   looking at these 29 statements, where is their character impugned

12   beyond just criticizing the product?  Criticizing the product and

13   saying that it doesn't work, that it doesn't meet the things that

14   people say about it, that it doesn't really clean the air as much

15   as people may think it does, that's an issue with the product.

16         It's just like *Innovative Block* saying, "Oh, they're

17   using, you know, substandard materials.  They're using bad

18   aggregate."  That's the same thing we saw in *Innovative Block*.

19   You're impugning the product and not the character of the company

20   that makes it.

21         THE COURT:  Okay.  So if it is defamation, per se, then

22   where are we?

23         They would -- On the defamation claim, they would be

24   entitled to nominal damages.

25         MR. MASSO:  Yes.

1          THE COURT:  That's it because there are no damages that

2     are demonstrated except for arguably reputational damages.

3          MR. MASSO:  Well, we don't believe they put on any

4     evidence of any damages at all, whether special damages or

5     reputational damages.  They didn't offer an expert.  They haven't

6     put anything ---

7          THE COURT:  Well, they have an expert.  They have Mimms

8     as their expert.

9          MR. MASSO:  But they didn't offer that in response to

10    the Motion for Summary Judgment.  Their only response to the MSJ

11    was about causation on Page 46 where they offer the ---

12          THE COURT:  I think it was quite clear that

13    Mr. Muckenfuss did not anticipate that the Judge would be

14    spending an hour and a half on a subject that takes two pages in

15    length in the Plaintiff's brief.  Your point is taken.

16          I don't remember what you're saying, though.  That

17    Mimms is not -- There's no reference to Mimms in the briefing?

18          MR. MASSO:  They don't -- In response to our Motion for

19    Summary Judgment, they do not rely on Mimms.  So they do not at

20    any point say, "Here's our evidence of causation and here's our

21    damages."  They just say there was causation because one thing

22    happened after another or somebody told somebody who told

23    Chris Boyd about Carrier.  Not Chris Boyd; I'm sorry.  That's a

24    radio personality.  Tim Boyd; told Tim Boyd about Carrier which

25    is -- we've got a double hearsay issue, I know.  I'm not going to

1    beat that dead horse, but they don't mention Mimms.  Mimms does

2    not get a single word.

3            THE COURT:  You want to talk about the state of mind

4    hearsay exception?

5            MR. MASSO:  I'm sorry?

6            THE COURT:  State of mind.

7            MR. MASSO:  Ahh.  I agree with Your Honor that seems

8    like a stretch.  It seems like the exception would consume the

9    rule if we said a state of mind if all you're saying is, "Well,

10   here is my state of mind," and you're not offering it for the

11   truth of the matter.  How is that not the truth of the matter

12   asserted?

13           But I don't think we even need to get there because in

14   this case it's double hearsay.  We do not have a situation where

15   Tim Boyd is testifying, "Chris Opie told me his state of mind."

16   That's not the testimony.  Tim Boyd's testimony is that

17   Chris Opie at Carrier told someone at GPS who told him what

18   Carrier was doing and why.  So even if 8033 would give them an

19   exception to the hearsay rule for that first statement, it

20   doesn't take care of the second statement.  We still have a

21   double hearsay problem and it's still excludable.

22           THE COURT:  Okay.  All right.  Unless you have

23   something else you want to say on that subject, I'll go to

24   counsel for enVerid.

25           All right.  Mr. Reed, you can address this question of

 1   conspiracy as a basis for liability, also.

 2           MR. REED:  I'm sorry.  As I was walking up here,

 3   Your Honor, you said address the conspiracy?

 4           THE COURT:  Yes.

 5           MR. REED:  Thank you, Your Honor.

 6           THE COURT:  As well as anything else you want to say

 7   about causation.

 8           MR. REED:  And I'll -- And I'll do my best not to

 9   repeat what Mr. Masso went on about causation so that -- because

10   we're aligned on that issue that there hasn't been damages

11   presented as far as in response to this Motion for Summary

12   Judgment.  As far as the conspiracy, ---

13           THE COURT:  Well, I would prefer that we phrase this as

14   a problem with causation.  In Mimms, Mimms talks about damages.

15   The problem is causation, not damages.  The problem, as I see it,

16   is a lack of linkage between the actions that are challenged here

17   and an injury of any type because of the nature of the evidence

18   that is offered.  Had we had testimony from Carrier, Boyd, all

19   the others I've listed, school district, Newark, we'd have

20   causation.  And Mimms, I think, could assume causation and

21   testify about damages resulting from causation.

22           So to me, your problem is not -- I mean maybe these are

23   just two ways of describing the same phenomenon, but I -- I

24   believe the problem is causation.

25           MR. REED:  Yes, Your Honor.  So do you want to move on

1    to conspiracy then?

2              THE COURT:  Unless you have something to say about

3    causation.

4              MR. REED:  I -- I don't, Your Honor, --

5              THE COURT:  Okay.

6              MR. REED:  -- other than the fact of when we are

7    talking about the Carrier MOU, I do think that maybe it's missed

8    there that this was a Memorandum of Understanding that was

9    completely aspirational, that had no obligations whatsoever by

10   Carrier to do anything.  So even if for some reason you could

11   look at that contract, it doesn't support a causal effect there.

12             THE COURT:  Okay.  So let's -- let's talk about this --

13   I can't remember what the phrase was -- "bipolar backlash."  What

14   about that?

15             MR. REED:  Yes, Your Honor.  And what we -- you know,

16   and what I've seen in the motion, what I've heard counsel talk

17   about here today is I think he said "a mountain of e-mails."  And

18   when you read the motion, what -- he and his corporate rep in

19   this, they don't have any direct evidence.  Mr. Boyle testified

20   they have no direct evidence of -- of a conspiracy or of enVerid

21   telling Marwa Zaatari to do anything as far as the statements or

22   the Open Letter or any of that concern.

23             So what they try to do here and -- and what I

24   envisioned when I read that paragraph is a conspiracy theorist,

25   and we've got pins and red strings all over the wall here.  And

1  what they try to do is take the Court through an October, 2020,

2  e-mail between individuals at enVerid that does not include

3  Marwa Zaatari.  And then they try to then draw a string over to

4  an April 9, 2021, e-mail between Zaatari and someone at Duke

5  about an Open Letter.

6         And then they add onto that the Weeks e-mail, which is

7  the bipolar backlash e-mail that you were referring to, that does

8  not include that conversation, does not include -- the original

9  one doesn't include Marwa Zaatari and, in fact, is talking about

10  another scientist, Ms. Farmer or Dr. Farmer, who's also an

11  ioniser critic.  That -- That e-mail's then forwarded on to

12  Zaatari with just an FYI to come up with this whole idea that

13  there's this mountain of -- of a conspiracy.

14         But the problem with that is -- and the Court is aware

15  and I think we've cited it in our -- in our papers here, the *Wynn*

16  *versus Hong* case, in that to prove a vital fact, you can use

17  inferences but you can't prove it by unreasonable inferences or

18  piling inferences upon inferences.  And that's exactly what the

19  Court is asked or what the GPS is asking the Court to do is to

20  pile an inference about:  Okay, when Mr. Weeks is having a

21  strategy call with someone else at enVerid and then because there

22  is another e-mail months later between Mrs. Zaatari and someone

23  at Duke about her Open Letter, that somehow that there's an

24  inference that in that letter he's telling her to do something

25  even though she's not copied.  What they don't provide you,

1   though, is any e-mails to her where she's told, "Hey, go out and

2   make these tweets."  Yeah, they -- they say, "Hey, we'd like you

3   to like some of our tweets," and that's some of their evidence

4   for an inference.  That doesn't amount to what the Court was

5   asking them here as:  Where is the evidence that, one, that we

6   had a meeting of the minds here from someone at enVerid with

7   control to -- with Ms. Zaatari to go out and perform an unlawful

8   act, to go out and perform -- to say, if you're assuming that

9   these statements -- And I don't concede that they're false when

10  we get into the 29 of them, but there's no meeting of the minds

11  demonstrated in that string of web there to meet the conspiracy

12  elements, Your Honor.

13          THE COURT:  Okay.  All right.  Thanks.

14          MR. REED:  All right.  Thank you.

15          THE COURT:  All right.  One of the Mr. Shields, come on

16  up here and talk about this Motion to Join Third-Party

17  Defendants.  Sorry, not "Defendants," responsible third parties.

18          While you're walking up here, I'm not happy about this

19  motion, so give it your best shot because I cannot imagine that

20  state law was intended to allow this.  First of all, these people

21  -- This is a whole side show of potential litigation.  Mr. Walker

22  and companies Falfurrias Capital Partners and Nu-Calgon, (this is

23  Document 336), I think whatever duties they have are duties to

24  GPS, not to you.  If I let you join -- not "join," but I let you

25  designate these people as responsible third-parties in a jury

 1   charge, we are off on a side show like no other.

 2          I get it that you have done this within the time

 3   allowed by Texas law, but to permit that in this case would

 4   eviscerate my Scheduling Order.  So other than that, I'm not a

 5   really big fan.

 6          So I'll hear from you.  Give it your best shot because

 7   I'm not enamored at this one at all.

 8          MR. DAVID SHIELDS:  Good morning, Your Honor.

 9          THE COURT:  Good morning.

10          MR. DAVID SHIELDS:  May it please the Court.

11   David Shields on behalf of Dr. Zaatari and enVerid.

12          THE COURT:  I just don't want Mr. Muckenfuss to feel so

13   bad.

14          MR. DAVID SHIELDS:  I am sure after that he does not,

15   Your Honor.

16          So steering a long uphill climb in the face, at first

17   it's clear that the -- that federal courts do occasionally adopt

18   state law.

19          THE COURT:  I've done -- I have done what you are

20   asking, setting aside the particulars, many times.  It's usually

21   the rare motor vehicle accident that ends up in federal court for

22   peculiar reasons.  Sometimes someone is deceased and -- or

23   they've settled, and that is what happens.  I have never in 22,

24   almost 23 years on the bench ever had a request to do it like

25   this.  There's a first time for everything.

1          MR. DAVID SHIELDS:  There is a first time for

2     everything, Your Honor.

3          So Chapter 33, the *Texas Civil Practice and Remedies*

4     *Code*, Section 4, allows a defendant to name other responsible

5     parties that caused -- that caused or contributed to the harm to

6     the plaintiff.  And there's two concepts that -- You know, again,

7     I understand there's some headwinds to this discussion,

8     Your Honor, but there's two concepts in the statute that are

9     directly applicable here which is:  The duty is not to the

10    defendants.

11         THE COURT:  Right.

12         MR. DAVID SHIELDS:  A responsible third-party doesn't

13    ever have to meet the defendant, just like in a car accident.

14    And it is not a doubt contributing to the duty or the breach or

15    the Lanham Act violation of the defendants.  It's about breach --

16    It's of contributing to a harm in breach of a duty between the

17    responsible third-party and the plaintiff.  So actually the

18    defendant doesn't have anything to do with that whole discussion.

19         The Plaintiff is seeking to recover from Defendants

20    certain harm.  Here, reputational harm and lost profits.

21         We have submitted Nu-Calgon, Kenneth Walker, and

22    Falfurrias Capital for contributing to the harm, lost profits in

23    breach of a duty to the Plaintiff.  And that's the basis of *Texas*

24    *Civil Practice and Remedies Code* 33.004, and we've outlined that

25    and attached case law where the -- Mr. Walker and Falfurrias

1    Capital, as board members and chairman of the board, owe duties,

2    certain duties to the Plaintiff and that Plaintiff is -- or those

3    duties -- excuse me -- are pretty clear under North Carolina law,

4    and those duties were breached.

5           And it's important to release "allegedly breached."

6    Certainly, that's not going to be on trial.  They're not going to

7    show up.  They're not going to provide testimony, but we believe

8    we are entitled, just based on -- and this is a key point -- just

9    based on the representations of Mr. Walker in both public

10   representations on the website and in the document cited in the

11   Appendix, that those actions, based on his actions to Plaintiff,

12   caused or contributed to the harm sought which are lost profits.

13          THE COURT:  So is it your position that I have no

14   discretion in this regard?  I am required, as a matter of law, to

15   allow you to do it at this stage of the litigation?

16          MR. DAVID SHIELDS:  Our position is that -- that the

17   rights in the ---

18          THE COURT:  Simple question.

19          MR. DAVID SHIELDS:  Yes, Your Honor.  The rights in the

20   statute provide that we can -- that Defendants can designate a

21   responsible third-party at any time prior to 60 days before

22   trial.

23          THE COURT:  "Yes."  So the answer is "yes."

24          MR. DAVID SHIELDS:  After that, we acknowledge it is up

25   to the Court's discretion.

1           THE COURT:  So the answer is "yes."

2           MR. DAVID SHIELDS:  Yes.

3           THE COURT:  You did it on the day, and I am required

4    and have no discretion whatsoever.  And if I limit the time,

5    which -- if we have a trial -- I will, you're going to spend some

6    of yours on this side show of whether these parties should bear a

7    piece of the liability.  Otherwise, argue those to your client.

8           MR. DAVID SHIELDS:  Your Honor, there are many

9    producing causes that could drop the -- or lower the profits of

10   the Plaintiff.  A lot of those are the subject of the Motion to

11   Strike Mr. Mimms.  There are many producing causes.  We are

12   asking for individuals that caused or contributed to that harm

13   that are contained in the documents and that have made their own

14   statements on their participation in Plaintiff's actions to be on

15   that -- to be included and before the -- before the jury if and

16   when they make a decision.

17          THE COURT:  Okay.  I think you might have been trying

18   to answer my question but I don't think you did answer my

19   question.

20          Are you telling me that you're going to spend some of

21   the limited time that I have given you to develop a legal theory

22   on which these parties would share in potential liability of

23   yours?

24          MR. DAVID SHIELDS:  If the motion is granted and

25   Falfurrias Capital, Mr. Walker and Nu-Calgon are permitted on the

1     jury charge, yes, Your Honor, we will spend some of that limited

2     time.

3           THE COURT:  And this motion is being asserted for your

4     clients only, Zaatari and D Zine, not for enVerid.

5           MR. DAVID SHIELDS:  I do not believe that enVerid has

6     joined this motion.

7           THE COURT:  Okay.  Thank you.

8           All right.  EnVerid want to be heard on this motion?

9     Mr. Reed?

10          MR. REED:  No, Your Honor.  We have not joined this

11    motion.

12          THE COURT:  Okay.  Well, are you in favor of the motion

13    or opposed to the motion?

14          MR. REED:  My client has not taken a position on the

15    motion, Your Honor.

16          THE COURT:  Yeah.  I asked you a question.  Are you

17    opposing the motion?  Are you telling me you are instructed by

18    your client to remain silent and not say whether you're in favor

19    of it or not?

20          MR TOBIN:  Your Honor, may I comment?

21          THE COURT:  Yes.  Go ahead and talk for a minute.  I'm

22    going to talk to my court reporter, so don't speak on the record.

23          (Pause)

24          THE COURT:  All right.  Go ahead, Mr. Tobin.

25          MR TOBIN:  Thank you, Your Honor.

1          We did not take a position on the motion on the merits.

2     To answer Your Honor's question, though, given Your Honor's

3     comments that there will be time limited, if there is a trial, to

4     the extent that the Court is envisioning that all the Defendants

5     share the same amount of time, then, yes, we would oppose the

6     motion because that's going to take into some of our valuable

7     time on the way we would present the case and our strategy.

8          THE COURT:  Okay.  All right.  Thank you.

9          All right.  Mr. Muckenfuss, you can respond to anything

10    that's been said so far.

11         MS. ANGELICH:  Good morning, Your Honor.

12    Brittany Angelich on behalf of the Plaintiff.

13         THE COURT:  Sorry.  "Brittany Angelich"?

14         MS. ANGELICH:  Angelich.  Yes, Your Honor.

15         THE COURT:  Okay, great.  Thank you.

16         MS. ANGELICH:  As the Court acknowledged, this is not a

17    simple negligence case.  This is a case for defamation under the

18    Lanham Act, et cetera.  In our response, we cite a case where

19    courts have specifically declined to apply the *Texas Civil*

20    *Practice and Remedies Code*, Section 33.004, to federal claims

21    such as the Lanham Act, and courts have also declined to

22    designate responsible third-parties in defamation claims such as

23    this.  We would acknowledge that the Court does have discretion

24    at this stage, given that we timely objected to the Motion for

25    Leave to File a Responsible Third-Party, and we would ask that

1    the Court decline the motion based on the fact that there's no

2    evidence or the Defendants have failed to plead at this stage

3    that Nu-Calgon, Mr. Walker or Falfurrias would have any

4    responsibility for the claims that GPS is bringing.

5            THE COURT:  Okay.  Thank you.

6            All right.  I don't know who would be addressing the

7    issue of the Motion for Continuance.  Is -- Is the Defense still

8    urging the continuance?

9            MR. DAVID SHIELDS:  Yes, Your Honor.  And that would be

10   the elder Mr. Shields that just stepped out for just a moment.

11           THE COURT:  Okay.  And is the -- Because you all were

12   beating the drum pretty hard about the case going to trial on the

13   dates set and now you're not.

14           MR. DAVID SHIELDS:  May I begin and then if ---

15           THE COURT:  Yes.  You don't have to begin.  I'm just

16   saying why I'm raising the question now.  I just wanted to know

17   if -- You may be able to answer this question.  If not, we'll

18   wait for Mr. Shields to return.

19           MR. DAVID SHIELDS:  Let me attempt to keep it going,

20   Your Honor.

21           THE COURT:  The dispute -- The dispute regarding

22   Mr. Garris, --

23           MR. DAVID SHIELDS:  Yes.

24           THE COURT:  -- G-A-R-R-I-S, is a pretty serious side

25   show issue regarding whether Mr. Garris was properly contacted,

1   what Mr. Garris said, whether Mr. Garris lied to Defense counsel

2   to get Defense counsel to leave him alone, et cetera, et cetera.

3           Is it correct that it is -- This is the only question

4   I'm going to ask you and then I'll wait.  Is it -- Okay.  There

5   you go.  Right on time.

6           (Mr. James Shields returned to the courtroom.)

7           MR. JAMES SHIELDS:  Your Honor, I was down the hall.  I

8   apologize.

9           THE COURT:  No, no.  You told me you were.  I didn't

10  know this was your matter or I wouldn't have raised it while you

11  were gone.

12          MR. JAMES SHIELDS:  Because of volume, we had to split

13  it up.

14          THE COURT:  Okay.  So is the main basis for the Motion

15  for Continuance filed by the Defendants the Garris issue?  That's

16  all I want to know.

17          MR. JAMES SHIELDS:  I missed the last two words you

18  said.

19          THE COURT:  The Garris issue.

20          MR. JAMES SHIELDS:  Your Honor, there's a couple of

21  reasons.  That's primarily it.

22          THE COURT:  Okay.  So the last -- The briefing on this

23  is that the basis for the Motion for Continuance is that

24  Mr. Garris, a former employee of GPS, spilled his guts, gave you

25  all kinds of dramatically important bad information about the

1   Plaintiff.  Then his lawyer from Indiana contacted GPS' counsel

2   and said that Defense counsel was hounding him, and he said what

3   he thought you wanted to hear to get you off his back and now

4   it's all false.  Did I summarize everybody's respective position?

5           MR. JAMES SHIELDS:  Yes, ma'am.

6           THE COURT:  Okay.

7           MR. JAMES SHIELDS:  As an advocate, I would like to go

8   further than that but I won't.

9           THE COURT:  Okay.

10          MR. JAMES SHIELDS:  Yeah.

11          THE COURT:  So given the state of the record, this is

12  the only issue I have on the Motion for Continuance because we're

13  not going to get to everything that's been filed.  It's not

14  possible.

15          Given the dispute about Mr. Garris and what is true and

16  what is false, why would I grant a continuance based on that

17  issue?

18          MR. JAMES SHIELDS:  Your Honor, it's not the Garris

19  issue -- I've been vaccinated and boosted, so I'm going to take

20  that off.

21          It's not the -- It's not Keith Garris and five hours'

22  worth of tapes.  He exposed the fact that GPS has actively -- We

23  have demonstrable proof that they have not complied with

24  discovery orders of this Court, primarily a June 15th Order which

25  required production of all data, summaries, tests, drafts,

1    et cetera.  We have unassailable new evidence, proof, that they

2    haven't complied with the Court's Order.

3         So to suggest that it's just Keith Garris, would I like

4    to depose Mr. Garris and get, you know, a wealth of information

5    from him?  Of course.

6         The point of the Garris communications, Your Honor, is

7    the failure of GPS to produce evidence.  The entire exchange on

8    causation which -- and the question that the Court -- Maybe it's

9    part of the elephant in the room that's the flip side of the coin

10   for causation is:  We believe Dr. Zaatari was right to the extent

11   any of her statements go to the science.  We also know, for

12   example, LMS as a lab, we have directly -- We designated him.

13   We've directly identified tests that they have not produced in

14   evidence.

15        We have a June 15th Order from Magistrate Ramirez who

16   said, "Produce all data, summaries, test results, information,

17   communications," and we know as a matter of certainty now that

18   that has not been done.  Our continuance is not predicated only

19   on Keith Garris' statements but on the highlight of the

20   noncompliance in production.

21        THE COURT:  Okay.  So you're not claiming that the

22   materials were produced late.  You're claiming they weren't

23   produced at all.

24        MR. JAMES SHIELDS:  It's both.

25        THE COURT:  Okay.  All right.

1          MR. JAMES SHIELDS:  There are -- Sixty-two percent of

2     all the production, Your Honor, came ---

3          THE COURT:  Yeah, I know.

4          MR. JAMES SHIELDS:  Yeah, yeah, yeah.

5          THE COURT:  What is the -- What is the field, the

6     general description of the materials that you claim, based, I

7     guess, on your conversations with Mr. Garris, that were never

8     produced and that you know these documents exist because of what?

9          MR. JAMES SHIELDS:  There are multiple labs that we

10    know about.  We believe that there may be other labs for testing

11    that we don't know about because we don't know what we don't know

12    that haven't been produced, number one.

13         Number two, we know that there are at least two

14    different labs, Boeing and LMS, that conducted tests, had

15    materials, have summaries, have results that have not been

16    produced.  We know ---

17         THE COURT:  Well, Boeing is all over this case.

18         MR. JAMES SHIELDS:  It is.

19         THE COURT:  If you thought Boeing had additional

20    documents, why didn't you go ask for them?

21         MR. JAMES SHIELDS:  Because the Court Order from June

22    15th says they have to produce it.  We -- We don't have the

23    burden of proof, Judge.

24         THE COURT:  Okay.  I -- I get that, Mr. Shields.  The

25    problem is that, you know, this dumb-founded reaction to finding

 1    out that Boeing might have some documents I find odd under the

 2    circumstances.  I know who has the burden of proof of here, and I

 3    know what's going to happen to parties who are ordered to produce

 4    documents and haven't produced them.  What I'm trying to figure

 5    out is whether it justifies a continuance.

 6              So what I want from you is, as specific as you can give

 7    to me, what you know exists that you didn't get and how you know

 8    it exists.  So we've got Boeing documents.  We've got what else?

 9              MR. JAMES SHIELDS:  Your Honor, we've had

10    conversations.  He's been designated with a gentleman called

11    Al Vatine who is a principal with a lab who directly said that

12    they conducted more tests for GPS that were not produced.  He

13    scoured the GPS production record and he said, "Oh, no.  You

14    don't have the tests, all the tests that we produced."

15              THE COURT:  This is not Albert Brockman?  It's another

16    person?

17              MR. JAMES SHIELDS:  No.  It's somebody else.  Yes,

18    ma'am.

19              THE COURT:  Okay.  All right.

20              MR. JAMES SHIELDS:  Yes, ma'am.

21              THE COURT:  Okay.

22              MR. JAMES SHIELDS:  And so that's -- We don't know what

23    we don't know.  We only know of a couple of instances in which

24    tests were conducted that we believe are completely exculpatory

25    for our client that have not been produced.  The continuance is

1    predicated on simply:  Let us have the documents timely.  It's

2    also predicated on the massive redactions without any kind of a

3    log or explanation, and those documents came in after the

4    deadline, so we didn't have the chance to take depositions on

5    them.  It's really those two buckets.

6         The redactions with no log, Judge, no claim of

7    privilege or confidentiality or anything else, they just

8    redacted.  And then we now know as a matter of fact that there

9    are test results that have not been produced in compliance with

10   the June 15th Order.  That's as specific -- And I think Fact No.

11   3 is that, and the Court knows this, 62 percent of the docs that

12   came in came in after the deadline.  We couldn't ask questions on

13   them because they produced them late.

14        THE COURT:  You did take a few depositions after the

15   deadline, didn't you?

16        MR. JAMES SHIELDS:  Yes, ma'am, we did.

17        THE COURT:  Okay.

18        MR. JAMES SHIELDS:  We took them on.

19        THE COURT:  Okay.

20        MR. JAMES SHIELDS:  But -- But as an illustration,

21   Judge, two of the three data productions, data dumps, came within

22   a day or two before we had a hearing with Judge Ramirez, after

23   the depositions were taken.  So that's 62 percent.  The bulk came

24   in after the depositions were already taken, and they took them

25   right before we had Motions to Compel hearing in front of

```
 1   Magistrate Ramirez.

 2             THE COURT:  Okay.

 3             MR. JAMES SHIELDS:  We didn't have the docs to take the

 4   deps, and we didn't have the unredacted docs to take the deps.

 5             THE COURT:  Very aliterate.

 6             MR. JAMES SHIELDS:  I apologize, Your Honor.

 7             The last comment that I would like ---

 8             THE COURT:  Aliterate.  I wasn't insulting you.

 9             MR. JAMES SHIELDS:  Oh, okay.

10             THE COURT:  The docs before the deps.

11             MR. JAMES SHIELDS:  You know, Judge, I probably ---

12             THE COURT:  I would not on my worst day ever say to a

13   lawyer, "You're very illiterate."

14             MR. JAMES SHIELDS:  Well, I'm going to take that as

15   compliment, not as a, you know, as a -- Judge, I characterize

16   myself -- I've been trying cases for a long time -- as just a

17   poor country trial lawyer.  That's all I do.

18             THE COURT:  Yeah, I've seen a bunch of them.

19             MR. JAMES SHIELDS:  Yes.

20             THE COURT:  All right.

21             MR. JAMES SHIELDS:  May I make one other comment to the

22   Court?

23             THE COURT:  Yes.

24             MR. JAMES SHIELDS:  The other thing that was

25   highlighted by the Keith Garris tapes is the destruction of
```

1    evidence.  There are multiple references in those tapes,

2    Your Honor, about how GPS directed him, the CEO, to remove

3    evidence, destroy text messages.

4          THE COURT:  Okay.  Are you vouching for this guy?

5          MR. JAMES SHIELDS:  No, ma'am.

6          THE COURT:  Okay.

7          MR. JAMES SHIELDS:  I'm not.  Absolutely not.  What I

8    am saying is that we should be entitled to investigate -- We

9    didn't know that there was evidence destroyed.  We should have

10   the opportunity to examine that because if that ---

11         THE COURT:  Okay.  So if you're trying to turn down the

12   temperature, as I suggested at the beginning, I would say, "We

13   had no reason to think documents were destroyed and we still

14   don't know if they were destroyed, but I'd like to look into it,

15   Your Honor," as opposed to accusing McGuireWoods of destroying

16   documents.

17         MR. JAMES SHIELDS:  You're -- You're exactly right.

18         THE COURT:  Okay.

19         MR. JAMES SHIELDS:  By the way, thank you.  Your Honor,

20   you're exactly right.  I don't want to be the cause of escalating

21   tensions between counsel.

22         THE COURT:  Well, it may be too late for that.

23         MR. JAMES SHIELDS:  It may be.

24         THE COURT:  This thing is another galaxy of mutual

25   disdain that makes me very unhappy and gives me indigestion.

```
1              MR. JAMES SHIELDS:  That I do accept as legitimate

2    criticism, and I'm -- and I'm just -- Judge, you're right.

3              THE COURT:  Okay.

4              MR. JAMES SHIELDS:  It's not how I practice.  It's not

5    my reputation.  You're absolutely right.

6              THE COURT:  Well, it all floats up.  Somebody says

7    something to somebody else, and then there's a response.  And the

8    condition of the world today is that civility is a little valued

9    concept except by me.  So -- All right.  Enough said.  I'm not

10   picking on you by yourself.

11             This is a comment that is directed to every one of you.

12             Okay.  All right.  Thank you very much, Mr. Shields.

13             MR. JAMES SHIELDS:  Okay.  Thank you, Judge.

14             THE COURT:  All right.  Mr. Muckenfuss, I think it's

15   back at you.

16             Ms. Wheatley?

17             MS. WHEATLEY:  Yes, Your Honor.

18             THE COURT:  Okay.

19             MS. WHEATLEY:  I'm up.  One thing I did want to raise

20   quickly because I do think it's important to have on the record:

21   With respect to summary judgment, we didn't discuss the causation

22   standard with respect to the Lanham Act claims.  I just want to

23   make it clear that is a different standard that hasn't been

24   addressed in this hearing.  If you'd like to hear it, we're happy

25   to address it.
```

1          THE COURT:  Sure.

2          MS. WHEATLEY:  Do you want me to address it now?

3          THE COURT:  Sure.

4          MS. WHEATLEY:  Okay.  With respect to a Lanham Act

5    claim, there is no requirement that the plaintiff show a link

6    between a specific lost sale and the statement.  So plaintiff has

7    to show materiality, and they have to show that it is likely to

8    cause harm or likely to mislead the buyers.  So the -- the entire

9    discussion of whether or not we can show that a particular

10   customer -- there's testimony of a particular customer saying, "I

11   did not do business with GPS because of this exact statement,"

12   does not apply to the Lanham Act claims.  So I think that's very

13   important.

14         THE COURT:  Okay.  So I -- I accept that it's a

15   different causation standard.  But assuming that I hold that the

16   evidence that is either in the testimony of Mr. Boyd and

17   Mr. Brinckman or in their declarations is not admissible, what is

18   the causation link that would satisfy the Lanham Act?  These are

19   material statements, and how will you prove that?

20         MS. WHEATLEY:  With respect to materiality, a statement

21   is material if it goes to the inherent function of the product.

22   Claiming that the products are unsafe, that they make the air

23   quality in schools worse, that they release ozone, that they

24   release VOCs, that they do not work, that the manufacturer is

25   using sheeting techniques, that they do not reduce airborne COVID

1    contrary to what the manufacturer has said, those are all going

2    to the inherent qualities of the product.  That is, in fact, why

3    you buy the product.  And these are very specific statements

4    mentioning GPS and saying that -- saying all these things.  I

5    mean these are -- This is, per se, material.  This is not a

6    question of, you know, saying is it, you know, the best pizza or

7    something.  This is saying the product does not work and tests

8    show the product does not work.  And this is from the perspective

9    of someone who is presenting themself as a self-described expert

10   who has access to scientific data and is saying that data shows

11   specific things about these products.  So we would say that

12   easily satisfies the materiality standard.

13          And with the other ---

14          THE COURT:  Let me interrupt you --

15          MS. WHEATLEY:  Sorry.

16          THE COURT:  -- and come back to where you are.

17          If I accept that premise, then what would be the basis

18   for a damage loss?  Mr. Mimms would assume materiality and then

19   what?  What would the required burden be for linking actual

20   damages to the Lanham Act violation?

21          MS. WHEATLEY:  So with respect to Lanham Act false

22   advertising and product disparagement claims, the fact of

23   materiality and that it is likely to mislead consumers is

24   separate from the amount of damages.  While you do have to prove

25   materiality, you do not have to precisely link that to the

 1    amount.  You can use a decline in sales, an explanation of how

 2    that follows in time to show the amount.

 3         And one piece that is very important here, you asked

 4    how did we know that these specific customers named knew about

 5    the statements in question, and you raised the issue that

 6    Mr. Boyd's declaration, Mr. Brinckman's testimony, Mr. Boyle's

 7    testimony is hearsay.  However, the fact that customers mentioned

 8    the statement to them in the calls where they canceled the

 9    contracts shows that they knew about the statements, and the fact

10    of their knowledge is not hearsay.  We're not offering that for

11    the truth of anything they have said.  We are offering it to

12    prove that they knew of the statement and then immediately

13    thereafter, upon mentioning the statements, canceled the

14    contract.

15         And we may not be able to offer it to show the

16    "because" part.  That is certainly acceptable circumstantial

17    evidence in a false advertising and we would also say a business

18    disparagement and defamation case that could go to the jury, that

19    customers knew.  We know that they knew because they said,

20    referenced the statements.  And so that is a very important

21    point, and that is not hearsay.

22         And I would also raise that, again, going to this

23    evidence of this link, the Fifth Circuit in *Morris Jewelers v.*

24    *General Electric Corp.* ---

25              THE COURT:  That's my case from when I was a baby

 1    lawyer.  Is that actually in the books?  That's an old case, so

 2    I'm just going to say that.

 3            MS. WHEATLEY:  It is, Your Honor, and we think it was

 4    well decided.  And it held that statements by plaintiff's

 5    customers were admissible to show the state of mind as to why

 6    they canceled.  And so even if we don't have that "because," we

 7    have:  They called our client.  They said, "Here are the

 8    statements we've heard about.  We can't continue to do business

 9    with you."  And that, we would say, is evidence that can go to

10    the jury, and none of that is hearsay.  We're not using it for

11    the truth of the matter asserted.  We're using it for the fact

12    that they knew and then immediately canceled the contract which

13    knowledge is different, and then the cancellation is a verbal

14    act.  It's not hearsay.  It is -- It is a fact our client can

15    testify to.

16            THE COURT:  Well, they're not contesting that the

17    cancellations are admissible.  The cancellations are admissible.

18            MS. WHEATLEY:  So, Your Honor, that would -- that would

19    go to this causative link, but I do want to reiterate that with

20    the Lanham Act, that precise causation as to damages ---

21            THE COURT:  All right.  I hear you.

22            MS. WHEATLEY:  Yeah.  And I won't belabor the point.

23            THE COURT:  Okay.  All right.

24            MS. WHEATLEY:  But I -- If -- If -- If you don't have

25    any questions on that, I can address the continuance.

 1              THE COURT:  Okay.

 2              MS. WHEATLEY:  I -- I have to put on the record that we

 3    very strenuously dispute any suggestion that anyone at GPS ever

 4    deleted any evidence.  And there's the -- The only sworn

 5    statement on the record about that is from Mr. Garris who says

 6    that is absolutely untrue.  And I am happy to go into more detail

 7    as to the circumstances of that.  I think in the tapes, you'll

 8    see there's a hint where Mr. Garris at one point asked about this

 9    again; starts talking about how there were personal things on his

10    computer.  We didn't really want to embarrass Mr. Garris as to

11    why he was terminated, but that would come out if we continue

12    down this road.

13              But in the interest of lowering the temperature, I do

14    not think we need to because there is nothing whatsoever in the

15    tapes, in the affidavit from Ms. Fontein that was not previously

16    disclosed in discovery.

17              Information on Boeing was known to everyone before this

18    case began.  The Boeing testing was something Dr. Zaatari tweeted

19    about a great deal.  Boeing was raised in the Complaint.

20    Defendants were well aware of Boeing.  And I think it's very

21    telling when you listen to those tapes, over and over and over

22    again Dr. Zaatari, her husband say, "Just give us one text, one

23    message, one thing Charlie told you to do, something that will

24    allow me to reopen discovery," and they begged Mr. Garris to give

25    them something that they don't have, something concrete.  I think

1    they actually used those words, "something concrete."

2         Mr. Garris cannot come up with anything.  And e-mails

3    from Mr. Garris were in this production in the very beginning,

4    produced in the very beginning of the case.  E-mails with

5    Mr. Garris and Boeing were produced at the very beginning of the

6    case.  This has all been known.  And even in the calls,

7    Mr. Garris admits that this story about a secret Boeing hard

8    drive, he made it all up.  He says that to Mr. Zaatari in the

9    calls themselves, and then his sworn declaration verifies that.

10        THE COURT:  Okay.  But at this juncture, I'm

11   considering him inaccurate in every respect.  I have no basis for

12   concluding otherwise.  He tells Story A.  He disavows Story A.

13   He tells Story B.  I have no idea what the truth is with respect

14   to Mr. Garris, and I don't know -- I can't make a decision based

15   on that.

16        And I'll add one footnote, and I'm certainly not going

17   to contribute to an escalation in the heat here, but in the six

18   months before I was confirmed as a judge, I had a hearing before

19   Judge Sparks, and my client was telling me on a stack of 12

20   Bibles that Document A did not exist.  And I stood before

21   Judge Sparks and said, "Document A does not exist and I'm

22   offended that they suggest it does."  And Judge Sparks had all of

23   his antenna going full bore and he said to me, while I was

24   writing an e-mail to my associate, "Someone's going to jail today

25   and if it's me, I'll never be a federal judge," and he made my

1    client file an affidavit under penalty of perjury that there was

2    no Document A and -- Eureka! -- Document A appeared to my great

3    disappointment.  Fast-forward in the six months after I became a

4    judge, something very similar happened and I did the same, and

5    Document A appeared yet again.

6              So I'm not suggesting anyone is hiding anything, but

7    there is a difference between a client making a representation

8    under oath and counsel representing to me what the truth about

9    what clients have and don't because you really don't know.  All

10   you can tell me is what your clients are telling you.  That's all

11   you're expected to tell me.  You're not a guarantor.  So I'm not

12   suggesting anybody is hiding any documents, but don't put

13   yourself too far ahead on that limb because you don't have to.

14   It's clients who discover documents unless lawyers are hiding

15   them, and I've never had that happen, and I don't expect it's

16   happening here.

17             So if there has to be sorting out about whether

18   documents exist or don't, somebody from the client will tell me

19   under oath that they do or they don't.  You don't have to.  So

20   again, with the complete caveat I'm not accusing GPS or the

21   Defendants of hiding anything from me, but if that becomes an

22   issue, we're going to sort it out differently from lawyers

23   telling me what they think the facts are because you only know

24   what you know.

25             MS. WHEATLEY:  Thank you, Your Honor.  I agree with all

1    of the above.

2            THE COURT:  Okay.

3            MS. WHEATLEY:  One thing I can represent, based on my

4    knowledge, is that at least one test report from LMS -- I think

5    it encompasses multiple tests -- was produced in this case and

6    e-mails from LMS have also been produced in this case.

7            I can also say that at one point Mr. Vatine had a

8    signed engagement letter with me personally as a privileged

9    litigation consultant.  So you can see why there may be some

10   confusion here.

11           THE COURT:  Yes.

12           MS. WHEATLEY:  But LMS has been known to everyone.  LMS

13   conducted the Trane testing which is the other big set of public

14   testing that Dr. Zaatari discussed.

15           So, again, for the purposes of a continuance, there's

16   -- it is nonsense to suggest that LMS was unknown to Defendants.

17   And as you mentioned, the vast majority of depositions in this

18   case were actually conducted after the close of the discovery

19   deadline.  To my knowledge -- I should be careful here -- I don't

20   believe that -- When Defendants said they wanted to depose

21   someone at GPS, they were permitted to depose them.

22           THE COURT:  Okay.  I want to ask you a practical

23   question.  So here we are November 8th.  The case is set in less

24   than three weeks.  There's a holiday in there.  Because of the

25   timing of when these motions were filed and the nature of them,

1    the practicality of me being able to get these all decided in

2    time for you to go to trial and know what you're trying and who

3    can testify is pretty remote.

4            Let's assume there wasn't a Motion for Continuance.

5    You're three weeks away from the trial.  You don't know what the

6    heck I'm going to let you do and by whom.  You still want to go

7    to trial on November 28th with that level of uncertainty?

8            MS. WHEATLEY:  Yes, Your Honor, and I'd like to explain

9    why.

10           Dr. Zaatari tweets almost daily things about our

11   client.  She has now escalated to accusing our client of being

12   xenophobic and making specific racist statements to her which is

13   a totally new accusation.

14           THE COURT:  Well, they say they've produced documents

15   about that very early on in the litigation.

16           MS. WHEATLEY:  I -- I cannot imagine ---

17           THE COURT:  Who is speaking for the Defense on this

18   subject?  Somebody in the back?

19           MR. DAVID SHIELDS:  Your Honor, I'll take

20   responsibility for that.

21           THE COURT:  Okay.  Am I recalling this incorrectly?

22   Aren't you saying you produced documents early on where this

23   question of Ms. Zaatari being the subject of xenophobic racist

24   remarks was in an early production?

25           MR. DAVID SHIELDS:  Two things, Your Honor.

1        One, it was in the declaration in support of the

2   summary judgment or I guess in response to their summary judgment

3   on the intentional infliction of emotional distress.  And

4   Dr. Zaatari has gone at length to go back through documents,

5   actually not produced by us but produced by GPS, to support those

6   allegations.  And I'm not sure if this made it into a pleading,

7   whether McGuireWoods filed it or whether we included it, but we

8   offered to have McGuireWoods and GPS take Dr. Zaatari's

9   deposition on this specific allegation, and they declined to do

10  so.  That was back in September.

11        THE COURT:  Okay.  All right.  Go ahead, counsel.

12        MS. WHEATLEY:  Your Honor, I would like to first

13  address the comment on the offer to take Zaatari -- Dr. Zaatari's

14  deposition again.  The offer was contingent on we waived various

15  claims that certain things were untimely.  And we said, "Well,

16  we're not going to waive our claims in order to take the

17  deposition."  And we asked, "Is the offer to take the deposition

18  still on the table if we will not waive certain claims and

19  defenses?"  And it was not, so we did not take them up on that

20  offer.

21        With the representation that there is a document about

22  racist statements early in the production, I did not hear

23  identification of one there.  And I would note that the

24  declaration from Dr. Zaatari on intentional infliction of

25  emotional distress, which was produced after the close of

1    discovery -- as he said, it was in summary judgment -- it was

2    interesting.  It said various negative things about GPS and then

3    it said something like, "In the halls of ASHRAE, I hear

4    statements about I should go home," or something to that effect

5    which did not actually name who said the statements or even say

6    that anyone from GPS or anyone associated with GPS said the

7    statements.

8            Now generally in a declaration under oath under summary

9    judgment, if you are going to accuse a company or a person of

10   saying certain statements, you say that.  You don't suggest that

11   vaguely you heard things unlinked to that person.  It was not

12   until the "Go Fund Me" page was the subject of the supplement

13   which suddenly that morphed into the statements were said by GPS

14   numerous times.  So -- So, anyway, that -- But I have -- So I'll

15   back up.

16           I raise this only because on the subject of the

17   continuance, the damage to my client is very real, and it is

18   escalating and it is getting worse.  These are real people with

19   families, and every day terrible things are being said about

20   them.  Mr. Garris' statements are being put on Twitter, him

21   saying, "I did horrible things," and it's got graphics and it's

22   animated when he submitted a declaration saying that was all a

23   lie.  But, of course, people aren't going to listen to -- read

24   the fake filings or listen to five hours of tapes.  So it's

25   treated as if my client has done something terrible.  So because

1    this harm is so severe and it is so constant and it is so hard on

2    the people at our company, we -- we do not want a continuance.

3    We want to go to trial.  We want to prove this to a jury, and

4    we're ready to do so.

5              THE COURT:  Okay.  Okay.

6              MR. JAMES SHIELDS:  May I have two minutes on the

7    comments, Your Honor?

8              THE COURT:  Yes.

9              MR. JAMES SHIELDS:  Three -- Three points, Judge.  One,

10   again, as I shared with the court, I'm just a poor country trial

11   lawyer.  This is not a continuance ---

12             THE COURT:  Blah, blah, blah.

13             MR. JAMES SHIELDS:  I am -- I -- I love trying cases.

14   We want to go to trial.  They have accused Dr. Zaatari of a

15   hundred percent of the losses, whether those losses resulted

16   because their products don't work or COVID went down or their

17   sales strategy, whatever, whatever, whatever; lots of causation

18   problems.  I don't think they can prove causation.  We spent the

19   morning on it.  We have every desire to go to trial.

20             When -- When counsel said he retracted -- Keith Garris

21   retracted his statements, and I understand the fact that the

22   Court can't rely on the Keith Garris, I have not heard yet that

23   the Defendants -- and I'm not talking about McGuireWoods; their

24   clients -- have fully complied with several court orders.  All I

25   want, Judge, is to know exactly what claims I'm trying, what

1    witnesses are going to be allowed, what causes of action we're

2    going to deal with, what elements we're going to prove with all

3    of the documentary and facts that we can use.

4         Reset the case for a very short period of time, Judge,

5    so that not only you can get your rulings but we can understand

6    the facts and know how we're going to try the case.  I'm not

7    trying to avoid a trial.  I love going to trial.  We have to go

8    to trial with all the facts, and I still have not heard all the

9    test results that have been done.  Still haven't heard an

10   explanation for redacted e-mails where we need that information.

11        I'm happy not to take the deposition and use unredacted

12   e-mails at trial.  Great!  I have no problem with that.

13        THE COURT:  Okay.

14        MR. JAMES SHIELDS:  We simply need the information,

15   though, Judge.  That's all I'm asking for.

16        THE COURT:  All right.  Do you have something?

17        MR. REED:  Yes, Your Honor, real quick on behalf of

18   enVerid on the continuance motion, and I'll try to come up here

19   and answer the Court's question as directly as possible.

20        From a practical standpoint, I think that's what the

21   Court last asked, you know, how can we go to trial with the

22   number of issues that are out there pending, given that there's

23   29 statements and multiple claims of causes of action.  Just

24   narrowing that down so that we know what we're actually trying

25   and what evidence is going to go to those things would be greatly

1    beneficial.

2            As for the Mr. Garris situation, just like enVerid was

3    brought into this case after -- after a lot of discovery had been

4    conducted, enVerid wasn't a party, and my client wasn't -- and we

5    were not a party to any of these conversations.  These -- These

6    tapes as well as the retraction raise some serious issues about

7    the existence of USB drives or hard drives or deleted e-mails and

8    texts that for our client's understanding, to be able to explore

9    those and understand, you know, was he lying, was he not, and to

10   get those documents, if he does still have them, is important,

11   especially on a witness that GPS failed to disclose in their --

12   in their disclosures with this Court.  Obviously, this was

13   someone who was involved but they did not disclose him, like some

14   of the others.  I mean it's not even that he wasn't even on their

15   late, you know, or their last-minute disclosures which is subject

16   to another motion, this guy wasn't even disclosed.  So we have

17   joined the Motion for Continuance on a practical matter,

18   Your Honor, as well.

19           THE COURT:  All right.  Let's talk practicalities for a

20   moment.

21           I have a criminal case set for November 28th, 2022.  I

22   am assured that it is actually going to go, so you're behind

23   that.  I have two criminal cases set then.  So the prospects of

24   me going then are pretty remote.

25           We don't really have the ability to give you all a

 1   special setting like you can get in the state court because the

 2   criminal cases that are likely to bump you, if you get bumped,

 3   involve people who haven't even committed their crimes yet.  So I

 4   can't very well predict whether you're going to have a criminal

 5   case that's going to get in the way.

 6          That was slow.  That was a good joke and it took 15

 7   seconds.  I should hold up the "LAUGH" sign.

 8          So the reality is my docket is probably not going to

 9   reach you.

10          Now in light of that, do you want to -- Why don't we

11   take a five-minute break here.  I'll hear from the Plaintiffs

12   about that.

13          I remain very concerned about causation.  I appreciate

14   the points that counsel made about the Lanham Act causation, and

15   that may have an impact on the Court's assessment of that, but I

16   think you all would be best advised for me to let you know who's

17   going to be able to testify and on what before you spend the

18   astonishing amounts that are going to be necessary to try the

19   case.

20          So when I come back here, I'm going to give you some

21   dates when I could try the case with a short continuance, again

22   subject to the age-old criminal case problem.  There's little I

23   can do about that.  But at this juncture, the case that is set

24   for November 28th is a pretty old case.  So if I can find a place

25   for you that's not too far off, that doesn't have an old criminal

```
 1   case set, the likelihood is a new case won't bump you because
 2   they rarely go to trial on the first setting just because people
 3   aren't ready.  So I'll give you a date.  I'm not ruling on the
 4   Motion for Continuance now, but I'll give you a date.
 5           Do you all have your calendars with you?
 6           MR. DAVID SHIELDS:  Yes, Your Honor.
 7           MR. MUCKENFUSS:  Yes, Your Honor.
 8           MR. REED:  Yes, Your Honor.
 9           MS. WHEATLEY:  Yes, Your Honor.
10           THE COURT:  Okay.  All right.  We'll take a ten-minute
11   recess.
12           COURT SECURITY OFFICER:  All rise.
13           (Court recessed from 10:58 AM until 11:07 AM.)
14           THE COURT:  All right.  Be seated.
15           All right.  If I continue the case -- Oh, sorry.
16           MR. MUCKENFUSS:  I would say they abandoned the Court.
17           (Defense counsel returning to the courtroom.)
18           THE COURT:  All right.  I've left my face mask by
19   mistake in my office.  Unless -- If anyone objects, I'll go get
20   it.  Otherwise, let's go forward.  Be seated, please.
21           MR. MUCKENFUSS:  It's okay with us.
22           THE COURT:  All right.  April 3rd is a date that I can
23   give you that has no conflicts, including criminal cases, and I
24   can instruct my Courtroom Deputy not to put any criminal cases
25   there.  Does that work?
```

```
1              MR. JAMES SHIELDS:  Do we know -- And I'm ignorant.  Do

2    we know when Easter is?

3              MR. MUCKENFUSS:  It is ---

4              THE COURT:  I'm liking to find Passover on my calendar.

5              MR. JAMES SHIELDS:  Yes, ma'am.

6              MR. MUCKENFUSS:  It's the 17th.  The 17th.

7              MR. JAMES SHIELDS:  Kendal just said it's the 9th.

8              MR. REED:  On my calendar but maybe that's wrong.

9              MR. MUCKENFUSS:  My calendar says the 17th.  Passover

10   starts the 15th.

11             THE COURT:  Okay.

12             MR. MUCKENFUSS:  I mean ---

13             THE COURT:  Okay.  Are you saying you can't do that or

14   -- April 3rd.

15             MR. JAMES SHIELDS:  I just generally don't like to --

16   Oh, Aaron, go ahead.  I'm sorry.

17             MR TOBIN:  Your Honor, I'm not arguing against April

18   3rd, but in all candor to the Court, I want to let the Court know

19   that I am set in a very old case in the Southern District of

20   New York on April 3rd.  It was a case that's been -- It's been

21   worked up completely.  Motions have been ruled on.  There are no

22   outstanding issues in front of the Court.  Settlement

23   conversations haven't happened for years.  It was a 2017 case

24   that ---

25             THE COURT:  Okay.  There's just too many of you and me
```

1    for me to find clear sailing for everybody.  It's just not going

2    to happen.  If I pick a date and somebody's in trial, then

3    somebody's in trial.

4          MR TOBIN:  Okay.  I just -- I just ---

5          THE COURT:  I'm not going to make you send a

6    substitute, but I'm never -- This is as good as it's going to get

7    for my calendar where I have no conflicts on my calendar to go.

8    That's the first hurdle.  I can't believe I found a date that

9    didn't have any conflicts.  So unless you know for sure, and you

10   never know for sure with conflicting settings, I'm going to pick

11   a date that may conflict with one of you subject to another trial

12   setting.

13         MR TOBIN:  Understood, Your Honor.  I just didn't want

14   to not say nothing about it now.

15         THE COURT:  No; that's fine.

16         Okay.  Any other problems?

17         MR. MUCKENFUSS:  April 3rd is fine with us, Your Honor.

18         THE COURT:  Okay.

19         MR. DAVID SHIELDS:  May I offer a light-hearted

20   consideration?

21         THE COURT:  A what?

22         MR. DAVID SHIELDS:  A light-hearted consideration that

23   doesn't actually weigh against the 3rd?

24         My wedding is the second Saturday of this current

25   trial, and that would be my honeymoon, but that's okay.  We'll --

```
 1   We'll -- I'm sure my fianceé will understand.

 2              THE COURT:  This is your honeymoon, April 3rd?

 3              MR. DAVID SHIELDS:  April 3rd, yeah, but that's okay;

 4   really.  We'll -- We'll -- It's already been moved around once.

 5   It will get moved around again.  The trials of the wedding date

 6   which is not usually, you know, not something you want to

 7   publicize, has moved twice because of new -- a new nephew.

 8              THE COURT:  Well, I'm not going to set a case during

 9   your honeymoon.

10              MR. DAVID SHIELDS:  No.  Your Honor, honestly we're --

11   we're -- we don't ---

12              THE COURT:  But you would be better off to be blaming

13   this on me because it's all being written down rather than saying

14   it's fine with you if I set the trial the date of your honeymoon.

15              MR. DAVID SHIELDS:  That's right.  Can we -- Can we

16   have that stricken from the record, please?

17              MR. JAMES SHIELDS:  As the father-in-law of his future

18   bride, Your Honor, --

19              THE COURT:  Yes.

20              MR. JAMES SHIELDS:  -- I'm going to let him tell her,

21   not me.

22              THE COURT:  The record will reflect that Mr. Shields

23   begged, pleaded, got down on the floor, made an impassioned plea,

24   and the Judge said, "Tough nuts!"

25              No; seriously, I mean I don't -- I would never do that.
```

1    So you -- you tell me whether you -- Why don't you think about it

2    for a minute.

3              MR. DAVID SHIELDS:  Well, Your Honor, if the next trial

4    date is May, I might request to do that.

5              THE COURT:  I've got a zillion conflicts in May.

6              MR. DAVID SHIELDS:  Well, that's what I'm saying.  If

7    the next trial date is then July, then we'll go forward in April.

8    I'm not going to let one person's ---

9              THE COURT:  Okay.  How long are you going to be away?

10             MR. DAVID SHIELDS:  Three weeks.  And it starts on the

11   10th.  But, Your Honor, honestly, we -- we -- I'm being very --

12   very serious and very candid with the Court.  We can do it in

13   May.

14             THE COURT:  April.

15             MR. DAVID SHIELDS:  No, no.  We can do the honeymoon in

16   May.

17             THE COURT:  Oh, okay.

18             MR. DAVID SHIELDS:  No, no.  I don't think the -- I'm

19   not trying to tell the Court when the trial can start.

20             THE COURT:  My May is just not good.  I'm not going to

21   be able to find a May slot for you.

22             All right.  I'm going to put it there based on counsel

23   stating that I'm not going to make his marriage over before it

24   begins.

25             MR. DAVID SHIELDS:  That's not going to happen,

1    Your Honor.  I'm very fortunate.  That should definitely stay on

2    the record.

3         THE COURT:  All right.  Okay.  I'm going to let you

4    ruminate on that.  If I am resetting the case, I'm going to give

5    you an opportunity by tomorrow to say, "I've changed my mind;

6    don't set it for my honeymoon," and then I won't, but I can't

7    commit to another date right now.  I had to work this out with my

8    Courtroom Deputy.  It's pretty rare for me to find a date where I

9    don't have any criminal cases ahead of you, and then my calendar

10   is clear.  The civil cases, there are some civil cases there but

11   I will put you ahead of them, if I reset it.

12        So are there any other issues on April 3rd?

13        MR. MUCKENFUSS:  Not from us.

14        THE COURT:  All right.  So, Mr. Shields, you've got

15   veto power here.

16        MR. DAVID SHIELDS:  Actually I don't have veto power,

17   Your Honor, but ---

18        THE COURT:  Your fianceé.

19        MR. DAVID SHIELDS:  My fianceé's got the veto power,

20   yes.

21        THE COURT:  So I'm going to let you tell me tomorrow if

22   you want me to find another date.  And then if you do, I'll run

23   that other date by all of you rather than spend your time with me

24   going back over my calendar now because I'm afraid I'm going to

25   hit something no matter what I do.

```
1              Okay.  Yes.

2              MR. MASSO:  Your Honor, I just -- if I could respond

3    very briefly to that brief argument on causation under the Lanham

4    Act.

5              THE COURT:  Yes.  I'm going to let you do that in just

6    a minute.

7              MR. MASSO:  That's fine.

8              THE COURT:  All right.  What I propose to do now is --

9    We've got 45 minutes.  I'm going to give 20 minutes to each side.

10   Each of you can argue whatever you want, responding to each other

11   or any of the pending motions that we have not addressed.

12             I'm going to give each of you one week to file ten

13   pages of supplement to your existing briefing.  No responses to

14   each other.  Ten pages of supplement to your briefing, limited to

15   issues that were discussed today.  Other than that, no additional

16   briefing.

17             And if I find something new in your briefing, I will

18   not read your brief at all.  Okay?

19             So I'm going to repeat that.  You can have ten pages to

20   add to the briefing record on matters that were discussed today

21   and nothing else.  And if you add something else, I will not read

22   your brief.  Okay?

23             All right.  So I'll let the Defense go first since it's

24   your motion, but you may address any of the other motions that

25   are pending, whoever filed them.  Twenty minutes.
```

```
1          MR. MASSO:  Thank you, Your Honor.  I'll be brief and

2    then yield the rest to the rest of the team.

3          But just responding to the argument about causation

4    under the Lanham Act, the Lanham Act does require proximate

5    causation, so it's actually a slightly higher standard than some

6    of the other causes of action.

7          The issue that Plaintiffs have is that there is still

8    not evidence in the record to support what they need to prove.

9    There was discussion about these people calling in and saying,

10   "We read the Open Letter and we're canceling as a result."  None

11   of that, again, is actually there.  We know the three documents

12   that were referenced on Page 46 of their response.  That's the

13   only evidence, and it talks about one event happening and then

14   another event happening.  There still is no time ---

15         THE COURT:  Well, Mr. Boyd and Mr. Brinckman's

16   declarations say what customers said.  The point that counsel was

17   making is that that can be -- that can come in as an exception to

18   the hearsay rule for purposes of notice to customers which would

19   not be hearsay.

20         MR. MASSO:  Okay.  And -- And that may be fair, but

21   they still have the causation problem.  They still have the link

22   of:  Did any of it happen because of those statements?  And

23   that's what they've never been able to produce, whether from the

24   customers or from somebody inside quoting the customers.  They

25   still don't have that link.
```

1    Of course, we have other problems with their Lanham Act

2    claim, not the least of which is the fact that these did not

3    occur in a commercial -- in commercial advertising or promotion.

4    That's a different issue that we haven't addressed.  I don't want

5    to get into it, but just remind the Court that that's also ---

6         THE COURT:  Well, you've -- you've addressed that in

7    your briefing --

8         MR. MASSO:  We have.

9         THE COURT:  -- whether it's in a commercial context and

10   whether GPS is a limited public figure.

11        MR. MASSO:  Yes.

12        THE COURT:  Okay.

13        MR. MASSO:  I just wanted to make the point that the

14   evidence simply isn't there for what they need to make that

15   "because of" tie.

16        THE COURT:  Okay.

17        MR. DAVID SHIELDS:  May it please the Court.

18   David Shields again.  Hopefully a little more downplay on this

19   time.  Your Honor, two quick points, one on the evidence of

20   the ---

21        THE COURT:  Just a reminder:  I'm not inquiring about

22   vaccination status, but if you've been vaccinated, you can take

23   your mask off.

24        MR. DAVID SHIELDS:  Oh, thank you, Your Honor.  I have

25   been vaccinated.

1          So, Your Honor, I have in front of me right now the

2    declaration of Tim Boyd that we've discussed, and I just wanted

3    to make a counterpoint to counsel's argument for GPS that that is

4    an exception to the hearsay rule; that the customer's state of

5    mind -- Two points.

6          One, Paragraphs 9, 10 and 11 of -- on APPX1811 of Tim

7    Boyd's declaration are very clear that -- that Mr. Boyd did not

8    have conversations with those representatives, making it hearsay

9    within hearsay.  That's the first point which, obviously, one

10   exception, without conceding that that exception applies, one

11   exception only clears one level of hearsay.

12         The second point is:  Even assuming that Mr. Opie and

13   representatives of Bard HVAC and others in Paragraph 11 of

14   Mr. Boyd's declaration, even assuming that those individuals

15   spoke to Mr. Boyd, the Defendants have filed objections to those

16   statements on the basis not just of hearsay but on

17   authentication, on the fact that that's a conclusory statement

18   because it doesn't identify any foundation on which he would have

19   personal knowledge of those conversations.  It doesn't identify

20   the people, when they happened, what the nature of the contract

21   was, what the date of the contract was.  None of those supporting

22   facts make this competent testimony in support of the causation

23   element.

24         And then finally, I would just note with regard to

25   those specific customers -- let's see -- Carrier, Bard HVAC, S&P

1    USA, JCI, Daikin, Greenheck and others, at least with regard

2    to -- not Carrier but Paragraph 11, none of those customers,

3    alleged customers, were disclosed by GPS at any point.

4         So Your Honor asked a good question which is:

5    Defendants, why didn't you take those depositions?  Well, we

6    didn't know they existed, so.

7         THE COURT:  You're telling me that as of today, you

8    have requested and not seen evidence of customers who allegedly

9    canceled their relationships with GPS or did not consummate a

10   relationship with GPS because of the alleged misrepresentation,

11   the defamatory statements?

12        MR. DAVID SHIELDS:  That information has been

13   requested.  The bulk of it, 60 percent, including, you know,

14   communications with many potential customers that are now being

15   claimed, was produced on August 17th and then again on October

16   17th, two and four months after the discovery deadline.

17        THE COURT:  Okay.  You said none of those customers

18   were disclosed by GPS at any point?

19        MR. DAVID SHIELDS:  No.  They were not contained in the

20   disclosures, Your Honor, as -- as people with relevant knowledge

21   of facts that could support the claims.

22        THE COURT:  Well, on the -- At the end of discovery,

23   you were given documents that revealed their names.  Is that

24   true?

25        MR. DAVID SHIELDS:  With regard to these specifically,

 1   the only discovery that I'm aware of that would have these

 2   customer names on it was produced on October or -- excuse me --

 3   August 17th after the discovery deadline.  You know, there's

 4   225,000 pages' worth of documents produced by GPS, the vast

 5   majority after the discovery deadline.  If there was a casual

 6   reference to one of these companies in one of the e-mails within

 7   the hundreds of thousands of pages produced prior to the

 8   discovery deadline, I'm not going to represent to the Court that

 9   that didn't happen.

10            THE COURT:  So these -- these people -- these entities

11   were not mentioned in the deposition of Mr. Boyd and

12   Mr. Brinckman?

13            MR. DAVID SHIELDS:  I'm not aware of that, Your Honor.

14            THE COURT:  Okay.  All right.  Thank you.

15            Okay.  Okay.

16            MR. DAVID SHIELDS:  Your Honor, I'd like to discuss the

17   Motion to Strike Mr. Mimms unless Your Honor feels the briefing

18   is sufficient.  And if that's ---

19            THE COURT:  Oh, go ahead.

20            MR. DAVID SHIELDS:  I have nothing to add -- nothing to

21   add to the briefing.  But just very briefly, Mr. Mimms is a

22   little bit of an interesting case because the Plaintiff disclosed

23   Mr. Mimms and his expert's opinions not just on damages but they

24   called it "correlation;" that he was going to testify to the

25   correlation between Defendants' statements and the lost profits,

1    and that's in their expert disclosure that was filed as Document

2    No. 92.  So some element -- You know, "correlation" is not

3    "causation."  That's a -- That's a truism that is even more

4    relevant right now in the COVID era, but there's some element of

5    linkage between the Defendants' allegedly defamatory and false

6    statements and the lost profits that the Defendants intend, at

7    least that they disclosed, intend to proffer Mr. Mimms about this

8    idea of correlation.  Of course, correlation does not satisfy any

9    element of causation in this -- of any of the causes of action,

10   even the standard discussed under the Lanham Act.

11          So what's apparent in Mr. Mimms' report and Mr. Mimms'

12   deposition and Mr. Mimms' rebuttal report is he goes at length to

13   talk about the idea that -- to link these statements between

14   defamation -- the allegedly defamatory statements and the

15   damages, and he talks about "but for" causation, and he talks

16   about "but for" causation for two reasons.

17          One, he was disclosed as a, you know, as an expert

18   witness that's going to offer testimony to correlate the

19   statements in the damages in Document No. 92.  That's the first

20   reason.

21          The second reason is:  His profession as a member of

22   the American Institute of Certified Public Accountants and

23   others.  The AICPA standards require that you make a causal, not

24   a correlative, a causal connection between the alleged bad acts

25   of the Defendant and the lost profits.

1              So there are many grounds in the Motion to Strike

2     Mr. Mimms, but one primary one that is of critical importance for

3     -- for striking Mr. Mimms is that his testimony would, one, be

4     totally unreliable because he uses a standard "but for" that is

5     not only unsupported by the case law of the different

6     causation -- causes of action at issue, it's not supported by the

7     AICPA standard.  And that standard is listed in our brief.

8              And the second thing is -- about that is:  We think

9     that the testimony could be incredibly prejudicial and confusing

10    to the jury if he was permitted, as he suggested in his report

11    and at his deposition and in his rebuttal report, that he put

12    forward this "but for" causation standard, which is a totally

13    errant standard under the Lanham Act, any other cause of action,

14    or the AICPA.

15             So I just wanted to discuss that point specifically.

16    We'll stand on the rest of the brief.

17             THE COURT:  Okay.

18             MR. DAVID SHIELDS:  Thank you, Your Honor.

19             MR. REED:  Just a few things, Your Honor.

20             Of the 29 statements that are at issue in this case,

21    only one is directly attributable to enVerid, and that is a

22    retweet.  So enVerid has been brought into this case on this idea

23    of what the Court mentioned earlier, this conspiracy, which when

24    deposed, Mr. Boyle, Mr. Brinckman, the corporate reps, had no

25    direct evidence of any direction, of any control by Mr. Weeks or

1    anyone at enVerid of Ms. Zaatari making these statements.  Their

2    only way to try to attribute any type of liability to enVerid

3    when they brought them into this is to connect the red strings

4    and try to create inference upon inference to try to get enVerid

5    into this case.

6           What's telling is:  For the other motions that are

7    before this Court as far as supplementing, as far as the

8    continuance, all of these actions, not one allegation is enVerid

9    involved in any of those posts, any of those -- of those disputes

10   between Dr. Zaatari and GPS.

11          So based upon the summary judgment, Your Honor,

12   enVerid -- because there is no linkage there between any action

13   by enVerid to cause the damages that -- that GPS is seeking here

14   today, Your Honor, the summary judgment could be granted as to

15   enVerid and remove it from this ongoing dispute here which, as a

16   small player in all this mess, they don't have a McGuireWoods.

17   They've got Condon Tobin here.  The time and expense that they've

18   had to ---

19          THE COURT:  You're not going to put up with that, are

20   you, Mr. Tobin?

21          MR TOBIN:  No.  I put up with way worse, Your Honor.

22          MR. REED:  Judge, in all fairness, we can bring him up

23   here to swear he told me that, you know, to -- to -- to say that.

24          But the fact is we're being drug along in this,

25   Your Honor.  And so the helpfulness here and with the looking

1  forward here as to -- based upon the pleadings that we've hit

2  there, the lack of causation, the lack of damages resulting from

3  any of those statements, and when the Court sees those individual

4  statements, and we're talking about 29, being able to narrow

5  those down and look at those, and on only one, and it's a retweet

6  which, you know, we briefed is not actionable against enVerid,

7  Your Honor, we'd ask that you grant summary judgment.

8         As to Mimms, we echo their -- he's unreliable.  He

9  basically, in effect, said, "I'm picking a reference period based

10  upon the representations of GPS;" did no independent analysis

11  whatsoever other than saying, "Yeah, I think it looks good," and

12  then projected with no analysis that this would continue, despite

13  information and documents that show that even GPS believed that

14  -- that they would not -- that their market wouldn't continue at

15  those levels.  The unreliability of his -- of his opinion would

16  require striking him and his testimony.

17         Thank you, Your Honor.

18         MR. MASSO:  EnVerid made their pitch to get out.  I'm

19  going to make a pitch on behalf of D Zine.

20         The theories against D Zine in the Plaintiff's most

21  recent ---

22         THE COURT:  Is it incorporated?

23         MR. MASSO:  It is an LLC.  It is D Zine Partners, LLC.

24         THE COURT:  And who are the partners?

25         MR. MASSO:  I don't -- I know that Dr. Zaatari and

 1  Mr. Studer who is here with us today.

 2          As best we can discern from Plaintiff's most recent

 3  Complaint, the only theory asserted against D Zine was

 4  conspiracy.  They are mentioned in the conspiracy section of the

 5  Complaint.  They're not mentioned with any significance anyplace

 6  else.

 7          We moved for summary judgment on Plaintiff's conspiracy

 8  theory against D Zine.  In response, they said they weren't

 9  asserting conspiracy.  They were only asserting agency.  The

10  problem with that, Your Honor, is they don't assert agency

11  against D Zine.  They don't assert that Dr. Zaatari is an agent

12  of D Zine anywhere in their Complaint.  They do assert, of

13  course, that Dr. Zaatari is an agent of enVerid.  They make that

14  very clear and make very specific allegations in support of that

15  claim, but they don't say anything about Dr. Zaatari being an

16  agent of D Zine.  In fact, they almost make it the other way

17  around.  They refer to D Zine being an instrumentality of

18  Dr. Zaatari that she uses.

19          We don't believe there's any pleadings at this point

20  that would support liability against D Zine.  They've conceded

21  conspiracy, they're not going to pursue.  So I don't believe

22  there's any reason D Zine should remain in the case.

23          THE COURT:  All right.  Thank you.

24          Oh, I think Mr. Shields -- They have a couple of

25  minutes left.

```
 1                    MR. MUCKENFUSS:  Oh, I'm sorry.  Apologies, sir.

 2                    MR. JAMES SHIELDS:  No advocacy, Judge.  Just one ---

 3                    THE COURT:  Country lawyer.

 4                    MR. JAMES SHIELDS:  Just country lawyer.  You're going

 5     to remember that.

 6                    THE COURT:  Yeah, I will.  It's not the first time I've

 7     heard that, though.

 8                    MR. JAMES SHIELDS:  Oh.  It's a little unique.  I

 9     mentioned that last week to somebody and they just -- I'm not

10     going to tell you what they said on the record, but it, you know,

11     it started with a "b" and ended with an "s" and gave me a hard

12     time about it.

13                    Anyway, case management.  We would like confirmation

14     that the June 15th Order requiring studies, data, summaries, test

15     results, reports from all labs be complied with.

16                    The level of -- Number two, the level of redaction of

17     communications which came in after the ---

18                    THE COURT:  Have you filed a motion on that?

19                    MR. JAMES SHIELDS:  We have.

20                    THE COURT:  You filed a motion that the redactions are

21     excessive?

22                    MR. DAVID SHIELDS:  Yes, Your Honor.

23                    MR. JAMES SHIELDS:  We did.  It was scheduled before

24     Judge -- Magistrate Ramirez and I think it -- and she denied it

25     but without no hearing, in anticipation of this hearing, because
```

1    she didn't know what was going to happen with the trial setting.

2            THE COURT:  Okay.

3            MR. JAMES SHIELDS:  And so that's a -- that's a

4    material issue.  And then I can't tell the Court right now that

5    if there are more lab results that come as a result of the Court

6    requiring GPS to certify under oath that it's complied and all

7    that, all the conversation we've already talked about, which I've

8    never heard of, by the way, Judge, but I fully support, of

9    course, I don't know yet if we need one deposition or two or

10   three or five.  I can't tell the Court that absent receiving

11   those unredacted documents, you know, receiving any additional

12   test results and then having the Court's ruling.  So really it's

13   a question, Judge, more than anything else, those three issues.

14           I rarely do this but I'm going to do it today.  Do you

15   have like a schedule of when you think -- We're going to submit

16   this ten pages within a week.  Can we expect rulings from the

17   Court in the next 30 days so that we can then ---

18           THE COURT:  Good try.

19           MR. JAMES SHIELDS:  I'm trying, Judge.  I'm tap

20   dancing.  Okay?

21           THE COURT:  Even though I can't see your feet.

22           MR. JAMES SHIELDS:  I know.  I'll come over here so you

23   can hear me tap dance.

24           THE COURT:  I'll do the best I can.

25           MR. JAMES SHIELDS:  Okay.  So that -- that -- So it's

1   purely a case management issue on those three items, the June

2   15th -- compliance with the June 15th Order, unredacted e-mails

3   because there's no log or anything, and then some guidance on

4   perhaps additional discovery that we may need in advance of April

5   3rd.

6          Thank you.  That's all I have.

7          THE COURT:  All right.  Now you have it,

8   Mr. Muckenfuss.  Thank you.

9          MR. MUCKENFUSS:  Thank you, Your Honor.  I've got a

10  country lawyer in Condon Tobin.  I think I need some kind of --

11  some brand on my part.

12         THE COURT:  Why here comes that hick, Mr. Muckenfuss.

13         MR. MUCKENFUSS:  Yeah.  And that's McGuireWoods, I

14  guess, whatever that means.

15         So, Your Honor, just ---

16         THE COURT:  You're not Sullivan Cromwell.

17         MR. MUCKENFUSS:  No, we're not Sullivan Cromwell.

18  That's true.

19         So I will split my time with Ms. Wheatley who will also

20  address the Court.  I wanted to just go back, Your Honor.  You

21  had asked some questions of me at the beginning around causation.

22  I did want to refer the Court to some specific citations to help

23  the Court.

24         THE COURT:  All right.

25         MR. MUCKENFUSS:  Mr. Brinckman -- This is at Appendix

1   97.

2          Mr. Brinckman testified, "So GPS signed, as the letter

3   states, a Memorandum of Understanding to join together in a

4   business venture to supply GPS products to various entities of

5   Carrier.  And they call it Carrier Commercial Services.  We were

6   on the way.  We were developing product for them, testing.  They

7   received a copy of the Open Letter penned by Ms. Zaatari, and

8   they subsequently, after review, decided to cancel the agreement

9   with GPS."

10          So that is at Appendix 97, Mr. Brinckman's deposition.

11          So, Your Honor, that -- you had asked me some

12   questions.  I may not have been as precise.  That is evidence

13   from Mr. Brinckman testifying that Carrier received the Open

14   Letter from Ms. Zaatari and then decided to cancel the agreement

15   with GPS.

16          THE COURT:  Okay.  Now I know you're not conceding that

17   the Court's expressions of concern about the hearsay rule are

18   correct.  But if they are correct, it's, I think, clear that that

19   statement is the product of a hearsay conversation.

20          MR. MUCKENFUSS:  Yes, Your Honor.

21          THE COURT:  I mean if he had said, "I had a conference

22   with them.  While we were in the conference room, an assistant

23   brought in a letter and they opened it in my presence," then he

24   would have direct personal knowledge that they had received the

25   letter.  I'm presuming that they told him they had received it.

1          MR. MUCKENFUSS:  I understand -- I understand the

2     Court's point about that.

3          THE COURT:  Okay.

4          MR. MUCKENFUSS:  But not to ---

5          THE COURT:  No, I understand you're arguing it doesn't

6     matter.

7          MR. MUCKENFUSS:  Yes.  And Ms. Wheatley maybe stated it

8     better than I did, but, obviously, the -- it's -- 8033 would

9     cover the hearsay exception.  I know we cited Your Honor's case

10    in the Fifth Circuit.  We cite a Third Circuit case, the same

11    kind of case, quoting, "Statements of a customer as to his

12    reasons for not dealing with a supplier are admissible for this

13    limited purpose."

14          So those statements, if made to Mr. Brinckman,

15    Mr. Boyd, would be admissible under 8033 for that limited

16    purpose.

17          THE COURT:  What limited purpose?

18          MR. MUCKENFUSS:  For the limited purpose, "i.e., the

19    purpose of proving customer motive."

20          THE COURT:  Okay.

21          MR. MUCKENFUSS:  And that was a quote from that case.

22          THE COURT:  Okay.

23          MR. MUCKENFUSS:  So in this case, it would the motive

24    as to why they were canceling or not going to do business with

25    GPS.  And, obviously, the Fifth Circuit case that Ms. Wheatley

1    quoted, the *Morris Jewelers* case as well is cited, Page 46,

2    Footnote 2 of our brief.

3          Your Honor, I would also -- Your Honor had invited me

4    to provide appendix cites on the agency conspiracy claim.  I

5    would -- I would like to do that.  I'll just read the appendix

6    cites.  I'm happy -- I will summarize this evidence but, again,

7    there are -- The record is replete with e-mails with enVerid.

8    Specifically Mr. Weeks and Dr. Zaatari have direct communications

9    about what she is doing in terms of her efforts to publicize and

10   publish statements about ionization and GPS.

11         For example, this is Appendix 508, an e-mail from

12   Dr. Zaatari.  It's at her gmail account to Christian Weeks at his

13   enVerid account.  She is sending him links about a fundraising

14   campaign to test a GPS device and provides a press release

15   relating to testing of a GPS device.  That's at Appendix 508.

16         Appendix 504 are further e-mails of Mr. Weeks relating

17   to Dr. Zaatari's efforts, and there are references to

18   Dr. Zaatari's public statements and links to her Open Letter that

19   are in -- in that e-mail.

20         Appendix 506 -- I'm sorry.

21         Appendix 564, enVerid, when Dr. Zaatari posted one of

22   her most damaging tweets reputationally which was referred to as

23   the "tobacco tweet," enVerid liked the tweet on their own social

24   media platform, and Heather Robb testified to that.  She admitted

25   and agreed that they had liked Dr. Zaatari's tweet.  And that's

 1    at Appendix 564.

 2              THE COURT:  What is that --

 3              MR. MUCKENFUSS:  I'm sorry?

 4              THE COURT:  What do you argue that that shows?

 5              MR. MUCKENFUSS:  Well, again, it's -- it's the

 6    combination from a conspiracy standpoint.  It's the overt acts

 7    and the combination of enVerid and Dr. Zaatari and her efforts to

 8    publicize -- I mean it's not the only evidence, obviously, but

 9    it's part of a list of e-mails and other acts by enVerid to join

10    with Dr. Zaatari and her acts to publicize the -- the attacks on

11    -- for the common purpose of attacking GPS.  And, again, I had --

12    I had cited to the e-mails that -- of Mr. Weeks where he talks

13    about enVerid wants to attack GPS.  I reference the -- the e-mail

14    where he talks about -- and he talks to Dr. Zaatari about this,

15    about coming out and saying that GPS' technology produces harmful

16    by-products.  That's an e-mail from Christian Weeks.  That is not

17    solely a Dr. Zaatari e-mail.

18              THE COURT:  What's the -- What's the reference to that?

19              MR. MUCKENFUSS:  We're getting it now.

20              THE COURT:  That's all right.  Whoever finds that can

21    just stand up and give me the number.

22              MR. MUCKENFUSS:  Thank you, Your Honor.

23              Appendix 510 is an e-mail where Christian Weeks

24    forwards an e-mail from Heather Robb.  So Heather Robb has an

25    internal enVerid e-mail where they are talking about their plan

1    in terms of the public statements and some of the media

2    statements about ---

3              THE COURT:  Yeah.  That's what I was looking at before.

4              MR. MUCKENFUSS:  Yeah, that was the one before.  And

5    Christian Weeks forwards that to Dr. Zaatari.

6              There is Appendix 315 through 317.  These are e-mails

7    again.  These are Christian Weeks' e-mails internally in terms of

8    the plan that they have to publicize attacks and to specifically

9    attack bipolar ionization in GPS' products.

10             THE COURT:  Okay.  So this happens all the time.  The

11   key document that I'm supposed to be looking at is not actually

12   here.  This could be -- Did we copy these or ---

13             LAW CLERK LAURA:  Yes.

14             THE COURT:  So we may have missed it.  I go from 299 to

15   322.  So just make a note, better go back, and I'm assuming

16   that's our error.

17             So go ahead, counsel.

18             MR. MUCKENFUSS:  And then in our supplemental briefing,

19   Your Honor, we'll list -- we can list the specific cites as well.

20             But just in terms of the conspiracy agency claim,

21   Your Honor, there again, the basic evidence in this case and the

22   clear evidence is that Dr. Zaatari's working and getting paid by

23   enVerid, and there are timesheets that Dr. Zaatari had as well.

24   Part of her efforts within ASHRAE were specific to what enVerid

25   was asking her to do which was to actually make -- make things

 1    more difficult for -- for GPS and ionization.  That was what

 2    enVerid was directing her to do.  That's what enVerid asked her

 3    to do, and that's what the e-mails show.  So they certainly had a

 4    common agreement, a common design to specifically attack GPS and

 5    ionization, and they did that with false statements about GPS'

 6    products and technology.

 7         The one thing I want to also point out, Your Honor,

 8    with regard to the conspiracy evidence, obviously, all of the

 9    conspiracy evidence:  My client wasn't aware of this when it was

10    happening, of course.  All of the evidence was produced by the

11    Defendants in this case.  So certainly when -- when, for example,

12    Mr. Boyle was asked, "Were you aware of the conspiracy at the

13    time?"

14         "I, obviously, wouldn't be aware of the conspiracy at

15    the time," as that was hidden from GPS, but I just wanted to know

16    that all of the evidence that supports the conspiracy claim

17    certainly are derived from the documents that are produced by the

18    Defendants in this case.

19         I want to address the comment about the list of

20    customers in Mr. Boyd's affidavit.  There was a comment that the

21    Defendants were not provided with a list or some identification

22    of these customers.  I think counsel was careful to say it wasn't

23    in the disclosures, but in point in fact, we produced a summary

24    list of what we contend were all of the lost customers as a

25    result of Dr. Zaatari's statements.  We provided that list to the

1    Defendants prior to Mr. Brinckman's deposition, his 30(b)(6)

2    deposition.  That list -- They actually asked Mr. Brinckman many

3    questions about that list in his deposition.  So it's not true

4    that these lists of customers that we contend we lost -- and it's

5    a long list.  I mean it was probably just, you know, 40 or so or

6    more or 50 customers on this list that we contend were lost as a

7    result of these.  So to -- It is -- It's not accurate to say that

8    they weren't aware of the list, the identity of customers that we

9    contend were lost, as they questioned Mr. Brinckman about that.

10           The other thing I would note, Mr. Boyd's -- This --

11   Again, there was a comment about double hearsay within

12   Mr. Boyd's.  In Paragraph 9 of his affidavit, he directly states,

13   "I started hearing from GPS' customers expressing concern and

14   asking questions about these statements."

15           So in Paragraph 9 of his affidavit, he states in early

16   2021 he heard directly from GPS' customers about Dr. Zaatari's

17   statements.  So it is not -- He's very clear.  He's not vague in

18   terms of hearing those from the customers.  In Paragraph 11 he

19   lists the customers and he lists the specific names of people at

20   these customers that he talked to.  So this -- There is a

21   reference to his affidavit being vague and unclear.  That is --

22   That is not true.

23           In Paragraph 11 he states, "Representatives of other

24   customers and potential customers spoke with me by phone and

25   indicated that they could not do business with GPS following

1    Zaatari's negative statements."

2             So I think his affidavit, you know, putting aside,

3    Your Honor, the hearsay discussion we had, we, obviously, believe

4    these are not -- this falls within the exception of the hearsay

5    rule, but those are direct statements by customers to Mr. Boyd

6    stating that they had reviewed and, you know, decided not to do

7    business with GPS because of Zaatari -- Dr. Zaatari's statements.

8             Just very quickly on Mr. Mimms.

9             We are not certainly going to put Mr. Mimms up as to

10   causation.  I believe Mr. Mimms testified in his deposition that

11   he was not opining as to causation.  I think we cited a lot of

12   cases in the brief.  I won't go through those.

13            The expert's entitled to assume liability or to assume

14   causation which he does for the purposes of his calculations, but

15   he is not going to opine certainly independently as to causation.

16   So that -- I don't believe that's a valid reason for striking

17   Mr. Mimms.  His testimony is valid in terms of his analysis and

18   review of the financial statements and to the chronology of what

19   happened to GPS after these statements came out from Dr. Zaatari.

20            I believe, Your Honor, those are the comments I had.

21   I'll turn it over to Ms. Wheatley.

22            THE COURT:  Okay.  While Ms. Wheatley is coming up

23   there, let me make a couple of comments.

24            The motion to exclude Dr. Zaatari from making

25   statements that might be considered in the nature of expert

 1    testimony is denied.

 2         I want to make sure you all understand:  It is not my

 3    practice to, quote, "certify," closed quote, an expert.  So if

 4    you all say, "I tender Dr. Zaatari," or anyone else as an expert

 5    and expect me to say something to the jury about them, I won't.

 6    So I'm not granting that motion.  That motion will be denied.

 7         It -- Clearly her expertise goes to the issue of

 8    malice, if nothing else.  So I'm not granting that motion.  That

 9    motion will be denied.  But I want to make sure, since you're

10    talking about experts, I don't certify them.

11         MR. MUCKENFUSS:  That was sort of -- That was our

12    concern in terms of the -- right, the Court's comment as to her,

13    but I understand the Court's ruling.

14         THE COURT:  Yeah.  I'm not -- I'm not granting that

15    motion.

16         MR. MUCKENFUSS:  Thank you, Your Honor.

17         THE COURT:  And along the same lines of -- I'm not

18    granting the motion not to allow Ms. Lee.  I can't remember if

19    it's Dr. Lee.  Those issues that you raise about her in the

20    Court's view go to weight.  So that motion is also going to be

21    denied.

22         All right.  Okay.  Ms. Wheatley?

23         MS. WHEATLEY:  Just a few points.  Opposing counsel

24    raised the issue of proximate causation as the standard for a

25    Lanham Act claim.  That is not an element of a Lanham Act false

1   advertising claim.  It's not one of the elements that Defendants

2   recited in their briefs.  It is not in the statute.  In fact,

3   there's only that it is likely to cause harm.

4        And I would point out that there is an important

5   distinction here.  Defendant -- Neither Defendant moved to strike

6   GPS' false advertising damages claim.  They made statements on --

7   They made arguments on causation which I had discussed were --

8   were not relevant to the Lanham Act claim, but they didn't move

9   to strike the damages claims.  So that issue was not actually

10  before the Court in the briefing.  So the kind of issue of the

11  link GPS has to show to get damages was -- was simply not there.

12  And, of course, you can go to trial with no damages.  Now we feel

13  like we have very good evidence that we've been extremely

14  damaged, but I did want to raise that in sort of the scope of the

15  summary judgment hearing what we were responding to with respect

16  to those particular claims.

17        The other point I did want to raise with respect to

18  what can go to the jury on causation and injury with respect to a

19  Lanham Act claim, the *Eastman Chemical* case, the district court

20  decision in 969 F.Supp 2d 756, and then it was affirmed by the

21  Fifth Circuit, is similar to this case in a number of respects.

22  And I would direct the Court to what that case said about how the

23  jury could rightfully find that the Plaintiff was injured by the

24  statements, and it talked about testimony about estranged

25  relationships with customers.  It talked about a customer falling

1   from the No. 1 customer to off the list of "Top Ten Customers."

2   It talked about evidence that these statements had been

3   communicated to customers, and it talks about evidence that the

4   statements had been widely disseminated.  I'll touch briefly --

5   And so we think that in our summary judgment briefing, we've put

6   forward all of those things, and those facts certainly should go

7   to a jury on the issue of damages.

8           We've also put forward a corrective advertising number

9   that is in Mimms' report that also goes to the issue of damages.

10  That is a particular type of damages to the Lanham Act claim.

11          I also want to briefly touch upon whether this is

12  commercial advertising.

13          Mr. Muckenfuss went through the great deal of

14  communication between Zaatari and the marketing employees or

15  consultants at enVerid and how they encouraged her to make these

16  statements.  And that in -- Certainly in this industry, how you

17  advertise your products is -- Social media, of course, is a major

18  way of advertising.  You give presentations.  We have evidence

19  that Dr. Zaatari gave presentations or she specifically talked

20  about GPS and made claims about GPS.  The March DOE presentation

21  has a number of slides directly on GPS which make very

22  unequivocal factual statements about GPS.

23          So in the same presentation, it touts filtration and

24  the type of products that enVerid and D Zine sell, and the

25  presentation also lists D Zine as in the title page of the

1    presentation.  So there was some discussion of that link to

2    D Zine.  That would just be one example.

3            Also, it would be the fact that D Zine's website links

4    to Dr. Zaatari's Twitter feed.  So if you go to the website and

5    you click on the Twitter button, it doesn't go to a D Zine page.

6    It goes to Dr. Zaatari's page that has been at issue throughout

7    this case.  So we would point that out as another example of this

8    link here amongst the parties.

9            I'd like to just briefly respond to -- I'm very sorry.

10   I can't remember everyone's names but opposing counsel's comments

11   on the continuance.

12           We don't think there is any grounds here to reopen

13   discovery.  Frankly, the fact that he wasn't clear if it was one

14   deposition or several depositions, you know, we don't think that

15   is the way to -- Part of the issue here is that there are so many

16   motions.

17           THE COURT:  Well, let me short-circuit this.  You all

18   will confer, assuming the case is reset for April 3rd, about

19   additional requests for discovery, and you'll advise me within a

20   week if there remains a dispute about that.  And if there is,

21   Judge -- I will refer that to Judge Ramirez because she's got

22   more information about what's already happened than I do.

23           MS. WHEATLEY:  Thank you, Your Honor.  So confer and

24   advise you within one week as to whether there are further

25   discovery disputes.

1          THE COURT:  Yes.

2          MS. WHEATLEY:  Understood.  And actually that does

3    bring me to a few housekeeping.

4          THE COURT:  Sure.

5          MS. WHEATLEY:  My team asked me very fervently to

6    confirm the November 14th deadline for all the objections to the

7    pretrial filings since -- Should we consider that off?

8          THE COURT:  Yes.  That would be like me cracking the

9    whip and asking the lions to get all up on the chairs and then

10   there will be no circus.

11         MS. WHEATLEY:  That's fair enough, Your Honor.  We

12   really appreciate that.

13         THE COURT:  No.  I'll back the -- I'll back the

14   deadlines off.  The trial date, we're going to wait to see what

15   the absent fiancée says about a trial date before I set it.  But

16   once -- If I set it for then, I will give you the other dates

17   that go with it.

18         MS. WHEATLEY:  One more housekeeping that I just want

19   to make sure.

20         THE COURT:  The pretrial that is scheduled is not going

21   to happen.

22         MS. WHEATLEY:  The ten-page supplement, is that also

23   one week?  I just don't think we caught the deadline for that.

24         THE COURT:  I would say a week from Monday.

25         MS. WHEATLEY:  A week from Monday, okay.

1          THE COURT:  Let me make sure I have not put you at

2     Thanksgiving.  Working on Thanksgiving, that is not my intention.

3          MR. DAVID SHIELDS:  That should be the 21st,

4     Your Honor, if I take your meaning to be two weeks from

5     yesterday.

6          THE COURT:  Yes.  That's just before Thanksgiving.  So

7     does that seem -- If you all think that's too harsh a deadline,

8     let me know.  Is that ---

9          MS. WHEATLEY:  I have no objection to that.

10          THE COURT:  Okay.

11          MR. DAVID SHIELDS:  We're good with it, Your Honor.

12          THE COURT:  November 21st.

13          MS. WHEATLEY:  And one final comment I wanted to make

14     on Mr. Mimms' report and, again, this is from the Lanham Act

15     perspective.  As a -- As a damages expert, he is not required to

16     opine on causation.  As we've discussed, that's an element of

17     some claims.  It's not an element of others.  However, he can

18     testify as to the amount of damages and as to whether there are

19     intervening causes that go into that amount.  And that's

20     certainly something that's subject to Cross Examination and

21     further proof.  But for that reason, we think that his report ---

22          THE COURT:  That's true.  But if he -- I'm not saying

23     this is the fact.  But if -- Is it Mister or Dr. Mimms?

24     Mr. Mimms, I think.

25          MS. WHEATLEY:  I believe it's Mr. Mimms.

1    THE COURT:  So if Mr. Mimms was asked the question, "So

2    did you consider the fact that there were vaccines that were

3    being developed during this period of the Spring of 2021?  Did

4    you consider that at all?"  And he says, "No, I didn't."  That is

5    potentially a basis for the Court to exclude him because he -- he

6    has to exclude from his analysis other reasonable causes.  There

7    are plenty of Fifth Circuit cases on that.  It's not just an

8    issue of weight and argument.  So I'm going to need to consider

9    this issue in light of that.  He certainly can assume causation,

10   but he has to address something that is quite clear, relevant.

11   And in this case, this issue is relevant as evidenced by GPS' own

12   documents.

13           MS. WHEATLEY:  Your Honor, I agree.  And I do think on

14   that point Mr. Mimms discussed how there was both omicron --

15   There was a second wave of COVID --

16           THE COURT:  Sure.

17           MS. WHEATLEY:  -- that increased demands sharply, and

18   there was -- there was also a second wave of federal funding

19   which also impacted demand.  And I don't believe he did say that

20   vaccines had no impact.

21           THE COURT:  No, no.  I wasn't suggesting he was saying

22   that.  I was just giving that as an example.

23           MS. WHEATLEY:  But, yes, I -- I agree that goes into

24   the validity of his opinion if it is such an obvious cause that

25   it was not considered.

1          THE COURT:  But he's not going to be able -- I mean

2    just to cut to the chase, and I don't think you're arguing

3    otherwise, he's not going to be able to testify about causation.

4    He -- To the extent I permit him to testify, he will be assuming

5    causation.

6          MS. WHEATLEY:  Correct, Your Honor.

7          THE COURT:  "So assuming that the reason that sales

8    dropped was because of all the Zaatari tweets and the Open

9    Letter, what are the damages that GPS suffered?"

10         "Eight hundred gazillion dollars."

11         "And what is the basis for that?"

12         And then he'll explain that.  That -- That's

13   appropriate testimony.  He can't testify that there is causation

14   but he can assume causation.  Now whether he properly excluded

15   other things that he needed to at least consider, I'm not holding

16   how I'm going to rule on that now.

17         MS. WHEATLEY:  Yes, Your Honor.  I believe that

18   completes the things I was going to discuss.  I just want to make

19   sure no one on my team -- So I believe I can step down.

20         THE COURT:  Okay.  All right.  All right, very good.

21         Okay.  We're going to go off the record for a moment.

22         (A discussion was held between the Court and counsel

23   off the record.)

24         THE COURT:  All right.  Anything else?

25         MR. MASSO:  I just wanted to make sure the ten-page

 1    supplement is argument only, not additional evidence.

 2           THE COURT:  Correct.  No additional evidence will be

 3    received.  You can point to evidence in the record but you cannot

 4    present any new evidence.  And, you know, if you all confer and

 5    one of you has 12 pages and you want to get a two-page -- I'm not

 6    going to go crazy on a short bump up, but when I say that,

 7    sometimes lawyers think, "Oh, it's fine, 50 pages."  No.  Ten

 8    pages, give or take, but you have to agree among yourselves if

 9    you're going beyond it because I'm not giving one side an

10    extension and not the other.

11           MR. MASSO:  Your Honor, something of interest for us

12    is -- and, you know, we will stick to 10 pages.  We will not have

13    leakage into 11 or 12, but is that 10 pages for Mr. Tobin and

14    Mr. Reed and ten pages for Dr. Zaatari?

15           THE COURT:  No.  Ten pages, Defendants all together.

16    You don't have to, you know -- I mean the main issue that enVerid

17    is raising is the issue of lack of evidence of conspiracy and one

18    retweet, and I know that.  So you don't need to write me that

19    telling me that.  This is for something that was triggered here

20    that you feel the need to clarify, not repeat.  I think I've

21    probably demonstrated that I've read your papers.  So I don't

22    need to get hit with a sledge hammer.  I'm mainly looking for

23    something subtle that, on reflection, we didn't get to today, not

24    telling me for the hundredth time what you've already told me.

25           MR. HIGGINS:  Judge, do you have a preliminary ruling

1   on the striking of Max Sherman?

2           THE COURT:  No.  If I did, I would have told you that.

3           MR. HIGGINS:  All right.  Thank you.

4           MR. MUCKENFUSS:  Thank you, Your Honor.

5           MR. MASSO:  Thank you, Your Honor.

6           THE COURT:  Okay.  All right.  Thank you.

7           COURT SECURITY OFFICER:  All rise.

8           (Hearing adjourned at 12:05 PM.)

<u>CERTIFICATE OF OFFICIAL REPORTER</u>


I, Deborah A. Kriegshauser, Federal Official Realtime Court Reporter, in and for the United States District Court for the Northern District of Texas, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 10th day of November, 2022.


/s/ Deborah A. Kriegshauser
_____
DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER